UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

| | |
|---|---|
| **Sherice Sargent**, et al., | |
| Plaintiffs, | |
| v. | Case No. 2:22-cv-01509-CFK |
| **The School District of Philadelphia**, et al., | |
| Defendants. | |

## MOTION FOR PRELIMINARY INJUNCTION

The plaintiffs respectfully move to enjoin the defendants from implementing their changes to the selection standards for the city's magnet schools. *See* Fed. R. Civ. P. 65(a). The plaintiffs are likely to succeed on their claims that the defendants enacted these changes for the illegal and unconstitutional purpose of achieving racial balancing at the city's elite magnet schools, by reducing Asian and white enrollments at schools such as Masterman and Carver, while simultaneously reducing black enrollment at schools such as Carver and Parkway. The plaintiffs are also likely to succeed on their claim that the change in admissions policies lacks a rational relation to a legitimate state interest, as racial balancing is not a legitimate state interest,[1] and the arbitrary admissions preferences conferred on the residents of six chosen zip codes in North Philadelphia is unsupportable even under rational-basis review.

The plaintiffs will suffer irreparable harm absent a preliminary injunction from this Court. Their children are suffering grievous and irreparable harms from the school district's decision to replace merits-based admissions with a lottery-with-zip-

---

1. *See Grutter v. Bollinger*, 539 U.S. 306 (2003) ("[O]utright racial balancing . . . is patently unconstitutional.").

code-preferences system, and the public interest is harmed by the lowering of academic standards at the city's elite magnet schools. And any harms that might befall other individuals from an injunction are more than outweighed by the patent illegality of the defendants' actions, the indisputable irreparable harms that will affect the plaintiffs and their children, and the harms to the public interest from the erosion of academic standards.

### FACTS CONCERNING THE SCHOOL DISTRICT'S MAGNET SCHOOLS[2]

The School District of Philadelphia maintains a system of public high schools. The city's public high schools fall into one of three categories: (1) neighborhood high schools, also known as "catchment" schools; (2) citywide admissions high schools; and (3) special-admission or criteria-based high schools, also known as "magnet" schools. *See* Exs. 3–4.

Neighborhood or catchment high schools are open to students living within certain defined geographical neighborhood boundaries. *See id*. Citywide admissions high schools accept student from across the city. These schools do not use merit-based admission criteria, and admission to a citywide school is based on the submission of an application and the outcome of a computerized lottery. Admission to these schools is subject to space availability. *See id*.

Special-admission or criteria-based high schools (also called magnet schools), like city admissions schools, do not have an attendance boundary and students must apply for admission. Admission to these criteria-based or "magnet" schools had traditionally

---

2.  The parties are preparing a set of stipulated facts for the Court, but they had not yet agreed on the final stipulation at the time this motion was filed. The motion will instead cite sworn declarations and documents whose authenticity is undisputed, and the plaintiffs may decide to file an amended motion that cites the stipulation after the parties agree upon the stipulated facts.

been determined by "competitive entrance requirements related to attendance, punctuality, behavior, grades, and standardized test scores,"[3] until the school district decided to change the selection process in 2021. The school district has described these criteria-based high schools as those "which offer a rigorous, enriched curriculum that may concentrate on a particular discipline or area of study, such as mathematics, natural sciences, engineering, humanities; social sciences, or fine and performing arts." Ex. 4.

In the spring of 2021, the school district's Board of Education approved a policy document entitled "Board of Education Goals & Guardrails." Ex. 5. The Goals & Guardrails document includes a section entitled "Addressing Racist Practices," which announces that "our students' potential will not be limited by practices that perpetuate systemic racism and hinder student achievement." *Id*. at 4. The Goals & Guardrails document states:

> Among 8th grade students who are qualified to attend Special Admission High schools, the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress towards being proportional to population as a whole) by August 2026.

*Id*. at 4. The Goals & Guardrails document also states:

> The percentage of suspensions received by Black/African American students will decrease from 72.6% in August 2020 to no more than 48.3% (proportional to population as a whole) by August 2026.

*Id*.

Later in 2021, after approving this "Goals & Guardrails" document, the school district decided to change the standards for admission to its criteria-based schools, starting with the 2022–2023 school year. *Compare* High School Directory 2022 Ad-

---

3.   Ex. 4.

missions (attached as Exhibit 2) with High School Directory 2021 Admissions (attached as Exhibit 1). The school district changed the admissions process for its criteria-based schools by: (a) eliminating the Pennsylvania System of School Assessment (PSSA) test as a criterion for admission; (b) eliminating letters of recommendation and interviews as criteria for admission; and (c) requiring applicants to sit for a 90-minute essay exam, which is administered and scored by a computer program called MI Write. Only students whose computerized essay score equals or exceeds 22 out of 30 would be eligible for admission to Masterman and Central,[4] and only students with essay scores at 17 or above would be eligible for admission to Carver, Parkway, and Palumbo. The school district further changed its admission practices by instructing criteria-based schools to admit students by lottery if they satisfied the minimum grade cut-offs (As and Bs) and minimum essay-score cut-offs (17 or 22), rather than allowing principals to select the best qualified students from among the applicant pool, as had been done previously.

Finally, the school district changed its admission practices by requiring students residing in six specified zip codes—19121, 19132, 19133, 19134, 19135, and 19140—to receive preferences in the lotteries for admission to Masterman, Central, Carver, Parkway, and Palumbo. *See* Ex. 2, page 4 ("Zip code preference will be applied at select criteria-based schools for students who meet the minimum qualifications"). Based on 2020 census data, the racial makeup of these six preferred zip codes is as follows:[5]

---

4. The school district later decided to lower to cut-off score for admission to Masterman and Carver from 21.5. *See* Meyer Decl. ¶ 6 (attached as Exhibit 15).
5. The term "white" in the chart refers to non-Hispanic whites, and the term "black" refers to non-Hispanic blacks. The data were obtained from data.census.gov. *See* Mitchell Decl. ¶ 4 (attached as Exhibit 16).

|  | Black | Hispanic | White | Asian |
|---|---|---|---|---|
| 19121 | 72.2% | 6.5% | 15.4% | 3.5% |
| 19132 | 91.9% | 3.2% | 2.5% | 1.15% |
| 19133 | 36.7% | 57.7% | 3.6% | 3.5% |
| 19134 | 13.4% | 51.3% | 30.3% | 1.6% |
| 19135 | 20.9% | 24.2% | 44.7% | 5.7% |
| 19140 | 50.1% | 42.2% | 4.3% | 1.7% |
| overall student body in school district of Phila | 47% | 23% | 15% | 10% |

Five of six the preferred zips codes are located in North Philadelphia, and the remaining zip code (19135) is located in the northeast.[6] No zip codes from South Philadelphia, Southwest Philadelphia, or West Philadelphia appear on the preferred zip-code list, even though many pockets of these communities are impoverished and overwhelmingly populated by minorities. The school district has never explained why it decided to give the residents of these six zip codes preference in the lottery-admission system, or why it decided to exclude the zip codes that do not appear on its preferred zip-code list. The school district has, however, admitted that the overall package of changes to the admissions process was made "in alignment with our commitment toward antiracism and equity, as outlined in the Board of Education's Goals and Guardrails." Ex. 2.

Each of the five magnet schools affected by the new lottery-with-zip-code-preference system already had a majority-minority enrollment before the school district's changes to the selection process, and each of them had a critical mass of black, Hispanic, and Asian students. The current racial enrollment at Masterman, Central, Carver, Parkway, and Palumbo is as follows:

---

6.   Maps of Philadelphia that highlight the territory of these preferred zip codes are attached as Exhibits 7–12 to this motion.

| Ethnicity | Asian | Black/African American | Hispanic/Latino | Multi Racial | White |
|---|---|---|---|---|---|
| Academy at Palumbo | 34% | 37% | 10% | 3% | 15% |
| Carver High School of Engineering and Science | 13% | 63% | 9% | 6% | 8% |
| Central | 39% | 18% | 8% | 5% | 30% |
| Masterman | 27% | 15% | 6% | 10% | 43% |
| Parkway Center City Middle College | 7% | 70% | 17% | 4% | 2% |
| Philadelphia School District | 10% | 47% | 23% | 5% | 15% |

Table: DOMINIQUE DeMOE / Staff Artist • Source: School District of Philadelphia

As can seen from the chart, at least two of the school district's elite magnet schools (Carver and Parkway) have a black enrollment that far exceeds the black population of the school district as a whole. And while black and Hispanic student enrollment at Masterman and Central falls below the percentages that appear in the overall student body of the school district, it still constitutes a "critical mass" under *Grutter v. Bollinger*, 539 U.S. 306, 329–36 (2003).

On December 15, 2021, the City Council of Philadelphia, Committee on Education held a hearing on the school district's plans to change the admissions process for its criteria-based schools. *See* Exhibit 6. Parents, members of the city council, and members of the community spoke overwhelmingly against the changes and blasted the school district for the lack of transparency in the way the new selection criteria were imposed. Councilmember David Oh was nonplussed at the zip-code preferences:

> [T]here were no zip codes in West Philadelphia, no zip codes in Southwest Philadelphia, no zip codes in South Philadelphia, no zip codes in most parts of Philadelphia that represent underserved communities. So it was unclear to me at that time what the basis of all of this was.

Ex. 6 at 8–9. Councilmember Oh also criticized the school district for announcing these changes immediately before the application process began:

> [T]his was announced the day before a seven-week window open for applications to these criteria-based admissions schools. And people were reeling from the fact that an entirely new process had been put in without their knowledge, without their opportunity to discuss or to have experts weigh in on it and that it was already implemented.

*Id.* at 9. Councilwoman Helen Gym was equally critical of the school district for springing these changes shortly before the application process opened and for keeping parents in the dark about it:

> [I]n terms of process, announcing a brand new high school selections process on the day that high school selection effectively with almost no information going to parents is irresponsible. It created chaos and uncertainty, fear and suspicion. That is the wrong approach towards any school system, towards its students, towards its parents and towards its educators and towards our City.

*Id.* at 14. She also criticized the idea of using computer-scored essays to determine eligibility for admission. *See id.* at 16 ("It is shocking to me that a computer would read and review essays for applications to a school. . . . [A]lgorithms, removing human judgment are no way a form of equity."). Councilmember Jamie Gauthier criticized the zip-code preferences as overly blunt and insufficiently calibrated. *Id.* at 19–20.

State Representative Donna Bullock, who chairs the Pennsylvania Legislative Black Caucus, appeared at the hearing and sharply criticized the process by which the school district implemented these new admission policies:

> The School District's development and implementation of the new admissions process is fraught with miscommunication, lack of transparency, conflicting information and mishaps, such as the total system failure during the administration of the online writing assessment at one school. These things continue to call on and to question the effectiveness of the policy and more specifically, the ability of the School District to execute it.

*Id.* at 29–30. Professor Joshua Wilson of the University of Delaware testified that the school district was misusing the computer-scored essay because MI Write was never intended to be used without a teacher or human rater evaluating the student's writing. *See id.* at 37–48. And parent after parent testified about how the school district's new

admissions policies harmed their children and eroded the meritocracy that had previously determined entrance into the city's magnet schools. *See, e.g.*, *id*. at 128–37 (Sherice Sargent); *id*. at 138–42 (Tanya Folk); id. at 142–47 (Wallette Carter); *id*. at 147–52 (Miriam Hill); *id*. at 152–57 (Eric Santoro).

Two the defendants, Sabriya Jubilee and Karyn Lynch, testified at the hearing on behalf of the school district and defended the proposed changes. Dr. Jubilee, who serves as Chief of Equity for the School District of Philadelphia, testified as follows:

> On June 15, 2020 in the wake of the murders of Breonna Taylor, Ahmaud Aubery, George Floyd and countless others, as a District we released or statement on anti-racism. In this statement, we committed to becoming an anti-racist equitable organization by uprooting policies, deconstructing processes and eradicating practices that create systems of privilege and power for one group over the other.
>
> The upending of privilege highlighted here is not simply in reference to a configuration of numbers or an assessment of differences in skin color or features, but rather speaks to the destruction of a system and the dismantling institutionalization of norms. It doesn't just ask for us to set aside seats as a way to appease a few, but rather challenges us to explore questions of why, who and for what.
>
> Through the school selection process, we have the opportunity to redesign a process that from inception to current practice has only truly benefited a small group of stakeholders, many of whom do not reflect the majority demographic of our School District or City. But this presentation, I am not speaking solely about visibility, but more about the impact of opportunity, access and power.

Ex. 6 at 84–85. Karyn Lynch, who serves as the Chief of Student Support Services for the School District of Philadelphia, testified that the changes to the school-selection process were made in response to the murder of George Floyd and inspired by the school district's "Goals & Guardrails" document:

> In addition to the removal of the PSSA as a criteria for the school selection process last year—this year, not last year, our District was also impacted by the growing national attention to racism, mainly the murder of George Floyd among others. As a result as an organization, we

> committed to examining all of our processes, procedures and practices to ensure equity and (inaudible). . . .
>
> For more than a year, the School District obtained feedback about the school selection process and listened to individuals and representatives of groups to inform the improvements to the school selection process. Several public meetings held by the Board of Education as its members considered the Board's goals and guardrails.
>
> One indicator for the guardrails is ending racist practices as I've shared in our policies and procedures.

*Id*. at 93–95. Ms. Lynch also admitted that "racial dynamics" (as well as other factors) played a role in the school district's decision to switch from merits-based admissions to the lottery system with zip-code preferences. *See id*. at 121 ("[A] good deal of the discussion has been about access and equity to these schools, so it's not just based on racial dynamics."). And Ms. Lynch warned that these changes were just "the beginning with more to come with regard to access and equity." *Id*. at 107.

Only one parent, Stephanie King, testified in support of the proposed changes. *See id*. at 231–34. She claimed that "much of the objection to this policy is privileged and racist," and she denounced the "privileged parents who are simply [upset] that they rigged their game towards the wrong test." *Id*. at 232–33. Ms. King continued:

> Statistics do not lie. Philadelphia's magnet schools are not representative of Philadelphia's demographics or zip codes and have become overwhelmingly a concentration of privilege. This policy levels the playing field while still requiring excellence. The people protesting it are of self-interest, should be ashamed of themselves.
>
> If these Councilmembers complaining and parents protesting just don't want to send your kids with poor people even when they're qualified, then just say that instead of this fake concern, and take the word fair out of your mouth.

*Id*. at 233.

## FACTS CONCERNING THE PLAINTIFFS

### I. Sherice Sargent

Plaintiff Sherice Sargent is the mother of a black female eighth-grade student. Sargent Decl. ¶¶ 3, 19 (attached as Exhibit 13). Ms. Sargent's daughter is currently enrolled at George Washington Carver High School of Engineering and Science (Carver), a science, engineering, and technical school for grades 7 through 12. *See id*. at ¶ 5. When Ms. Sargent's daughter was admitted into her current school, a school district official stated that if she maintained an A/B average she would be able to continue her education at Carver's high school. *See id*. at ¶ 6. Ms. Sargent's daughter has maintained an A/B average and meets all of the criteria for admission into Carver for the ninth grade. *See id*. at ¶ 8.

Ms. Sargent's daughter, however, will not be allowed to continue her studies at Carver on account of the school district's decision to replace the school's merit-based admissions program with a lottery system. *See id*. at ¶ 9. Ms. Sargent's daughter was waitlisted at Carver (receiving waitlist number 187) and placed in Walter B. Saul High School, an agricultural school that specializes in teaching students how to become farmers. *See id*. at ¶ 11. The district eventually cancelled the waitlist for Carver so Ms. Sargent's daughter never gained admission or placement. *See id*. at ¶ 12. Neither Ms. Sargent nor her daughter live in any of the six zip codes that receive preferential treatment in the lottery. *See id*. at ¶ 10.

Ms. Sargent's daughter has always been a highly academically motivated student. *See id*. at ¶ 13. She has been immersed in STEM (science, technology, engineering, and mathematics), and she chose Carver because of the computer-science track that they start in middle school. *See id*. at ¶ 14. Her brother is a current twelfth grader at Carver. *See id*. She started volunteering at the school four years of ago because her brother's enrollment and became interested in computer science and robotics. *See*

*id.* My daughter eventually left her K–8 school and enrolled at Carver because wants to follow in her brother's footsteps. *See id.*

Ms. Sargent's daughter intends to enroll in a technology-focused college. *See id.* at ¶ 15. Her goal is to gain acceptance to Drexel University's computer-science program, and Drexel has a partnership with Carver. *See id.* Saul does not have any computer science or robotics classes or programs. *See id.* at ¶ 16. Saul also has a lower graduation and college admissions rate than Carver. *See id.* at ¶ 17. The catchment school in Ms. Sargent's neighborhood was closed five years ago due to poor performance, so Ms. Sargent has no choice but to send her daughter to schools outside their neighborhood. *See id.* at ¶ 18. The school district's new admissions policies have caused a significant decline in the number of black students enrolled at Carver. *See id.* at ¶ 20.

## II.  MICHELLE SHERIDAN

Plaintiff Michele Sheridan is the mother of an eighth-grade student at Christopher Columbus Charter School. *See* Sheridan Decl. ¶¶ 3–4 (attached as Exhibit 14). Ms. Sheridan's son is non-white (bi-racial). *See id.* at ¶ 5. Ms. Sheridan's son applied for admission to the Academy at Palumbo, a criteria-based school. *See id.* at ¶ 6. Ms. Sheridan and her son live mere feet from the front door of the Academy at Palumbo. *See id.* at ¶ 7. Ms. Sheridan's son is an A and B student and meets all the requirements for admission into the school; he also scored 22.5 on the school district's admission essay. *See id.* at ¶¶ 8–9. But Ms. Sheridan's son was denied admission to the Academy of Palumbo and is currently wait-listed at number 530. *See id.* at ¶ 10. Ms. Sheridan's family does not reside in any of the "underrepresented zip codes" that receive admissions preferences. *See id.* at ¶ 11.

Ms. Sheridan and her son are suffering irreparable harm over the school district's new admissions policies. Since Ms. Sheridan's son learned that cannot attend the

Academy of Palumbo, his behavior is regressed. *See id.* at ¶ 12. He has had verbal outbursts over his inability to attend the Academy of Palumbo. *See id.* He plans to attend college someday and he has been devastated that he won't get the opportunity to take AP classes at Palumbo. *See id.* He is interested in architecture and wants to study that in college, and he feels as though his future has been derailed by the school district's refusal to allow him to attend the school that he is academically qualified to attend. *See id.* He has asked many times why he bothered working so hard when the school district court won't allow his academic achievements to control his school assignment. *See id.* Ms. Sheridan's son also wants to play football and looked forward to competing on the Academy of Palumbo's football team, and he hoped that his football achievements would boost his college applications and earn him a football scholarship. *See id.* He has completely lost that opportunity on account of the school district's racially motivated admissions policies. *See id.*

## III.   Joshua Meyer

Plaintiff Joshua Meyer is the father of an eighth-grade student at the Julia R. Masterman Laboratory and Demonstration School (Masterman). *See* Meyer Decl. ¶¶ 3–4. Mr. Meyer's son is white. *See id.* at ¶ 3. Mr. Meyer's son wanted to continue his high-school studies at Masterman, which consistently ranks as the top high school not only in Philadelphia but in the entire state of Pennsylvania. He also would have been excited to attend Central High School, another school with a history of high achievement and a broad range of accelerated and exciting offerings. *See id.* at ¶ 5. Mr. Meyer's son is a stellar student, having received only one quarter grade less than an A (one 5th grade quarter of a B in music). All of his final grades were As. He also scored over a 25 out of 30 on the school district's computer-scored writing sample, which exceeds the minimum required score of 22 for admission to Masterman and Central. *See id.* at ¶ 6.

Mr. Meyer's son would have very likely been admitted to Masterman, as well as Central High School, under the merit-based admission system that was used before the school district switched to the lottery system. Under the previous regime, the top 50% (approximately) of the eighth-grade class at Masterman would be admitted to the high school, and the strong grades that Mr. Meyer's son has earned place him well within the top 50% of his eighth-grade class. In addition, virtually all Masterman eighth graders would be admitted to Central High School under the previous merit-based admission system. *See id*. at ¶ 7. But as a result of the school district's decision to replace its merit-based admissions system, Mr. Meyer's son did not get admitted to either Masterman or Central. *See id*. at ¶ 8.

Mr. Meyer has decided to enroll his son in a private school for the fall of 2022. *See id*. at ¶ 9. But either Masterman or Central would have been a better high school for Mr. Meyer's son under the previous admissions criteria, where students were accepted on the basis of merit and the institutions served as elite magnet schools for the city's most ambitious and hardest-working students. *See id*. at ¶ 10. Yet the new lottery-based admission system has so diluted the academic quality of Masterman and Central that Mr. Meyer may not even want his son to attend those schools over the private school where he is enrolled for the upcoming school year, even if his son had won admission under the new lottery-based system. *See id*. at ¶ 11.

Mr. Meyer's son is being grievously harmed by the school district's decision to change admissions standards in its effort to achieve racial balancing at the city's criteria-based high schools. *See id*. at ¶ 12. He is hardworking and ambitious, and is interested in challenging himself in high school. His goal is to take intellectually rigorous courses, including a substantial number of AP courses, in order to prepare himself for the most academically challenging college career that is available to him. *See id*. at ¶ 12. Masterman presented an ideal opportunity for him to be surrounded by other students from a variety of backgrounds and coming from all over the city who shared

this mindset. *See id.* at ¶ 12. The top-notch education in addition to the tremendous diversity of the students was an incredible combination that helped to teach these students both graded and ungraded lessons that were vital to their growing up to be effective members of the community. Unfortunately, the new selection process has diminished the school's ability provide this unique opportunity. *See id.* at ¶ 12.

## THE PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a plaintiff must show: "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176–77 (3d Cir. 2017) (quoting *Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). A district court should also consider: "(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* A district court "should balance those four factors so long as the party seeking the injunction meets the threshold on the first two." *Id.* The plaintiffs easily satisfy the first two factors, and the balance of the four factors cuts strongly in favor of preliminary injunctive relief.

## I.   THE PLAINTIFFS HAVE ESTABLISHED A REASONABLE PROBABILITY OF EVENTUAL SUCCESS ON THE MERITS

The plaintiffs claim that the defendants changed their magnet schools' admissions policies for the unlawful and unconstitutional purpose of achieving racial balancing among the student population. See First Amended Complaint, ECF No. 31, at ¶ 46. The plaintiffs also contend that the city's decision to admit students by lottery with arbitrary zip-code preferences fails rational-basis review. *See id.* at ¶ 97. The plaintiffs have, at the very least, a reasonable probability of success on at least one of these claims.

A. **There Is A Reasonable Probability That The Defendants Were Motivated By An Unlawful And Unconstitutional Desire To Achieve Racial Balancing In The City's Elite Magnet Schools**

It is indisputable that the school district changed its admissions practices because it wanted to alter the racial makeup of its magnet schools—and to ensure that the racial composition of those schools more closely resembled the demographics of the city as a whole. The Goals & Guardrails document makes this as clear as be:

> Among 8th grade students who are qualified to attend Special Admission High schools, the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress towards being proportional to population as a whole) by August 2026.

Ex. 5 at 4. The school district is not even attempting to hide its racial motivations, and it proudly proclaims that it "will" increase black and Hispanic enrollment to its announced quota of "at least 52.0%." And then it announces that this will be only the *first* step in a five-year march toward racially proportional representation in the city's magnet schools. In light of the Supreme Court's repeated admonitions that "racial balancing . . . is patently unconstitutional,"[7] one can only marvel at the temerity of the school district in producing a document of this sort. Karyn Lynch also testified before the city council that the Goals & Guardrails document (as well as the murder of George Floyd) inspired the change in school district's admissions policies,[8] and that "racial dynamics" (as well as other factors) played a role in the school district's decision to abandon merits-based admissions a switch to a lottery system with zip-code preferences.[9] And the school district's High School Directory for 2022 admits that the changes to the admissions process was made "in alignment with our commitment

---

7. *Grutter v. Bollinger*, 539 U.S. 306 (2003); *see also Fisher v. University of Texas at Austin*, 570 U.S. 297, 311 (2013); *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 730 (2007) (plurality opinion of Roberts, C.J.).

8. *See* Ex. 6 at 93–95.

9. *See* Ex. 6 at 121.

toward antiracism and equity, as outlined in the Board of Education's Goals and Guardrails." Ex. 2.

So the school district has all but confessed that its new admissions practices were adopted for the purpose of achieving racial balancing in the city's magnet schools—which runs headlong into the many statutory and constitutional prohibitions on racial discrimination in public education. *See* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be . . . subjected to discrimination under any program or activity receiving Federal financial assistance."); *Shaw v. Hunt*, 517 U.S. 899 (1996) ("[T]he Fourteenth Amendment['s] . . . central purpose was to eliminate racial discrimination emanating from official sources in the States."); Pa. Const. art. I, § 29 ("Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual.").

The only remaining question is whether the school district can hide behind *Grutter* and invoke the allowance that the Supreme Court has recognized for public-university affirmative-action programs. *See Grutter*, 539 U.S. at 326–42. It cannot do for many reasons. First, there is already a "critical mass" of black and Hispanic students at the city's elite magnet schools, including Masterman and Central. *See supra* at 6. Second, the city's zip-code preferences are not "narrowly tailored" to the goal of student-body racial diversity. *See Grutter*, 539 U.S. at 326. Third, the school district is engaged in "outright racial balancing" because its "Goals and Guardrails" document purports to establish a quota and declares that its ultimate goal is to achieve racially proportional representation at the city's magnet schools. *See Grutter*, 539 U.S. at 330 ("[O]utright racial balancing . . . is patently unconstitutional"); *id.* at 334 ("[A] race-conscious admission program cannot use a quota system"). Fourth, race-conscious admissions practices are allowed only when a school "engages in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways

an applicant might contribute to a diverse educational environment," *Grutter*, 539 U.S. at 337. That is assuredly not happening under the school district's revised admissions policies. Fifth, the school district's use of racial balancing is not time-limited. *See id*. at 342 ("[R]ace-conscious admissions policies must be limited in time"; *id*. at 351 (Thomas, J., concurring in part and dissenting in part) ("I agree with the Court's holding that racial discrimination in higher education admissions will be illegal in 25 years."). Finally, *Grutter*'s affirmative-action allowance is inapplicable to article I, § 29 of the Pennsylvania Constitution, which prohibits discrimination on account of race or ethnicity without exception. See Pa. Const. art. I, § 29 ("Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual.").

So there is a reasonable probability—indeed, a near-certainty—that the plaintiffs will prevail on their claim that the school district's admissions policies were racially motivated in violation of the Equal Protection Clause, Title VI, and article I, § 29 of the Pennsylvania Constitution.

### B.   There Is A Reasonable Probability That The Defendants' Admissions Policies Fail Rational-Basis Review

Even if the school district can find a way to rebut the evidence of racial motivation, its magnet-school admissions policies cannot survive rational-basis review under the Fourteenth Amendment. *See Romer v. Evans*, 517 U.S. 620, 633 (1996) (Equal Protection Clause requires that "classification[s] bear a rational relationship to an independent and legitimate legislative end") There is no conceivable legitimate governmental interest that can support a lottery-based admissions process in which the residents of six selected zip codes—all of which happen to be located in North Philadelphia or northeast Philadelphia—receive preferences over the residents of the remaining zip codes, especially when there are neighborhoods in West Philadelphia and

southwest Philadelphia that have equally high levels of poverty and equally high con-
centrations of minority residents. The school district has never even attempted to ex-
plain why these six zip codes were chosen at the expense of others.

The goal of achieving racially proportional representation at the city's magnet
schools is not a legitimate state interest. *See Grutter v. Bollinger*, 539 U.S. 306 (2003)
("[O]utright racial balancing . . . is patently unconstitutional."). Neither is the goal
of favoring North Philadelphia residents over West Philadelphia residents. The city
must present some imaginable non-arbitrary reason for favoring these six zip codes to
survive rationality review. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845
(1998) ("We have emphasized time and again that '[t]he touchstone of due process
is protection of the individual against arbitrary action of government'" (quoting *Wolff
v. McDonnell*, 418 U.S. 539, 558 (1974)).

## II.   The Plaintiffs Will Suffer Irreparable Injury Absent Preliminary Relief

The plaintiffs and their children will suffer grievous and irreparable harm if the
school district is not enjoined from implementing these changes before the start of
the 2022–23 school year. Sherice Sargent's daughter, who wanted to continue her
studies at Carver in the hopes of winning acceptance to Drexel University's computer-
science program, has been relegated to an agricultural school where she will learn to
become a farmer. *See* Sargent Decl. ¶¶ 14–17. Michelle Sheridan's son had his dreams
of attending the Academy of Palumbo dashed and now regards the hard work he put
in during his middle-school years as useless, and he is being deprived of the oppor-
tunity to take AP classes at Palumbo and compete on the school's football team. *See*
Sheridan Decl. ¶ 12. Joshua Meyer's son, who earned straight As at Masterman, is
being forced to leave the school where he has attended and wished to continue, a
school that consistently ranks as the top high school not only in Philadelphia but in
the entire state of Pennsylvania. *See* Meyer Decl. ¶ 5. These students—and many

other students of all races and backgrounds—are having their educations and their futures ruined by the school district's misguided and ill-conceived pursuit of racial balancing.

## III.   THE PUBLIC INTEREST SUPPORTS A PRELIMINARY INJUNCTION

The public interest also supports a preliminary injunction. There is no conceivable public interest that can support the school district's decision to abandon merit-based admissions in favor of a system in which students who meet the minimum academic criteria are admitted by lottery, with arbitrary and unexplained preferences conferred on the residents of six selected zip codes. And the school district has never attempted to justify this change in admissions policies apart from making vapid appeals to "equity"—which is nothing more than an unconstitutional desire to attain racial balancing in the city's elite magnet schools. And if the Court agrees with us that the city's new admissions practices were influenced by unconstitutional racial motivations, then the public interest will by definition require a preliminary injunction. *See Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 884 (3d Cir. 1997) ("[T]he public interest clearly favors the protection of constitutional rights.").

## IV.   THE HARMS THAT MAY RESULT FROM A PRELIMINARY INJUNCTION DO NOT OUTWEIGH THE NEED FOR IMMEDIATE RELIEF

Doubtless there will be some harms that befall others if the Court enjoins the school district from implementing its new admissions policies for the 2022–23 school year. School officials will have to reconsider applications under the previous merits-based admission policies, and some students who won admission to magnet schools under the lottery-system-with-zip-code-preferences will be directed to other schools. But none of those considerations can thwart injunctive relief if the Court concludes that the school district is violating the Constitution and federal civil-rights laws—especially when the students who won admission under the new system did so at the

expense of other students who will suffer irreparable harm in the absence of a preliminary injunction. If the Court agrees that the new admissions regime is not only harmful but unlawful, then it is constitutionally obligated to stop it dead in its tracks. *See* Charles Alan Wright & Arthur R. Miller, et al., 11A Fed. Prac. & Proc. Civ. § 2948.2 (3d ed.) ("[W]hen plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue.").

## CONCLUSION

The motion for preliminary injunction should be granted.

Respectfully submitted.

 /s/ Walter S. Zimolong III 

JONATHAN F. MITCHELL
Pennsylvania Bar No. 91505
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

GENE P. HAMILTON*
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

Dated: June 3, 2022

WALTER S. ZIMOLONG III
Pennsylvania Bar No. 89151
Zimolong, LLC
Post Office Box 552
Villanova, Pennsylvania 19085-0552
(215) 665-0842 (phone)
wally@zimolonglaw.com

* admitted *pro hac vice*

*Counsel for Plaintiffs and
the Proposed Classes*

## CERTIFICATE OF SERVICE

I certify that on June 3, 2022, I served this document through CM/ECF upon:

William Kennedy
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street
Philadelphia, Pennsylvania 19103-7505
(215) 772-7291 (phone)
(215) 731-3689 (fax)
wkennedy@mmwr.com

*Counsel for Defendants*

 /s/ Walter S. Zimolong III 
Walter S. Zimolong III
*Counsel for Plaintiffs and*
*the Proposed Classes*