UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

**Sherice Sargent**, et al.,

    Plaintiffs,

v.

**The School District of Philadelphia**, et al.,

    Defendants.

Case No. 2:22-cv-01509-CFK

### REPLY BRIEF IN SUPPORT OF
### MOTION FOR PRELIMINARY INJUNCTION

The school district's change in its admissions policies was indisputably motivated by a desire to change the racial makeup of the city's criteria-based schools so that they would more closely resemble the racial breakdown of the overall city population. The Board of Education *admits* this in its Goals & Guardrails document—a document that the defendants do not even mention or acknowledge in their brief. Lest one forget what this document says, let us once again hear the Board of Education in its own words:

> Among 8th grade students who are qualified to attend Special Admission High schools, the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress towards being proportional to population as a whole) by August 2026.

*Id*. at 4. This is as close to a smoking gun as can be imagined. The Board of Education not only announces a 52.0% *quota* for black and Hispanic students, it goes on to declare that this is only the first step on the road to an enforced proportional-representation regime, in which school officials will consciously and continuously stamp

out deviations that arise between the racial composition of the city's criteria-based schools and the racial makeup of the city's population.

It is hard to imagine a more patent a violation of the Equal Protection Clause and federal civil-rights law. Even when Supreme Court upholds affirmative-action programs or diversity initiatives, the Court always goes out of its way to condemn racial quotas and efforts to obtain proportional racial representation. *See Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) ("[O]utright racial balancing . . . is patently unconstitutional"); *id.* at 334 ("[A] race-conscious admission program cannot use a quota system"); *Regents of University of California v. Bakke*, 438 U.S. 265, 289 (1978) (opinion of Powell, J.). And for good reason, as demands for proportional representation have led to the most odious and disgraceful episodes in the history of American education, such as the overt or disguised Jewish quotas that elite universities perpetuated into the 1960s. *See* Jerome Karabell, *The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale, and Princeton* (2006); Dan Oren, *Joining the Club: A History of Jews and Yale* (2d ed. 2001); Dirk Johnson, *Yale's Limit On Jewish Enrollment Lasted Until Early 1960's, Book Says*, New York Times B1 (March 4, 1986), https://nyti.ms/3nXCW6q. Asians-Americans have now taken the place of Jews as the "overrepresented" demographic that needs to be cut down to size,[1] but efforts to impose quotas or proportional racial representation in response to this "problem" are as pernicious now as they were then—and they are flatly prohibited in public schools that must obey the anti-discrimination commands of Title VI, the Equal Protection Clause, Title VI, and the Pennsylvania Constitution.

The school district tries to defend its new policy by pointing out that the admissions criteria are race-neutral on their face. *See* Defs.' Br., ECF No. 37 at 4 ("Neither

---

1. See Ian Shapira, *Before Asian Americans sued Harvard, the school once tried restricting the number of Jews*, Washington Post (October 15, 2018), https://wapo.st/3cev9hO.

the 2020-21 admissions process nor the 2021-22 admissions process used any racial classifications."). Indeed they are, but a facially neutral admissions policy that is *motivated* by racially discriminatory goals is as unconstitutional as an explicit racial classification. *See Guinn v. United States*, 238 U.S. 347 (1915) (holding that Oklahoma's facially neutral "grandfather clause" violated the Fifteenth Amendment because it was enacted with racially discriminatory intent); *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272 (1979) ("A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification. *This rule applies as well to a classification that is ostensibly neutral but is an obvious pretext for racial discrimination*." (emphasis added)). And the school district cannot escape a discriminatory-purpose finding when its own documents announce a racial quota for black and Hispanic students at its criteria-based schools and declare that racially proportional representation is the ultimate goal.

## REPLY TO STATEMENT OF FACTS

Some of the factual assertions in the school district's brief are unclear, unsupported, or contested. For example, the school district claims: "In 2021, *as it had in prior years*, the School District reviewed and revised the school selection process for qualified students applying to criteria-based high schools for the 2022-2023 school year." Defs.' Br., ECF No. 37 at 3 (emphasis added). But the school district has never before revised its admissions policies to criteria-based schools in this manner, nor has it done so in response to a "Goals & Guardrails" document that establishes racial quotas for black and Hispanic students and announces an ultimate goal of proportional racial representation. The school district should not be suggesting that this overhaul was no different from the routine tweaks implemented in previous years.

There is also no evidence to support the school district's claim that the preferred zip codes "were selected based on their enrollment numbers and without consideration of their racial composition." Defs.' Br., ECF No. 37 at 4. The school district provides no declarations to support this assertion, nor does it provide statistical evidence demonstrating that these zip codes had lower enrollment numbers than their competitors. It is also unclear what the school district means when it says that these zip codes were chosen "based on their enrollment numbers." What, exactly, about their "enrollment numbers" caused them to be chosen? The school district's brief does not claim that these were the zip codes with the *lowest* enrollment levels of all the zip codes in Philadelphia.

Finally, the school district's claim that "[n]o student received any advantage or disadvantage based on race" is false or, at the very least, misleading. Defs.' Br., ECF No. 37 at 4. The entire reason that school district overhauled its admissions policies was to alter the racial makeup of its criteria-based schools and implement its 52.0% quota for black and Hispanic students. When wholesale changes are implemented for the purpose of changing the racial composition of a school, then the affected students are by definition receiving advantages or disadvantages "based on race"—even if those students are not receiving overt racial preferences at the retail level. *See Feeney,* 442 U.S. at 272 ("'Discriminatory purpose,' . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.").

## I. The Plaintiffs Have Established A Reasonable Probability Of Eventual Success On The Merits

The plaintiffs not only have a reasonable probability of success on the merits—they have a near-certainty of success given the school district's Goals & Guardrails document, which announces a 52.0% quota for black and Hispanic students and declares a goal of proportional racial representation in the city's criteria-based schools.

The school district makes no attempt to mitigate this document or explain it away. Its apparent strategy is to ignore the smoking-gun evidence and hope that by adopting this ostrich-like posture it can somehow induce the Court to do the same.

### A. The Court Must Apply Strict Scrutiny To The School District's Implementation Of Racial Goals And Quotas

The school district argues for rational-basis review by relying on the fact that the its admissions policies are race-neutral on their face. *See* Defs.' Br., ECF No. 37 at 6 (describing the new admissions process as "a completely objective, race-blind process" in which students are admitted by lottery). But there is nothing race-neutral about the school district's *motivations* for adopting this lottery-with-zip-code-preferences. The Goals & Guardrails document, as well as the other evidence discussed in the plaintiffs' motion for preliminary injunction,[2] shows beyond a shadow of a doubt that the school district changed its admissions policies for the purpose of altering the racial composition of its criteria-based schools—and with a desire to bend the demographics of those schools toward the overall racial makeup of the city.

The school district tries to get around this in two ways. First, the school district blinks reality by denying that the plaintiffs have produced evidence of racially discriminatory purpose. *See* Defs.' Br., ECF No. 37 at 5 ("Plaintiffs have not submitted any evidence of a discriminatory purpose or impact, and there is none."). Answering this requires nothing more than a citation of our opening brief, which repeatedly invokes the Goals & Guardrails document, as well as the public statements from Karyn Lynch admitting that the Goals & Guardrails document and the murder of George Floyd inspired the changes to the school district's admissions policies. *See* Mot. for Prelim. Inj., ECF No. 32, at 3, 8–9.

Second, the school district claims that strict scrutiny can apply only when a plaintiff shows *both* a racially discriminatory purpose *and* a discriminatory effect—and that

---

2. *See* Mot. for Prelim. Inj., ECF No. 32, at 3, 8–9.

racially discriminatory purpose alone is insufficient to move a case out of rational-basis review and into strict scrutiny. *See* Defs.' Br., ECF No. 37 at 7 ("Rational basis review applies unless Plaintiffs can establish that the process had a racially discriminatory purpose *and a racially discriminatory impact*." (emphasis in original)). But that is simply untrue. The courts have repeatedly held that a facially neutral law or policy that was enacted for a racially discriminatory purpose will *always* be subject to strict scrutiny—regardless of the actual effects of the law. *See, e.g., Miller v. Johnson*, 515 U.S. 900, 913 (1995) ("[S]tatutes are subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, *but also when, though race neutral on their face, they are motivated by a racial purpose or object.*" (emphasis added)); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66 (1977) ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, [rational-basis review] is no longer justified."); *see also Boston Parent Coalition for Academic Excellence Corp. v. School Committee of City of Boston*, 996 F.3d 37, 45 (1st Cir. 2021) ("Absent a showing of discriminatory purpose, we review an equal protection challenge to race-neutral selection criteria for a rational basis only."); *Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 276–77 (S.D.N.Y. 2019) ("If a court concludes that the government used a racial classification or was motivated by racial discrimination, then the court must review the government action under strict scrutiny. Absent either conditions, the government action is subject to rational basis review." (citation omitted)). The school district cites no case in which any court has ever applied rational-basis review to a law or policy enacted with a racially discriminatory purpose—or that did so on the ground that the admittedly discriminatory purpose was not supplemented with proof of discriminatory effects.[3]

---

3. The school district appears to be relying on language in *Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524, 549 (3d Cir. 2011), which indicates that

In all events, the plaintiffs *have* shown a "reasonable probability" that the school district's new admissions policies will have the effect of altering the racial makeup of the city's criteria schools, as they were designed to do—even though the parties do not yet have data showing the racial composition of the incoming students for the 2022–23 school year. A plaintiff does not need proof on a motion for preliminary injunction, and it is not only "probable" but nearly certain that the school district's drastic change in admissions policies, and its move away from a merits-based admission process to a lottery with zip code preferences, will achieve the desired outcome of reducing the numbers of "overrepresented" racial groups, such as Asian-Americans and whites at Masterman and Central, and blacks at Carver. The school district does not contend that its new admission policies will leave the racial makeup of the city's criteria schools unchanged, and it presents no reason for imagining that such an outcome could occur.

Finally, the plaintiffs are *not* contending that strict scrutiny applies because the school district's officials "consider[ed] the racial impact of their decisions." Defs.' Br., ECF No. 37 at 6; *see also id*. ("[S]trict scrutiny is not triggered simply because public officials consider the racial impact of their decisions."). The courts have made clear that public officials may consider the racial impact of their decisions, but they may *not* choose a policy *because of* the racial effects that it will have. The acid test for discriminatory purpose is set forth in *Feeney*:

---

strict scrutiny will apply when a facially neutral policy has both a racially discriminatory purpose and a discriminatory effect. *See* Defs.' Mot. to Dismiss, ECF No. 36-1, at 13 (citing *Doe*, 665 F.3d at 549). But *Doe* never says or suggests this is the *only* circumstance in which strict scrutiny will apply to a law or policy enacted with a racially discriminatory purpose. *See Doe*, 665 F.3d at 549 ("To establish government action *within the third alternative*, a plaintiff is 'required to prove that the actions of . . . officials (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose.'" (emphasis added) (citation omitted)).

> Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action *at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.*

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) (emphasis added) (citations and footnotes omitted). A school district, for example, might decide to abolish all consideration of academic merit and admit students entirely by lottery or geographic proximity—and it might do with the full knowledge that a policy change of this sort this will adversely affect Asian-Americans. The mere fact that a school district knew of these effects and considered those effects will not trigger strict scrutiny. But a school district *will* trigger strict scrutiny if it adopts such a policy *because of* the effects that would fall upon an identifiable racial group. *See id*. As the Third Circuit has explained:

> The term "discriminatory purpose" implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, the action's beneficial or adverse effects upon an identifiable group. Racially discriminatory purpose means that the decisionmaker adopted the challenged action *at least partially because* the action would benefit or burden an identifiable group. Even conscious awareness on the part of the [decisionmaker] that the [policy] will have a racially disparate impact does not invalidate an otherwise valid law, *so long as that awareness played no causal role in the adoption of the policy.*

*Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524, 551–52 (3d Cir. 2011) (emphasis added) (citations and some internal quotation marks omitted); *id*. at 548 ("Racially discriminatory purpose means that the decisionmaker adopted the challenged action *at least partially because the action would benefit or burden an identifiable group*." (emphasis added)).

Here, the plaintiffs have presented direct and uncontroverted evidence that the school district changed its admission policies because it wanted to implement a 52.0% quota for black and Hispanic students in the city's criteria-based schools and move

toward its announced goal of proportional racial representation. *See* Mot. for Prelim. Inj., ECF No. 32, at 3, 8–9; *see also* Goals & Guardrails Document, ECF No. 32-5. The school district adopted these changes "because of," not "in spite of," the racial effects that they would have; indeed, racial balancing was the *raison d'être* of the school district's decision to overhaul its admissions policies in this manner. That is what distinguishes this case from lawsuits in which the plaintiffs failed to prove that the school district adopted a policy *because of* a desire to impose racial quotas or attain racial balancing. *See, e.g.*, *Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524, 529 (3d Cir. 2011) ("[T]he school assignment plan neither classifies on the basis of race *nor has a discriminatory purpose*." (emphasis added)); *Coalition for TJ v. Fairfax County School Board*, 2022 WL 986994, *4 (4th Cir.) (Heytens, J., concurring) ("The race neutral policy challenged here includes no racial quotas or targets."); *Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 280 (S.D.N.Y. 2019) ("[T]he Court concludes that Plaintiffs are *not* likely to show that Defendants *had discriminatory intentions* in amending the Discovery program." (emphasis added)).

    The evidence of racially discriminatory purpose is overwhelming, and the school district won't even address the Goals & Guardrails Document that conclusively proves the racial motivations behind the change in admissions policies. Strict scrutiny applies, and the burden shifts to the school district to demonstrate that its new admissions criteria are "narrowly tailored" to advance a "compelling state interest." *See Fisher v. University of Texas at Austin*, 570 U.S. 297, 310 (2013) ("Strict scrutiny is a searching examination, and it is the government that bears the burden to prove that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate" (citations and internal quotation marks omitted)).

### B. The School District Has Not Satisfied Its Burden Under Strict Scrutiny

The school district insists that its admissions policies can nonetheless survive scrutiny,[4] but it never identifies the "compelling" interests that these policies serve or explains how they are "narrowly tailored" to attain those goals. The school district seems to think that the *plaintiffs* bear the burden of proving that the admissions policies *fail* strict scrutiny. *See* Defs.' Br., ECF No. 37 at 8–9 ("Assume that [strict scrutiny] applies. That is only half the battle for Plaintiffs. They still must show a reasonable probability of eventual success in arguing that the current admissions process fails that review. They have not done so."). But that is not the law. Racially motivated policies are *presumed* unconstitutional,[5] and it is the school district must rebut that presumption by demonstrating "narrow tailoring" and a "compelling interest." *See Fisher*, 570 U.S. at 310 ("Strict scrutiny is a searching examination, and it is the *government that bears the burden* to prove that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate" (emphasis added) (citations and internal quotation marks omitted)).

The school district claims that *Grutter v. Bollinger*, 539 U.S. 306, 329–36 (2003), is irrelevant because *Grutter* "concerned higher education and has no relevance to this case about high school admissions." Defs.' Br., ECF No. 37 at 9. But without *Grutter*, the school district has no authority that can possibly support a "compelling interest" in achieving racial diversity at public high schools. The Supreme Court has never held that public high schools have a compelling interest in promoting student-body diversity, so if the school district wants to insist that *Grutter* has no bearing on high-school admissions then it has nothing left on which to hang its hat. And even if

---

4. *See* Defs.' Br., ECF No. 37 at 8–10.
5. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 234 (1995) ("[A]ny official action that treats a person differently on account of his race or ethnic origin is inherently suspect and presumptively invalid" (citation and internal quotation marks omitted)).

the *Grutter* framework applied, the school district cannot show that its admissions policies are *Grutter*-compliant, for the reasons provided in our opening brief. *See* Mot. for Prelim. Inj., ECF No. 32, at 16–17.

### C. There Is A Reasonable Probability That The Defendants' Admissions Policies Fail Rational-Basis Review

Even if rational-basis review applied (and it doesn't), the plaintiffs would *still* have a reasonable probability of success because there is no legitimate governmental interest that can support a lottery-based admissions process in which the residents of six selected zip codes win automatic admission after satisfying the minimum academic cut-off requirements. The goal of pursuing racial balancing or racially proportional representation at the city's magnet schools is not a legitimate state interest, and the school district does not argue to the contrary. *See Grutter v. Bollinger*, 539 U.S. 306 (2003) ("[O]utright racial balancing . . . is patently unconstitutional."). Neither is the goal of favoring the residents of the preferred six zip codes at the expense of everyone else. The school district proposes no other "interest" that might support this approach to high-school admissions, and we cannot think of any.

### II. The Harms That May Result From A Preliminary Injunction Do Not Outweigh The Need For Immediate Relief Against The City's Patently Unconstitutional Actions

The school district claims that it is too late to revert to its previous admissions practices and redo admissions decisions for the upcoming 2022–23 school year. But that is not a reason to withhold a preliminary injunction; it is only an argument to limit the *scope* of relief. This Court can still enjoin the defendants from implementing these unconstitutional admissions policies for the 2023–24 school year if it determines that too much harm will befall the school district and admitted students by scrambling the rules this close the start of the new school year. It can also order the school district to admit the children of the named plaintiffs to their preferred schools, or at least order the school district to admit those students if it can be determined whether those

students would have been admitted under the rules in place during the 2020–21 school year.

The school district suggests in a footnote that even relief limited to the children of Ms. Sargent, Ms. Sheridan, and Mr. Meyer would impose intolerable burdens,[6] but that claim is not supported by declarations or evidence and is not believable in any event. Last-minute changes to anticipated enrollments occur all the time at colleges and high schools as previously admitted students change their plans and other students are added off wait lists. Adding one additional student to a high school's entering class is hardly an unprecedented occurrence, and it is not something that school officials are ill-equipped to handle. *See Regents of University of California v. Bakke*, 438 U.S. 265, 320 (1978) (opinion of Powell, J.) (ordering Alan Bakke admitted to the medical school at UC-Davis after he had proven that the school's admissions program violated the Constitution and Title VI); *id*. at 408–21 (Stevens, J., concurring in the judgment in part and dissenting in part) (same).

Finally, this Court must *weigh* the harms asserted by the school district against the other preliminary-injunction factors. The school district tries to characterize these alleged harms as one of the "gateway" factors in the preliminary-injunction inquiry,[7] but that misrepresents the test for a preliminary injunction. The two "gateway" factors that the plaintiffs *must* show are: (1) a reasonable probability of eventual success in the litigation; and (2) that *they* will be irreparably injured if relief is not granted. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 176–77 (3d Cir. 2017). The plaintiffs have indisputably satisfied each of these threshold requirements. The harms that might befall the school district and other interested parties are additional discretionary factors that must be balanced against the other considerations in the preliminary-injunction inquiry. *See id*. ("A district court should also consider: "(3) the possibility of harm

---

6. *See* Defs.' Br., ECF No. 37 at 10 n.4.
7. *See* Defs.' Br., ECF No. 37 at 13.

to other interested persons from the grant or denial of the injunction, and (4) the public interest."). The constitutional violations in this case are so patent and obvious that they warrant injunctive relief notwithstanding the disruptions that might be result.[8] A court would never decline to enjoin a school district from establishing racially segregated schools, even if that decision were made on the eve of an upcoming school year. No different result should obtain when school officials decide to implement racial quotas and try to escape judicial redress by pleading a too-late-in-the-day-to-change-our-policies defense.

## CONCLUSION

The motion for preliminary injunction should be granted.

Respectfully submitted.

WALTER S. ZIMOLONG III
Pennsylvania Bar No. 89151
Zimolong, LLC
Post Office Box 552
Villanova, Pennsylvania 19085-0552
(215) 665-0842 (phone)
wally@zimolonglaw.com

GENE P. HAMILTON*
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

Dated: July 13, 2022

_/s/ Jonathan F. Mitchell_
JONATHAN F. MITCHELL
Pennsylvania Bar No. 91505
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

* admitted *pro hac vice*

*Counsel for Plaintiffs and the Proposed Classes*

---

8. The plaintiffs are not contending, and have never argued, that constitutional harm "automatically requires preliminary injunction relief," as the school district claims in its brief. *See* Defs.' Br., ECF No. 37 at 13.


# CERTIFICATE OF SERVICE

I certify that on July 13, 2022, I served this document through CM/ECF upon:

William Kennedy
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street
Philadelphia, Pennsylvania 19103-7505
(215) 772-7291 (phone)
(215) 731-3689 (fax)
wkennedy@mmwr.com

*Counsel for Defendants*

      /s/ Jonathan F. Mitchell
     Jonathan F. Mitchell
     *Counsel for Plaintiffs and*
     *the Proposed Classes*