UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | . | |
| Sherice Sargent, et al., | . | Docket #CV-22-1509 (CFK) |
| | . | |
| Plaintiffs, | . | United States Courthouse |
| | . | Philadelphia, PA |
| vs. | . | July 27, 2022 |
| | . | 2:06 p.m. |
| The School District of | . | |
| Philadelphia, et al., | . | |
| | . | |
| Defendants. | . | |

.........................................................

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE CHAD F. KENNEY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiffs:           Jonathan F. Mitchell, Esq.
                              Mitchell Law, PLLC
                              111 Congress Ave.-Ste. 400
                              Austin, TX 78701

                              Walter S. Zimolong, Esq.
                              Zimolong, LLC
                              P.O. Box 552
                              Villanova, PA 19085

                              James J. Fitzpatrick, III, Esq.
                              Zimolong, LLC
                              353 W. Lancaster Ave.-Ste. 300
                              Wayne, PA 19087

For The Defendants:           William K. Kennedy, Esq.
                              Montgomery McCracken Walker
                              & Rhoads, LLP
                              1735 Market St.-21st Fl.
                              Philadelphia, PA 19103

2

                                        Renee N. Smith, Esq.
                                        Montgomery McCracken Walker
                                        & Rhoads, LLP
                                        1735 Market St.-21st Fl.
                                        Philadelphia, PA 19103

Audio Operator                          Chris Kurek

Transcribing Firm:                      Writer's Cramp, Inc.
                                        1027 Betty Lane
                                        Ewing, NJ 08628
                                        609-588-8043

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

3

## Index

|                                        | Direct | Cross | Redirect | Recross | Further Redirect |
|----------------------------------------|--------|-------|----------|---------|------------------|
| **Witnesses For The Plaintiff:**       |        |       |          |         |                  |
| **Witnesses For The Defendants:**      |        |       |          |         |                  |

| EXHIBITS: |                            | Marked | Received |
|-----------|----------------------------|--------|----------|
| D-1       | Admission Requirements     | 51     |          |
| D-2       | Admission Requirements     | 51     |          |
| D-6       | Data Compiled By Mr. Wills | 5      |          |
| D-7       | 2020 Census Data           | 14     |          |
| D-8       | City Council Testimony     | 18     |          |

SUMMATION BY:

1           THE CLERK:  All rise, please.  The United States

2    District Court for the Eastern District of Pennsylvania is now

3    in session, the Honorable Chad F. Kenney presiding.

4           THE COURT:  Good afternoon everyone.

5           ALL:  Good afternoon, Your Honor.

6           THE COURT:  All right, so (indiscern.) and we are on

7    the record in <u>Sargent</u>, and it is 1509 of 22.  Counsel, for the

8    record.

9           MR. MITCHELL:  Jonathan Mitchell for the Plaintiffs.

10          THE COURT:  All right.

11          MR. ZIMOLONG:  Good afternoon, Your Honor.  May it

12   please the court, Walter Zimolong for the plaintiffs.

13          MR. FITZPATRICK:  Good afternoon, Your Honor.  May

14   it please the court, James Fitzpatrick for the plaintiffs.

15          MR. KENNEDY:  Good afternoon, Your Honor.  William

16   Kennedy and Renee Smith for the defendants.

17          THE COURT:  All right.  Are we all set to go?  All

18   right, counsel, go ahead.

19          MR. MITCHELL:  Your Honor, before I begin, Mr.

20   Kennedy has asked us whether we would stipulate to the

21   admission of a supplemental declaration, and we have told him

22   we object to that.  I don't know if Your Honor wants to

23   resolve that issue before I begin my presentation.  I --

24          THE COURT:  Well, it's a supplemental declaration by

25   who and for what purpose?

1          MR. KENNEDY:  Defendants, Your Honor.  We have a

2     supplemental declaration of a school district employee named

3     Theodore Wills, Ted Wills, that would -- it provides

4     background for Exhibit-6, which is an exhibit to the parties'

5     stipulation of facts.  Mr. Wills is the person who drafted

6     Exhibit-6.  The reason we seek to introduce this is -- well,

7     actually, the basis for the data in Exhibit-6 was called into

8     question in plaintiff's reply brief, and this declaration

9     provides some background about when and how Mr. Wills compiled

10    the data that is included in Exhibit-6.

11         (Defendant's Exhibit-6 previously marked for

12    identification)

13         MR. ZIMOLONG:  Your Honor, we received this 15

14    minutes before the start of trial.  This is not a supplemental

15    declaration in that Mr. Wills did -- never submitted a

16    previous declaration.  We think this is classic hearsay,

17    should be excluded, and we also think it's an end run around

18    this court's order that said no witnesses were going to

19    testify today.  If Your Honor looks at this, this is something

20    that we absolutely must test the credibility of the witness.

21    There was never an attempt to make -- to get any of these

22    facts stipulated to.  And to be -- have this hoisted upon us

23    at the start of the hearing is highly prejudicial, not

24    standing a clear prohibition under the rule -- Federal Rules

25    of Civil Procedure based upon hearsay.

1              THE COURT:  All right.  What's the significance of

2      the Exhibit, Exhibit-6, the data in Exhibit-6 that you're

3      challenging?

4              MR. ZIMOLONG:  The data in Exhibit-6 --

5              THE COURT:  That your --

6              MR. ZIMOLONG:  What we believe --

7              THE COURT:  -- your reply brief targeted?

8              MR. ZIMOLONG:  What we believe the defendants are

9      trying to do here is to provide a justification, a race

10     neutral justification for selection of the zip codes, and this

11     declaration --

12             THE COURT:  All right, I'm going to exclude the

13     declaration.

14             MR. ZIMOLONG:  Thank you.

15             THE COURT:  The whole point of the -- the whole

16     point of my early on of marshaling and managing the case was

17     to have the parties decide up front what they needed so we

18     wouldn't have -- so that you could take depositions on

19     disputed facts and then call those witnesses so that every

20     side would have an opportunity to prepare a response to what

21     was being produced, okay?  So I will not accept the

22     declaration for purposes of this -- for the preliminary

23     injunction.  So with that, are you ready to proceed?

24             MR. ZIMOLONG:  We are ready, Your Honor, thank you.

25             THE COURT:  All right, go ahead.

1          MR. MITCHELL:  Thank you, Your Honor, and may it

2    please the court.  It is indisputable that the Philadelphia

3    School District's motivation for changing its admissions

4    policies for its criteria-based high schools away from a pure

5    merits-based admissions system and toward a lottery system

6    with zip code preferences, was motivated by a desire to alter

7    the racial makeup of the student body at the city's elite

8    magnet schools.  The evidence proves that this was indeed the

9    school district's motivation.  The goals and guardrails

10   document produced by the Board of Education, which was issued

11   in the spring of 2021, says, and I quote, "Among eighth grade

12   students who are qualified to attend special admissions high

13   schools, the percentage who are black/African American or

14   Hispanic/Latinx, will grow from 33.8% in August 2020 to at

15   least 52% (making progress toward being proportional to

16   population as a whole) by August 2026" {end quote}.  This

17   document not only establishes a 52% quota for black and

18   Hispanic students, it declares that the school district's

19   ultimate goal is proportional racial representation in which

20   the racial makeup of the city's criteria-based high schools

21   mirrors the racial makeup of the city's population as a whole.

22   It is hard to imagine a more flagrant violation of the equal

23   protection clause and federal civil rights law.  Efforts to

24   achieve proportional racial representation or racial balancing

25   of any type and establishing numerical goals or quotas toward

1    that end have been condemned in every decision of the supreme
2    court dealing with the issue and use of race in school
3    admissions, even when the supreme court has upheld diversity
4    initiatives, as in cases such as Bakke and Guarta (phonetic).
5    The school district claims that its admissions policies are
6    race neutral on their face, which they are.  But a facially
7    neutral policy that is motivated by racially discriminatory
8    purposes is as odious and as unconstitutional as an explicit
9    racial classification.  The grandfather clause, for example,
10   was race neutral on its face.  It simply said that in order to
11   be eligible to vote, you must demonstrate that your
12   grandfather was eligible to vote.  Made no mention of race
13   whatsoever.  But it was clearly enacted with the intention of
14   favoring one racial group over another, and it was the racial
15   motivation behind the grandfather clause that doomed the
16   statute, even though the law was written and purported to be
17   administered in race-neutral terms.
18        The same is true here, as the invalid purpose of the
19   school district's new admissions policies is to bend the
20   demographic makeup of the city's magnet schools toward the
21   overall racial makeup of the city of Philadelphia, by reducing
22   the number of black students at Carver, and by reducing the
23   number of Asian American and white students at Masterman and
24   Central.  And that is what distinguishes this case, most
25   importantly, from other lawsuits brought against other school

1    districts, where the plaintiffs were unable to muster evidence
2    of a racially discriminatory purpose.  In the Lower Merion
3    case that the city cites repeatedly throughout its briefs, the
4    plaintiffs never proved in that case that the school district
5    was motivated by a desire to change the racial makeup of the
6    student body at any school.  The same is true in the Thomas
7    Jefferson litigation in the fourth circuit, and the Christa
8    McAuliff School litigation in the second circuit.  The
9    plaintiffs did not have evidence that the city's or the school
10   district's change in admission policies was being done with
11   the intent, with the purpose, with the motivation of altering
12   the racial makeup of the student body.  All they could show
13   was that the change in admission policies had an effect of
14   changing the racial composition of the student tree.  But that
15   does not by itself show discriminatory purpose.  Here we have
16   smoking gun evidence from the goals and guardrails documents.
17   We have it in this school district's own words, in the
18   document that was issued by the city's, the school district's
19   own board of education claiming that this is a goal to achieve
20   a 52% minimum of black and Hispanic students at the city's
21   magnet schools, and that they will ultimately work toward
22   overall representation among the races that reflects the
23   racial makeup of the city of Philadelphia.  And because this
24   is a racially motivated admissions policy, strict scrutiny
25   applies, and the burden therefore is on the school district to

1    show first a compelling state interest, and second, they must

2    demonstrate how their admissions policy is narrowly tailored

3    to advance the compelling state interest that the school

4    district asserts, and they have made no attempt to do so in

5    their briefing, or in the evidence they have so far submitted

6    to this court.  They have not even told us what the supposed

7    compelling interest is, and they certainly have not

8    demonstrated how this new change in admissions policies is

9    narrowly tailored to achieve that purported governmental

10   interest.

11        If I could, Your Honor, I would like to spend some time

12   discussing the issues of balance of harms, because the school

13   district has argued quite vigorously in its brief that it's

14   simply too late in the day for a federal court to order

15   wholesale changes to the school district's admissions policies

16   when we're this close to the upcoming school year.  That is

17   not in any way an argument to deny a preliminary injunction;

18   it is only an argument to affect the scope of whatever

19   injunctive relief this court might issue.  There is no

20   justification to withhold the preliminary injunction that

21   would bar the city from imposing these new admissions policies

22   for the 2023/24 school year, and applications for admissions

23   to the city's criteria-based high schools will begin in a few

24   months.  So it is certainly appropriate and timely for this

25   court to enter relief with respect to the school year that

1    begins in 2023.  But more importantly, this court can at the
2    very least order relief for the three plaintiffs and their
3    children in this case, because an order from this court that
4    allows the children of Ms. Sargent and Ms. Sheridan and Mr.
5    Meyer to be admitted to their preferred schools for the
6    upcoming 2022/23 school year, will not in any way disrupt the
7    administration of the school district.  It is common fro
8    students to be admitted last minute off wait lists before a
9    school year starts, both at the high school level and at the
10   university level, and they have not made any claim or
11   demonstration that merely admitting these three students to
12   Carver, Palumbo and Masterman respectively, would cause any
13   irreparable harm for the city.
14        And finally, if I can close by turning back to the
15   overall standard for a preliminary injunction.  The third
16   circuit has held that there are two threshold requirements
17   that must be met.  #1) A reasonable probability of success on
18   the merits; and #2) irreparable harm to the plaintiffs.  We
19   have clearly satisfied those two gateway requirements for a
20   preliminary injunction.  The remaining factors the third
21   circuit has said are discretionary factors for this court to
22   consider and to balance against the two gateway factors, which
23   would include consideration of harm to others, including the
24   school district, and the public interest.  It is manifestly in
25   the public interest for this court to enforce the commands of

1    the constitution and federal civil rights law, including title
2    6, and enjoin the enforcement of this racially motivated
3    policy.  There is no conceivable public interest justification
4    for the city to be allowed to continue this any longer than
5    necessary.  I welcome the court's questions.
6              THE COURT:  Thank you, counsel.  I'll withhold my
7    questions until I hear both sides.
8              MR. MITCHELL:  Thank you.
9              THE COURT:  All right.  Counsel?
10             MR. KENNEDY:  Thank you, Your Honor.  May it please
11   the court.  The Philadelphia School District has 22 criteria-
12   based schools.  This case relates to three or four of those.
13   They happen to be the three or four, what are generally
14   regarded as the most competitive, most rigorous of the 22 --
15   frankly of the 250 upper Philadelphia school district schools.
16   Each year qualified students are eligible for admission to
17   these criteria-based schools.  That hasn't changed from year
18   to year.  In the year that just passed, the changes made to
19   the process, there were changes to the qualifications for
20   these four schools, as well as the other 20 -- other 18
21   criteria-based schools.  The changes at these four, Carver,
22   Central, Masterman and Palumbo, actually increased, made them
23   more stringent.  In the prior year, 2020/21, students applying
24   to these schools would be qualified if they had A's and B's
25   and potentially one C.  In the year that's at issue, '21/22,

1    the criteria at each of these schools requires A's and B's.

2    One of the other changes was to go from a process in which the

3    principals at each school selected among qualified applicants

4    to a lottery.  The lottery essentially gave students from any

5    area of the city, regardless of race, an equal opportunity for

6    admission to these schools, provided they met the minimum

7    qualifications, which again were heightened from the prior

8    year.  For these four schools -- and the lottery system

9    applied to all 22 criteria-based schools, and for over a

10   decade before last year had been applied at the city-wide

11   schools.  With respect to these four schools, there was a zip

12   code preference.  Zip code preference allowed students who met

13   the qualifications and lived in one of six zip codes,

14   admission to a school, if they met the qualifications and

15   applied to that school.  What the plaintiffs have not done is

16   tell the court or the school district, what about the school

17   district's policy was discriminatory?  The lottery is as

18   neutral as it can be.  The zip code preference, as set forth

19   in Exhibit-6 to the stipulated facts, was based not on race

20   but on the number of students from each zip code admitted to

21   one of these four schools over the previous four years.  And

22   on pages 10 and 11 of the research brief, Mr. Wills from the

23   school district sets out the percentage of students accepted,

24   admitted to each of these four schools over the previous four

25   years.  They range from 3% of students in zip code 19133 to

1    almost 70% of the students in 19103.  There is no mention in

2    the research brief of race.  Race was not considered in

3    identifying the six zip codes, and frankly, the lottery as a

4    whole was based on the fact that there is great disparity

5    between where a student lives and in many cases where that

6    student goes to school, and whether that student has a

7    realistic opportunity to be admitted into one of these

8    schools.

9         The plaintiffs cite to the zip code preference, it seems

10   as both evidence of alleged discrimination and as part of the

11   discrimination, but there is no evidence that the zip code

12   preference or the lottery was discriminatory in any way.  The

13   plaintiffs actually submitted the racial makeup from the 2020

14   census of the six preferred zip codes.  Now keep in mind,

15   that's Exhibit-7 to the stipulation.  Mr. Wills doesn't

16   mention the racial makeup.  And this is data that was pulled

17   for purposes of this case and this hearing.  But if you look

18   at Exhibit-7, Your Honor, the racial makeup of these zip

19   codes, they are not the {quote} "blackest" zip codes, they are

20   not the {quote} "whitest" zip codes.  They're not the most

21   anything.  They are purely, based on Exhibit-6, the zip codes

22   from which the fewest number of students had been admitted to

23   one of these four criteria-based schools in the previous four

24   years.

25        (Defendant's Exhibit-7 previously marked for

1    identification)

2        I'll talk some more about the zip codes in a moment, but
3    the plaintiffs argue in their reply brief that plaintiff's
4    obligation is only to show discriminatory motive, and that the
5    impact of the admissions process is not relevant.  Well, this
6    court is in the third circuit, and the third circuit's
7    decision in <u>Lower Merion</u> makes it clear that is not the case,
8    that impact and motive must be shown in order for this court
9    to grant a preliminary injunction.  In <u>Doe vs. Lower Merion</u>,
10   the court set out three circumstances, three alternatives for
11   establishing the strict scrutiny you should apply.  The first
12   is intentional discrimination shown by racial classification,
13   something like the <u>Seattle</u> case.  The plaintiffs have
14   acknowledged that this is a facially race-neutral policy, so
15   alternative 1 does not apply.  The second is intentional
16   discrimination shown by discriminatory application of a
17   facially neutral policy.  With respect to #2, we have a
18   facially-neutral policy and there's no allegation that the
19   lottery or the zip codes were -- that any student, based on
20   that student's race, was given preference or penalized.

21       The third alternative is intentional discrimination shown
22   by discriminatory purpose for a facially neutral policy, and
23   that's the alternative the plaintiff's rely on.  The third
24   circuit, however, made clear, relying on the <u>Palmer</u> case from
25   the supreme court, that although disproportionate impact alone

1    is not dispositive, a Plaintiff must show discriminatory
2    impact in order to prove an equal protection violation under
3    this third alternative.  The plaintiffs argue that
4    discriminatory motivation is enough, that impact doesn't
5    matter.  That argument is both illogical and inconsistent with
6    the Lower Merion case and the supreme court's decision in
7    Palmer.  In Palmer, the supreme court said that there's an
8    element of futility in a judicial attempt to invalidate a law
9    solely because of the bad motives of its supporters.  If the
10   law is struck down for this reason, rather than because of its
11   facial contact or effect, it would presumably be valid as soon
12   as the legislature or relevant government body re-passed it
13   for different reasons.  In other words, discriminatory impact
14   must be shown to establish an equal protection violation.
15   There is no evidence in this case of whether or how the school
16   district's changes to the admissions process will impact the
17   racial makeup of any of these schools.  And the plaintiffs
18   will say that by going to a lottery, we -- it must -- because
19   the lottery is random. it must mirror the population.  But
20   what we don't know, what plaintiffs don't know, is what was
21   the racial makeup of qualified students city wide?  We don't
22   have that data.  We won't know what the racial makeup of any
23   of these schools is, of each of these schools is until the
24   school year starts, and without that evidence this court
25   cannot/should not grant a preliminary injunction.

1      With respect to the discriminatory purpose, the
2   plaintiffs rely almost entirely on the goals and guardrails
3   document, but they do mention the zip codes.  As I said
4   earlier, the zip codes are in the plaintiff's argument both
5   evidence of and the discriminatory aspect of the process, and
6   they mention city council testimony.  And the city council
7   testimony is attached as Exhibit-8 to the stipulations.
8   Significantly, Karen Lynch, who is the school district
9   official who was primarily responsible for the development of
10  the admissions process, not just this year but in prior years,
11  testified at the city council hearing.  The plaintiffs rely on
12  one statement, one phrase by Ms. Lynch on page 121 of her
13  council testimony, ignoring, however, that on page 120
14  Councilman Oh asked Ms. Lynch about the racial makeup of these
15  schools, these four schools and Parkway.  The end of his
16  questions says, for example, Parkway 72.4% African American.
17  Why does that need to be overhauled?  Ms. Lynch's response is,
18  you're looking at the racial demographic of each of these
19  schools?  Councilman Oh says yes.  Ms. Lynch says, and a good
20  deal of the discussion has been about access and equity to
21  these schools, so it's not just about racial -- not just based
22  on racial dynamics.  Plaintiff sees on that phrase racial
23  dynamics, ignoring first that Ms. Lynch is responding to
24  Councilman Oh's questions about the racial makeup of the
25  schools.  They also ignore that Ms. Lynch states that the

1    discussion is about access and equity to these schools, and

2    then goes on to describe that students who meet the

3    qualifications, who live in areas where they have not had the

4    opportunities that others have had because the decision making

5    has been by database more on school that they attended,

6    perhaps, than their educational qualifications.  What Ms.

7    Lynch is basically saying is we looked at the zip codes and

8    the attendance -- the admissions to these schools among the

9    students in these zip codes, and determined that there's a

10   disparity.  Using zip codes as an identifier, or using zip

11   codes to identify where there is a disparity is completely

12   appropriate.  The first circuit condoned the use of zip codes

13   in the <u>Boston Parents</u> case, and even in the third circuit

14   case, <u>Lower Merion</u>.  The Lower Merion school district

15   identified certain areas in the township based on their racial

16   demographics, and elected to assign students to one school or

17   another based on where they lived in part because of the

18   racial makeup of those areas.  In this case, there is no

19   discussion, no acknowledgment, frankly, in Exhibit-6, there's

20   not even any knowledge or acknowledgment of any racial makeup

21   of any of these zip codes.  Because there is -- well, let me -

22   - I'll go the goals and guardrails as well.

23          (Defendant's Exhibit-8 previously marked for

24   identification)

25          The plaintiffs spend most of the time in the reply brief

1    and at argument this afternoon focusing on the goals and
2    guardrails, on one sentence in one document that describes the
3    school district's desire, school district's goal, of enabling
4    a greater percentage of black and Hispanic students to obtain
5    the qualifications to be admitted to one of the 22 criteria-
6    based schools.
7         Now first of all, the goals and guardrails don't say
8    anything about the admission process for the four schools at
9    issue in this case.  Second, as I said earlier, in each year's
10   process, the first step is to determine who is qualified.  The
11   second step is to do admissions based on or of qualified
12   students.  The statement in the goals and guardrails is not a
13   quota.  It is not a set-aside.  The <u>Brudder</u> case, the supreme
14   court -- in the <u>Brudder</u> case, the supreme court defined or
15   described a quota system as one that insulates each category
16   of applicants with certain qualifications from competition
17   with all other applicants, and that's not what happened here.
18   The goals and guardrails, talking about increasing the
19   percentage of students who are qualified for admission is
20   basically saying that we as a school district are going to do
21   a better job, we'll take a different approach to education of
22   our kindergarten through seventh graders to allow more of them
23   to be qualified for admission in eighth grade.  All of the
24   work required by that goal, by that guardrail, is required to
25   be done long before any student applies for admission to a

1    criteria-based school.

2         As I mentioned, there are 21 criteria-based schools --

3    22.  They have various levels of qualification from minimum,

4    there are 11 of the 22 that have a minimum criteria, to

5    medium, five schools, to high, 17 schools -- I'm sorry, high

6    17, which is three schools, high 22, one school, Central, and

7    high 22 algebra, which is one school, Masterman.

8    Qualifications only relates to whether those students are

9    prepared, are going to be qualified to apply for one of the

10   schools, and if they do, to be admitted.  And again, in the

11   last year, the school district did not decrease or lower the

12   level of qualifications, they increased it, from allowing

13   students to have a C to saying students have to have all A's

14   and B's.

15        The last thing plaintiffs rely on is the zip codes.  And

16   Mr. Mitchell didn't talk about the zip codes much in his

17   argument today, but it is clear that the zip codes were

18   selected based on the percentage of students from each of

19   those zip -- from each zip code in the city admitted to the

20   schools over the previous four years.  The goal of going to a

21   lottery, the goal of zip code preference, was to give greater

22   access to students regardless of where they live, regardless

23   of where they went to middle school, to give qualified

24   students the same access to the criteria-based schools.

25   That's what Ms. Lynch confirmed in the city council testimony,

1    that's what Mr. Wills confirms in Exhibit-6, the research

2    brief, and frankly, Exhibit-7, the 2020 census data, does not

3    support plaintiff's argument that the school district selected

4    these zip codes based on their racial makeup.  Even if we were

5    to look at the specific racial makeup of each of these zip

6    codes, to use plaintiff's argument, if the school district

7    wanted to alter the racial makeup by selecting zip codes, the

8    school district would have theoretically identified one zip

9    code that would get preference at Carver, a different zip code

10   that would get preference at Masterman or Central.  Because,

11   again, plaintiff's argument is not that the school district

12   tried to decrease the number of students of any one race or

13   increase the number of students of any one race at all four

14   schools, their argument is that the school district tried to

15   decrease the number of black students at Carver and increase

16   the number of black students at schools like Central and

17   Masterman.  And that's just not born out by the data we have,

18   the only data in this case, which includes the research brief,

19   the city council testimony, and the census data.

20        Because the plaintiffs cannot establish -- there is no

21   evidence of discriminatory impact and they can't establish

22   that there was a discriminatory purpose for the school

23   district's process change, rational basis applies.  And the

24   rational basis set out in these documents, including the city

25   council testimony and the 2022 high school admissions

1    brochure, confirm that the geographic provided greater access

2    regardless of where students live or where students go to

3    middle school, is a valid goal.  There's a heavy presumption

4    of constitutionality under the rational basis test, and the

5    school district has met it.  In Boston Parents, the first

6    circuit case, the court found that zip codes are completely

7    race neutral admissions criteria subject to rational basis

8    review.  The third circuit decision in Lower Merion found

9    making decisions about where students will go based on where

10   they live is not subject to strict scrutiny, it's subject to

11   rational basis.  In this case, rational basis applies, and

12   therefore the plaintiffs do not have a reasonable probability

13   of success on the merits.

14        Mr. Mitchell described the third and fourth criteria for

15   a preliminary injunction.  They are harm to others if an

16   injunction is granted or denied, and the public interest.  And

17   in this case, there would be significant harm if the court

18   were to undo the admissions process.  In the Boston Parents

19   case, the first circuit stated that it would deny a request

20   for preliminary injunction because in that case the decision

21   was coming too close to the time when the admissions decisions

22   would be announced.  The admissions decisions in this case

23   were announced I think six months ago.  We are six months

24   after the decisions were announced.  Many students have known

25   where they were going to school in three weeks six months ago.

1    The plaintiffs knew about the changes to the process as early
2    as September or October of last year, and certainly by
3    December when the lead plaintiff, Ms. Sargent, testified at
4    city council about the changes to the process.  Plaintiffs
5    didn't file this case in September or October, they didn't
6    file it in December, they filed it in April.  They filed their
7    request for preliminary injunction in June.  We are way too
8    close to the time when not just decisions will be announced,
9    but students will actually show up at these schools ready for
10   their first day.  The teachers have already been assigned to
11   these schools based on attendance.  Almost 9,000 students have
12   made plans to go to one school or another based on the
13   admissions process.  The balance of harms clearly disfavors a
14   preliminary injunction in this case.
15           With respect to plaintiff's request that we just allow
16   three students in, that request would completely upend the
17   process.  We had an admissions process that took place over
18   approximately five months.  Thousands of students have been
19   assigned to one school or another based on that process.
20   Plaintiffs are essentially asking this court to allow three
21   students to jump ahead of hundreds of students who may be on
22   the waiting list at these schools and just let them in based
23   on the fact that they have filed a lawsuit.  That's completely
24   unfair and would completely undermine the school district's
25   process which, again, is race neutral, did not consider the

1    races of any of these students, and should be upheld.

2              THE COURT:  Thank you, counsel.

3              MR. KENNEDY:  Any questions, Your Honor?

4              THE COURT:  You can have a seat.

5              MR. KENNEDY:  Thank you.

6              THE COURT:  I have a question for plaintiff's

7    counsel.  How do you respond to counsel's characterization of

8    the guideline language, the language that you characterize as

9    a smoking gun?

10             MR. MITCHELL:  So as I understand Mr. Kennedy's

11   argument --

12             THE COURT:  Yes.

13             MR. MITCHELL:  -- he is trying to say that that is

14   simply trying to alter the racial composition of students

15   qualified for the magnet schools.  But it's the city that

16   decides the cutoff for who is qualified.  So it's still

17   operating as a racial quota.  The city has total control to --

18             THE COURT:  Well, they do, but in terms of the --

19   who qualifies for the lottery, my understanding of the record

20   is that who qualifies for the lottery is standardized.

21             MR. MITCHELL:  But a school district still chooses

22   the cutoff, so there is the standardized computer-graded essay

23   exam, and they've chosen, I believe -- Mr. Kennedy should

24   correct me if this is wrong -- 22 is the cutoff for Masterman

25   and Central, and 17, or something in that area, is the cutoff

1    for Palumbo and Carver.  But the city decides ultimately what

2    those cutoff numbers will be, and they will define the scope

3    of qualified applicants according to these racial goals they

4    put forth in the goals and guardrails document, so --

5              THE COURT:  Yes, but how is the cutoff racially

6    determined?  So you're talking -- the -- first of all, this is

7    -- our students' potential will not be limited by practices

8    that perpetuate systemic racism and hinder student

9    achievement.  So to me, it says indicator 4.1.  What is an

10   indicator that we're reaching that type of goal?  And it says

11   among eighth grade students who are qualified to attend

12   special admission high school, the percentages who are black,

13   African American or Hispanic or Latinx will grow from 33.8% in

14   August 2020 to at least 52%, making progress towards being

15   proportional to population as a whole by August 2020.

16             MR. MITCHELL:  Right.

17             THE COURT:  That's as if -- that is to me saying

18   that, very much like some of their other goals, every student

19   reads on or above grade level.  Every student performs on or

20   above grade level in math.  Every student graduates ready for

21   college and careers.  Welcoming and supportive schools.

22   Enriching and well -- these seem to be objectives that we

23   would like to achieve and indicators that we've achieved that

24   would be, for instance, that of the eighth grade pool that is

25   qualified to get into the lottery, that we would raise the

1    number of students who qualify from where -- to 33.8% and 52%.
2    In other words, we have to do a better job with those students
3    in getting them to do this standardized work that gets them to
4    the level in which they qualify.
5                MR. MITCHELL:  Your Honor --
6                THE COURT:  That's what this seems to be saying to
7    me, not that our goal is that the attendance is that -- would
8    be that, that admissions would be that, but the -- that they
9    would -- we would raise them up so at least they would qualify
10   to get into the lottery.
11               MR. MITCHELL:  Your Honor, I could agree with that
12   interpretation if the school district did not make changes to
13   the definition of who's qualified in response to the issuance
14   of this document.  So if Your Honor's interpretation is simply
15   that -- all the other passages you read -- Your Honor read
16   from that document are entirely benign.  They're not dealing
17   with any type of racial preference, they're just setting forth
18   aspirations to achieve.  The problematic provisions in the
19   goals and guiderails documents are the language that we quoted
20   in our brief that Your Honor read, and also the statement
21   about school discipline, where they're trying to impose a
22   quota on black students who are being subject to disciplinary
23   action and make sure that that is no greater than the
24   proportion of black students in the Philadelphia school
25   district.  So in both of those situations they are setting

1    forth numerical goals and quotas.  And we know these are not

2    simply aspirations to improve academic achievement, because

3    they're simultaneously changing the definition of who is

4    qualified to attend the magnet schools in response to this

5    announced goal.  That's why I don't think it can reasonably be

6    interpreted as simply a statement that we're trying to boost

7    academic achievement among --

8         THE COURT:  So what qualifications did they change

9    to -- that would tie into this indicator 4.1?

10        MR. MITCHELL:  Yes, so they changed it in several

11   ways.  We have described them in the stipulation.  So before,

12   the principals would make the decision about who would be

13   admitted to the school.  Under the new system there's a thresh

14   --

15        THE COURT:  This doesn't sound like a great system.

16        MR. MITCHELL:  Perhaps not.  It depends on how the

17   principal --

18        THE COURT:  That sounds fairly arbitrary and almost

19   then -- then almost invites the -- puts the principal in a

20   position where it's being invited that you've discriminated.

21   You liked this one, didn't like that one and you had implicit

22   reasons for liking this one and not doing that.  I wouldn't

23   even want to be the principal making those decisions.

24        MR. MITCHELL:  To be clear, Your Honor, it was not

25   purely principal discretion.  There were still cutoffs.  And

1    again, Mr. Kennedy will know --

2             THE COURT:  Yes, I know, I know, but --

3             MR. MITCHELL:  -- the facts, but you had to have A's

4    and B's.

5             THE COURT:  -- once the cutoffs were made --

6             MR. MITCHELL:  Right, once the cutoffs were made --

7             THE COURT:  -- and now you have this qualified pool

8    --

9             MR. MITCHELL:  Right.

10            THE COURT:  -- you have this, you know, subjective

11   arbiter saying, okay, these are the kids I like, these are the

12   kids that are going in.  That's not necessarily a great

13   system.  So now they changed their system.

14            MR. MITCHELL:  If -- and if they changed the system

15   because --

16            THE COURT:  All right, so tell me how they then --

17   they worked the system to change these percentages, because

18   that just doesn't seem this case.  You're telling me on the

19   face of this, this is a smoking gun.  Now you're telling me,

20   well, not on the face of it, Judge, you've got to look at all

21   these other factors and turn it into it.

22            MR. MITCHELL:  Well, it --

23            THE COURT:  But this says nothing about admissions.

24   This says about qualifications, raising -- working to raise

25   the qualifications of certain students, which to me seems to

1    be an admirable thing, and then raising their qualifications

2    so they get in the pool.

3              MR. MITCHELL:  That is --

4              THE COURT:  Now they're in the pool, but they may be

5    in a pool that's not within these six zip codes.  They very --

6    they could be in any one of these zip codes, in any one of

7    them, and they get admitted.  But you have -- you've raised

8    the boat up and you have then, by raising the boat up, more of

9    those children likely then to be picked out of the lottery.

10             MR. MITCHELL:  What Your Honor described is entirely

11   permissible, if that were indeed what the city is doing.  But

12   that's clearly not the case because they've changed the

13   standards for what it means to be qualified for admission to

14   the magnet schools.  In response to this document that

15   establishes a racial goal or quota for set-aside.  There's

16   absolutely nothing wrong with a school district saying that we

17   want to improve academic performance among any particular

18   group, racial or non-racial.  There is a problem --

19             THE COURT:  That's what this says.

20             MR. MITCHELL:  Well, no, I don't believe I --

21             THE COURT:  And you said --

22             MR. MITCHELL:  No, it --

23             THE COURT:  -- this was a smoking gun.  You read it

24   --

25             MR. MITCHELL:  Your Honor --

1          THE COURT:  -- to me as a smoking gun.

2          MR. MITCHELL:  -- it's a smoking gun because that

3    has to be read in context to what they did in response to the

4    document.  They changed the admissions policies for the magnet

5    schools right after they issued the document.  So that

6    document is proof --

7          THE COURT:  All right, so now --

8          MR. MITCHELL:  -- of any -- I'm sorry.

9          THE COURT:  -- they changed admissions qualifiers.

10   But how did they change them in a way that somehow -- that is

11   racially motivated?

12         MR. MITCHELL:  So it is race neutral on their face,

13   and I agree with Mr. Kennedy.  A lottery is facially --

14         THE COURT:  No, we don't need to get to a lottery.

15   You're saying -- maybe we don't, I --

16         MR. MITCHELL:  Right.

17         THE COURT:  Maybe I'm missing a step, okay.  You're

18   saying, Judge, you've got to read this in context, and they

19   changed the qualifiers.  And I -- you didn't show me where

20   they changed the qualifiers.  You jumped right to the lottery.

21         MR. MITCHELL:  Okay.

22         THE COURT:  They changed the lottery, but the

23   lottery is not a change of qualifiers.

24         MR. MITCHELL:  They established a definition of who

25   meets the minimum cutoff for Masterman, Central, and Palumbo

1    and Carver.

2              THE COURT:  Right, and that --

3              MR. MITCHELL:  So there's a certain score -- I'm

4    sorry.

5              THE COURT:  -- applies to everybody.

6              MR. MITCHELL:  Correct, that's right.

7              THE COURT:  Right.

8              MR. MITCHELL:  Same race -- all scores apply to the

9    same races.

10             THE COURT:  So I'm reading -- that's the context I'm

11   reading this in now.

12             MR. MITCHELL:  That's right.

13             THE COURT:  So I don't see anything in reading that

14   context that changes this indicator that you're referring to

15   as a smoking gun.

16             MR. MITCHELL:  Well, the problem --

17             THE COURT:  So -- go ahead.

18             MR. MITCHELL:  Sorry.  There's absolutely nothing

19   wrong with adopting the lottery system, on its face.  There is

20   a problem with adopting the lottery system if your motivation

21   is to change the racial makeup of the student body.  So --

22             THE COURT:  And everybody agrees with that --

23             MR. MITCHELL:  Yes, so --

24             THE COURT:  -- as long as there's a discriminatory

25   impact.

1               MR MITCHELL:  That's right.  So --

2               THE COURT:  Okay.

3               MR. MITCHELL:  So the question for the court to

4       resolve is, and we're at the preliminary injunction stage.

5               THE COURT:  Right.

6               MR. MITCHELL:  So we don't need proof at this point,

7       we just need to show a reasonable probability of success on

8       the merits.  Does that document that Your Honor is --

9               THE COURT:  Yes, but the reasonable probability has

10      to have -- reasonable probability of success at this stage has

11      to have a very strong evidentiary foundation.

12              MR. MITCHELL:  It has to be based in evidence.  It

13      can't be based in speculation.

14              THE COURT:  Right, it's not plausibility.

15              MR. MITCHELL:  That's correct.

16              THE COURT:  Right.  Go ahead.

17              MR. MITCHELL:  So the question for Your Honor to

18      decide is whether the documentary evidence that we've

19      presented --

20              THE COURT:  Yes.

21              MR. MITCHELL:  -- the goals and guardrails documents

22      --

23              THE COURT:  Yes.

24              MR. MITCHELL:  -- the statements that we cited at

25      that hearing that the city council held, and all this

1    together, does that create a reasonable probability that this

2    was motivated by a desire to change the racial makeup of the

3    student body.

4              THE COURT:   Okay.

5              MR. MITCHELL:   There's nothing wrong in the abstract

6    with moving to a lottery system.   Many schools do that.

7              THE COURT:   Right.

8              MR. MITCHELL:   There is a problem, though, if the

9    reason you chose the lottery system is because you want to

10   change the racial makeup of the student body.

11             THE COURT:   Sure.

12             MR. MITCHELL:   So having made a reasonable

13   probability of success that we will ultimately, after going

14   through discovery, which we haven't even started yet, but is

15   there a reasonable probability that at the end of the day we

16   will be able to prove by a preponderance of the evidence that

17   the school district's motivation for doing this was to alter

18   the racial makeup of the student body, as opposed --

19             THE COURT:   Right.   And what you have right now is

20   this indicator, 4.1, which refers to -- which refers not to

21   admission but refers to qualifying --

22             MR. MITCHELL:   Correct.

23             THE COURT:   -- and you have statements of council.

24             MR. MITCHELL:   Statements of council.   We also have

25   statements in the hearing that we cited from some of the

1    school officials that mention this was done in response to
2    George Floyd.  Again, clearly evidencing a desire to do
3    something on the racial makeup of the student body at those
4    schools.  And again, if they have a reason for doing this
5    that's not motivated by race, it's -- not -- I shouldn't say a
6    reason.  If they have purely race-neutral motivations where
7    racial considerations aren't even part of the consideration,
8    that would be constitutional.  But at this stage, simply at
9    the preliminary injunction phase of the litigation where we
10   need to show just a reasonable probability of success on the
11   merits, does that document, do those quotes that we've cited
12   from the city council meeting, is that enough to show a
13   reasonable probability that we will eventually prove by a
14   preponderance of the evidence that a school district did this
15   for racial reasons.  And it's overwhelming in our view, Your
16   Honor, because I think Your Honor also has to look at the
17   statement on school discipline, where they are saying that we
18   are going to cap the number -- the percentage of disciplinary
19   actions against black students at -- I believe the number they
20   said is 42%.
21             THE COURT:  Yes, and I think you're reading --
22             MR. MITCHELL:  So that's --
23             THE COURT:  -- this document differently than I am
24   in terms of -- these educational goals and guardrails in terms
25   of what they're saying.  We're going to -- I mean, every

1    student graduates ready for college and careers.

2              MR. MITCHELL:  Right.

3              THE COURT:  I mean, that's never going to happen in

4    the real world.

5              MR. MITCHELL:  That's aspirational.

6              THE COURT:  And -- aspirational?  It's never going

7    to happen in a real world in any pretty much school district

8    in the country.  But so in that context then it is -- and

9    they're talking about, look, we've got to change this systemic

10   racism.  So in terms of whether or not we're being successful,

11   here are some indicators that we're looking for.  We're

12   looking for an indicator that, hey, so many proportion of our

13   kids are qualifying for these exams.  That's an indicator.

14   Will they ever reach that indicator?  Doesn't say that we're

15   going to make sure that we're reaching that indicator by

16   saying we're -- these are the percentages and that's it.  It's

17   the same way with your indicator on discipline.

18             MR. MITCHELL:  Right.

19             THE COURT:  Are we going to get better at raising

20   our kids, at getting them to come to school, pay attention and

21   do all the other things?  It's not saying we're not going to

22   suspend kids for doing anything wrong, it's an indicator that

23   we're doing much better with these children if the percentages

24   are decreased.

25             MR. MITCHELL:  Your Honor, with respect --

1            THE COURT:  So what I'm saying is I don't think

2    things are as clear as you're making them out to be or want to

3    believe that they are.

4            MR. MITCHELL:  Your Honor, I have to respectfully

5    disagree with your characterization of the school disciplinary

6    statement in there.  That is far more pernicious I think than

7    what Your Honor suggests.  They're not trying to say we want

8    our children to be better behaved.  They want to say that a

9    percentage, the racial percentage of suspensions, of

10   disciplinary actions, will be a certain number for black

11   students, meaning --

12           THE COURT:  Yes, and I think from where you're

13   coming from, right?

14           MR. MITCHELL:  Right.

15           THE COURT:  That's how you read it.

16           MR. MITCHELL:  Absolutely.  I think that's how --

17           THE COURT:  And where I'm coming from the bench --

18           MR. MITCHELL:  Right.

19           THE COURT:  -- I don't necessarily read it that way.

20           MR. MITCHELL:  Well, Your Honor -- yes.

21           THE COURT:  So you can respectfully disagree --

22           MR. MITCHELL:  Sure.

23           THE COURT:  -- which I get, that's why you're here.

24           MR. MITCHELL:  Right.

25           THE COURT:  That's why there's appeals, that's why

1    there's a third circuit.  But I would respectfully not

2    disagree with you, but respectfully say that there's another

3    way of reading that.

4              MR. MITCHELL:  I think the question is how would a

5    reasonable observer look at that document in the context of

6    what the school district has done with respect to school

7    admissions.

8              THE COURT:  That's true.

9              MR. MITCHELL:  That really is I think what --

10             THE COURT:  In the context of what they've done.

11             MR. MITCHELL:  Yes.

12             THE COURT:  Because, guess what, somebody like you

13   sitting in a front office may say, well, I'm up to so many

14   percentage points, I can't suspend this child.  Maybe they're

15   doing that.

16             MR. MITCHELL:  Right.

17             THE COURT:  They could be doing that, and if that's

18   what they're doing, then there goes the neighborhood, quite

19   frankly.

20             MR. MITCHELL:  Right.

21             THE COURT:  I don't think anybody would want to run

22   a school like that.

23             MR. MITCHELL:  Right.

24             THE COURT:  That's why I think if you look at 4.1

25   and 4.2, I think they're aspirational like all the other

1   things said in here.  But like you said, you know, there's a

2   context here.  Okay, what is the context?  So you say you have

3   these statements from the hearing.

4               MR. MITCHELL:  But even -- Your Honor, even an --

5               THE COURT:  And if there's statements from the

6   hearing, is that the end of the game?  Then I guess that's a

7   question I'm also going to hear from defense counsel.

8               MR. MITCHELL:  But even an aspirational racial quota

9   is unconstitutional.  You can set a goal, and even if you fail

10  to meet the goal, you're violating the constitution.  If

11  you're --

12              THE COURT:  Well, that's -- I think everybody at

13  both tables would agree to that.  I don't think they're

14  saying, though, that we have an aspirational goal of getting

15  these kids to a level where when they take these tests that we

16  put out there, they meet these markers.  If they meet the

17  markers as to grades, if they meet the markers as to absences,

18  if they meet the markers as to how well they do on the essay -

19  -

20              MR. MITCHELL:  Sure.

21              THE COURT:  -- we're trying to get all these kids --

22  we want to raise the boat so these kids can meet the

23  percentages to get into -- to -- and we've discussed this

24  already.

25              MR. MITCHELL:  Yeah, that's right, that's right.

1              THE COURT:  You said that that would be okay.

2              MR. MITCHELL:  Your Honor, I think that's a more

3     plausible reading if the document we're referring to objective

4     benchmarks, that the school district has no authority to alter

5     or change itself.  For example, if they wanted to say we want

6     to raise the racial percentage of black or Hispanic students,

7     they get a certain score on the SAT.  The SAT is administered

8     by an entity separate from the school district.  It's quite

9     another thing for the school district to say we want to have

10    56 or 52 percent of black and Latino students be deemed

11    qualified for admissions to magnet schools when we the school

12    district have the full prerogative to decide who will be

13    qualified, and we the school district define the cutoffs for

14    who's qualified.

15             THE COURT:  Yes, there --

16             MR. MITCHELL:  That is far more --

17             THE COURT:  I agree, and you're --

18             MR. MITCHELL:  Yeah.

19             THE COURT:  You're making argument.

20             MR. MITCHELL:  Yeah.

21             THE COURT:  And you're reading way too much into

22    what this says.  This -- you're reading the way you want to

23    read it, the way your reaction to this policy is, but it

24    doesn't read that way.  Among the eighth grade students who

25    are qualified to attend special admission high schools, the

1    percentages who are black, African American, Hispanic, will
2    grow from 33.8% to at least 52%.  You either make it or you
3    don't --
4              MR. MITCHELL:  Right.
5              THE COURT:  -- don't make it.
6              MR. MITCHELL:  But it's all --
7              THE COURT:  Now it may be that there is a tie-in.
8    You say that -- read me something from the evidence that says
9    there's a tie-in.  You said you have these statements.
10             MR. MITCHELL:  Well, the statements from the hearing
11   at the city council, both Dr. Jubilee and Dr. -- and Ms. Lynch
12   repeatedly invoked the goals and guardrails document, as the
13   reason for why they made the change in admissions policy.  So
14   we have those statements from the hearing that explains the
15   link between the goals and guardrails documents and the
16   eventual --
17             THE COURT:  Right.  Let me hear --
18             MR. MITCHELL:  -- change in the admissions policies
19   that were made.
20             THE COURT:  -- let me --
21             MR. MITCHELL:  Yes.
22             THE COURT:  -- you take a look at those statements
23   while you're sitting down --
24             MR. MITCHELL:  Sure.  Thank you, Your Honor.
25             THE COURT:  -- to dig them out, and let me have

1    counsel respond to that.

2            MR. MITCHELL:  Thanks.

3            THE COURT:  Counsel, he's saying that this is a

4    smoking gun, it's not denying at all that when you look at the

5    testimony in front of city council from the public officials

6    that it makes clear what they're doing.

7            MR. KENNEDY:  And I disagree, Your Honor.  We

8    disagree.  If you look at the council testimony, both Dr.

9    Jubilee and Karen Lynch testified -- well, let's take a step

10   back.  The city council hearing -- fortunately Your Honor

11   unfortunately read the 300+ pages, and every witness talks

12   about diversity, racial makeup of the schools.  Several of the

13   witnesses talk about their immigrant status and how difficult

14   it's been and how important it is for their kids to be

15   successful and over and over, diversity, race.  And as I

16   mentioned earlier, the council people specifically asked Karen

17   Lynch, several council people, about racial makeup and racial

18   demographics.  It is accurate that Dr. Jubilee and Ms. Lynch

19   talked about the goals and guardrails, specifically the goal

20   and guardrail related to anti-racism and equity coming --

21   being issued in the wake of the George Floyd and Breonna

22   Taylor incidents.  What they then say over and over, both

23   Sabrina Jubilee and Karen Lynch, over and over say that the

24   focus in this process, the admissions process, was on equity,

25   and Ms. Lynch goes into great detail -- I read it earlier, she

1   says it's not just -- you know, racial dynamics are one piece

2   of what is going on here, but this is really looking at equity

3   and identifying those areas of the city from which students

4   don't seem to have a -- have not seemed to have a realistic

5   opportunity to go to these schools.

6         Another point, and I agree with a lot of -- most of the

7   points Your Honor made about the goals and guardrails.  One

8   thing to keep in mind is that that guardrail guideline 4.1

9   relates to the minimum qualification for admission to a

10  criteria-based school, and the criteria-based schools, 11 of

11  them are classified as -- well, in at least one of the

12  documents as minimum.  The four schools we're talking about

13  here are -- have significantly more stringent qualification

14  criteria.  And the admissions criteria in the process that is

15  at issue today, actually were more stringent when it comes to

16  students' grades than they had been in the prior year.  Mr.

17  Mitchell a couple times said that we changed the criteria.  We

18  changed the criteria to make it essentially harder to be

19  qualified to get into one of these four schools.  There was an

20  objective test that had been used in prior years, the PSSA,

21  the Pennsylvania scholastic test.  That test wasn't used in

22  the last process or the process before due to COVID.  So that

23  was not changed from the prior year.  With respect to the

24  writing sample, that's another change but that writing sample

25  had been used at one of the five most elite, for lack of a

1    better word, criteria-based schools for several years before.

2    And the computerized writing sample took the place of a

3    writing sample that students had to submit.  So that

4    statement, the goals and guardrails, first of all it doesn't

5    establish a quota.  It doesn't say or even suggest that we're

6    changing the criteria for admission to get into these schools

7    or making them somehow less stringent, and the only thing that

8    the city council testimony confirms is that the goals and

9    guardrails exist, and that the focus in this process was on

10   increasing the opportunity for students to go to these schools

11   regardless of where they lived or went -- where they went to

12   middle school.

13            THE COURT:  Well, regardless of the focus of the

14   city council back and forth in those kind of hearings, my

15   understanding is that it's not as if they can't discuss and

16   talk about demographics.

17            MR. KENNEDY:  Absolutely, Your Honor.  And that's --

18   the cases on these topics, so the Lower Merion case --

19            THE COURT:  Because they're discussing demographics

20   and the potential effect on demographics, it doesn't seem to

21   me that's the end of the game if that's being discussed.

22            MR. KENNEDY:  It absolutely is not.

23            THE COURT:  It's not a -- it doesn't establish

24   motivation, it doesn't seem to me, from reading the supreme

25   court cases.

1          MR. KENNEDY:  The supreme court cases, the first

2     circuit cases, the Lower Merion case of the third circuit all

3     say that consideration of or knowledge of racial dynamics does

4     not equate to racial -- or discriminatory motivation.

5          THE COURT:  All right.  So have a seat.  We're going

6     to take ten minutes.  I'm going to let you consult with your

7     brain trust next to you, the entire brain trust.  You can

8     consult with your brain trust over here, and then I'll give

9     you ten minutes to wrap up and quote from the best cases that

10    say Judge Kenney really is not -- he may not -- he may be in

11    the wrong ball park, but he's in the outfield, he's not in the

12    infield, all right.  So if you want to do that, you can do

13    that.  I'll give you ten minutes to sort of figure that out,

14    okay?

15          MR. KENNEDY:  Thank you, Your Honor.

16          THE COURT:  All right.

17          MR. MITCHELL:  Thanks.

18          THE CLERK:  All rise, please.

19       (Recess)

20          THE CLERK:  Court is back in session.

21          THE COURT:  All right, have a seat.  All right.

22    While counsel are still collecting their thoughts, I notice

23    some of the parents are in -- maybe the parents are for all

24    three defendants.  I'd just like to say, you know, when you

25    have systems like this, lottery systems and those types of

1    things, you know, decisions are made at a policy level and
2    they're not personal and then when they come down into your
3    individual child it becomes very personal for you.  So, it's
4    kind of interesting with decision makers.  They make decisions
5    based on policy and then they go ahead and it does effect
6    individually, individuals personally.  So, I do recognize
7    that.
8         Counsel are you ready?  I saw you had your head buried in
9    your hand -- hurt, but you --
10             MR. ZIMOLONG:  Thank you.
11             THE COURT:  -- got a migraine or anything.
12             MR. ZIMOLONG:  Thank you, Your Honor.  Thank you.
13             THE COURT:  I have a tendency to have that effect on
14   people.
15        (Laughter)
16             MR. ZIMOLONG:  Deep thought, Your Honor.
17             THE COURT:  They just shake their head and say,
18   "This guy just doesn't get it."
19             MR. ZIMOLONG:  No, no, Your Honor.  No, I'm in deep
20   thought about the final comments.
21             THE COURT:  But I'm getting there.  I'm trying.  All
22   right.  So, I wanted both sides to have a chance then to --
23   after my input, to collect their thoughts and just wrap up.
24   So, counsel, if you want to step up here, you're welcome to do
25   that.

1          MR. MITCHELL:  Thank you, Your Honor, and may it
2    please the Court.  The ultimate test for racially
3    discriminatory purpose is set forth in a Supreme Court's
4    decision in <u>Feeny</u>.  This is a canonical test and I'll just
5    read it to the Court.  "Whether the decision maker acted
6    {quote}, "at least in part because of, and not merely in spite
7    of, the effects that this decision would have on a racial
8    group."  The question for Your Honor --
9          (Pause in proceedings - telephone ringing)
10         THE COURT:  Hold on for a second. I don't know whose
11   cell phone that is but --
12         (Laughter)
13         THE COURT:  -- I'm really not happy about it.
14   That's all I've got to say.  So, please don't let that happen
15   again.  Go ahead counsel, I apologize.
16         MR. MITCHELL:  All right.  So again, the test from
17   <u>Feeny</u>, whether the decision was made because of, and not
18   merely in spite of, its effects on a particular racial group.
19   So, the question for Your Honor to decide is whether we have
20   shown a reasonable probability the discovery will uncover
21   evidence that will show, by a preponderance of the evidence,
22   that the school district changed its admissions policies, at
23   least in part, because of, and not merely in spite of the
24   racial effects that the change in the admissions policies will
25   produce.  And we have provided for this Court, more than

1   enough evidence, at least at this stage of the litigation to

2   demonstrate a reasonable probability that we will ultimately

3   prevail on this claim.  And the evidence goes well beyond the

4   Goals and Guardrails documents that we discussed earlier. Your

5   Honor, consider Dr. Jubilee's statements from the City Council

6   Meeting.  This is on page 84 of Exhibit-6 to our motion for

7   preliminary injunction.  I'm quoting from Dr. Jubilee.  She

8   says, "On June 15, 2020, --

9               THE COURT:  Hold on a second.

10              MR. MITCHELL:  -- I'm sorry.

11              THE COURT:  Page 84?

12              MR. MITCHELL:  Page 84 of Exhibit-6.

13              THE COURT:  Of Exhibit-6.  Counsel, do you have that

14  in front of you?

15              MR. KENNEDY:  I have it behind, Your Honor.

16              THE COURT:  I want him to be able to --

17              MR. MITCHELL:  Sure.

18              THE COURT:  -- read along with you.

19               MR. MITCHELL:  It's the transcript of the City

20  Council Hearing.

21              THE COURT:  Hold on one second.

22              MR. MITCHELL:  I'll wait.

23              MR. KENNEDY:  Got it.  Thank you, Your Honor.

24              THE COURT:  Uhm-hum.

25              MR. MITCHELL:  And she's making this statement to

1  justify it to the City Council Committee, why the school

2  district changed its admissions policies.  And she's making

3  these statements after a series of parents had complained

4  quite vigorously about what the City's new admissions policy

5  had done.  So, I'm quoting from Dr. Jubilee, {quote} "On June

6  15ᵗʰ, 2020 in the wake of the murders of Brianna Taylor,

7  Ahmaud Aubrey, George Floyd, and countless others, as a

8  district, we released our statement on anti-racism.  In the

9  statement, we committed to becoming an anti-racist equitable

10  organization by uprooting policies, deconstructing processes

11  and eradicating practices that create systems of privilege and

12  power for one group over another. The upending of privilege

13  heightened here is not simply in reference to a configuration

14  of numbers or an assessment of differences in skin color or

15  features, but rather speaks to the destruction of a system and

16  the dismantling institutionalization of norms.  It doesn't

17  just ask for us to set aside seats as a way to appease a few,

18  but rather challenges us to explore the questions of why, who

19  and for what."  She goes to say, {quote}, "Through the school

20  selection process, we have the opportunity to redesign a

21  process that from inception to current practice, has only

22  truly benefitted a small group of stakeholders, many of whom

23  do not reflect the majority demographic {singular} of our

24  school district or city.  But this presentation I am not

25  speaking solely about visibility, but more about the impact of

1    an opportunity, access and power," {end quote}.  A shorter
2    statement from Ms. Karen Lynch, a school district official
3    that appears on page 93 of the same exhibit, Exhibit-6.  I'm
4    quoting again.  "In addition to the removal of the PSSA as a
5    criteria for the school selection process last year, this
6    year, not last year, our district was also impacted by the
7    growing national attention to racism, mainly the murder of
8    George Floyd, among others.  As a result, as an organization,
9    we committed to examining all of our processes, procedures and
10   practices to ensure equity."  Later she says, "For more than a
11   year," still quoting, "the school district obtained feedback
12   about the school selection process and listened to individuals
13   and representatives of groups to inform the improvements to
14   its school selection process.  Several public meetings held by
15   the Board of Education as it members considered the Board's
16   Goals and Guardrails wanting to care for the Guardrails as
17   ending racist practices as I've shared, and our policies and
18   procedures," {end quote}.
19        So, these quotes when combined, not only with the Guard
20   {sic} and Guiderails documents, but also the School District's
21   own packet on high schools admissions that it had issued in
22   2021 to 2022, explaining once again, the reason for why the
23   School District changed its admission policies which refers
24   back to the Goals and Guardrails Documents, and mentions
25   issues of race.  All of that, taken together, satisfies our

1    burden at this stage of the litigation, to establish a

2    reasonable probability that it will ultimately succeed on the

3    merits of our claim that these policies were enacted with at

4    least in part, racial motivations.

5             THE COURT:  Thank you counsel.

6             MR. MITCHELL:  Thank you, Your Honor.

7             MR. KENNEDY:  Your Honor, give me one second to find

8    page --

9         (Pause in proceedings)

10            MR. KENNEDY:  Your Honor, I'm just going to address

11   a couple of points that were just raised and wrap everything

12   up.  The process that the School District used, more stringent

13   qualifications for admission to these four schools --

14            THE COURT:  Do you know what the grade equivalent

15   was?  What the grade cutoff was?

16            MR. KENNEDY:  Sure, Your Honor.  And actually I

17   should have pointed this out earlier.  An example, if you want

18   to look at Academy of Palumbo, it's 19 of Exhibit-1 and page

19   19 of Exhibit-2.  And page -- Exhibit-1 to the stipulated

20   facts is the 2021 Admissions Directory, page 19.  It sets out

21   the admissions requirement for Academy of Palumbo.  "Admission

22   Requirements Grades - Grades were A's and B's with the

23   possible exception of one C in major subject on report cards."

24   And that's consistent if you look at the criteria for Carver,

25   which is on page 24, Central on page 25 and Masterman which is

1    on page 48 of Exhibit-1, A's and B's with the possible

2    exception of one C. In the following year, which is the year

3    that's at issue here, the 2022 Directory, if you go to the

4    same page, page 19.   Example Academy at Palumbo says,

5    "Admission Criteria, Grades, A's and B's."  So, no C's

6    allowed.   And that's why I've said a few times, Your Honor,

7    that the criteria for admission at these four schools actually

8    was more stringent in the process that was at -- that's at

9    issue.   As Your Honor acknowledged, using a lottery is as

10   objective of a basis for selection as you can think of.   The

11   lottery gives equal access provided the student meets the

12   qualifications to attend, provides equal access to everyone.

13   And the selection of six zip codes is based only on the

14   historic attendance at these four schools.   And Exhibit-7,

15   which is the actual census data, confirms that there is no

16   rhyme or reason here.   If someone were to look at the census

17   data and say we're going to select zip codes based on race, it

18   would not be these six.   These six --

19            (Defendant's Exhibit-1 previously marked for

20   identification)

21            (Defendant's Exhibit-2 previously marked for

22   identification)

23            THE COURT:   Counsel says, "Look, I -- Judge, I've

24   shown clearly I got a reasonable probability of prevailing.

25   Once I do discovery it's all going to come out, so I've met my

1    burden here."

2             MR. KENNEDY:  Your Honor, that's a fair question and

3    you're right, that's the plaintiff's position.  But the

4    reasonable probability has to be based on evidence.  The only

5    evidence here is that the zip codes were selected based on

6    attendance, not based on race.  The evidence of the actual zip

7    code, the demographic data --

8             THE COURT:  He's saying discovery is going to show

9    just the opposite.

10            MR. KENNEDY:  That's not evidence.  That's an

11   assumption that discovery is going to show something different

12   than the actual data, the actual School District data is going

13   to show.  Exhibit-6 is the only data -- I'm sorry, Exhibit-6

14   sets forth the basis for selecting these six zip codes and

15   sets out the disparity in attendance at these four schools

16   among all the zip codes in Philadelphia ranging from 69% of

17   students in one of these zip codes going to Carver, Central,

18   Masterman or Palumbo, all the way down to 3% of the 1,064

19   students in 19133.  Three percent of those students over the

20   prior four years had been admitted to Caver, Central,

21   Masterman and Palumbo.  That is not based on the racial make

22   up of those zip codes.  It's not based on the race of any

23   student.  There's no selection, there's no advantage based on

24   race.  It's just -- this is factual and this is the only

25   evidence.  The plaintiffs would like the Court to say that the

1  Goals and Guardrails establish that the School District

2  intended, created this process specifically to change the

3  racial make up.  What they haven't said is how.  Who was

4  intended to be benefitted or penalized which racial group.

5  The answer is that the data doesn't bear it out.  There is no,

6  you know, this idea that the School District was trying to

7  racially balance these schools, decrease the number of black

8  students at Carver, increase the number of black students at

9  Masterman.  That's not consistent with what was actually done.

10  The zip codes are neutral.  The data confirms that there is no

11  -- they didn't pick or {quote} "blackest" or the {quote}

12  "whitest" zip codes.  And they didn't say this zip code will

13  get preference at the school where we want to change the

14  numbers one way and another zip code would get preference at a

15  school where we want to change the numbers the other way.

16      So, they'd like the story to be that the Goals and

17  Guardrails mean that we set -- that we are trying to

18  manipulate the numbers.  But that's just not borne out by the

19  actual evidence and the Court can't grand a preliminary

20  injunction based on the plaintiff's hope or the plaintiff's

21  assumption that the evidence will be something other than it

22  currently is.  Right now, this is the evidence and the council

23  transcript, the testimony by Dr. Jubilee and Ms. Lynch,

24  confirms -- yes, do they talk about race as it relates to the

25  Goals and Guardrails Document, certainly.  But they said over

1    and over that the goal of the changes to the admissions

2    process is equity.  And Ms. Lynch says several times that that

3    equity means that what they saw was that people from certain

4    parts of the city, regardless of their racial make up, and

5    students who went to certain schools did not have a realistic

6    opportunity to be admitted to one of these four criteria-based

7    schools.  That's all the evidence shows.  Your Honor made the

8    point earlier, the Goals and Guardrails is, first,

9    aspirational; second, does not set a quota; and third, sets a

10   goal to be attained by four years from now, not today, not

11   that this process will be conducted in a way's -- in x, y, z

12   way.  The Lower Merion case, the Boston case, and the Supreme

13   Court cases all confirm even if the Goals and Guardrails set

14   some sort of a backdrop for the changes to the process,

15   knowledge of, consideration of, racial dynamics, those are not

16   evidence.  That does not establish --

17             THE COURT:  All right.  Thank you counsel --

18             MR. KENNEDY:  -- a racial discriminatory purpose.

19             THE COURT:  -- thank you kindly.  thank you.

20             MR. KENNEDY:  One last thing, Your Honor is that the

21   Lower Merion case confirms that even if the purpose were

22   established, there has to be evidence of a discrminatory

23   impact.  And it's just not here.  There is no evidence.

24             THE COURT:  All right.  Thank you counsel.

25             MR. KENNEDY:  Thank you, Your Honor.

1            THE COURT:  All right.  Well, well argued on both

2    sides.  I'll take it under advisement.  All right, thank you

3    all and thank you for everybody attended and your interest.

4            ALL:  Thank you, Your Honor.

5            THE CLERK:  All rise please.

6       (Court adjourned)

7

8                            CERTIFICATION
9    I, Lewis Parham, certify that the foregoing is a correct
10   transcript from the electronic sound recording of the
11   proceedings in the above-entitled matter.
12
13
14   _____        7/28/22
15
16   _____        _____
17   Signature of Transcriber                Date