UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
PHILADELPHIA DIVISION

| | |
|---|---|
| **Sherice Sargent**, et al., <br><br> Plaintiffs, <br><br> v. <br><br> **The School District of Philadelphia**, et al., <br><br> Defendants. | Case No. 2:22-cv-01509-CFK |

### MOTION FOR INJUNCTION PENDING APPEAL

On August 11, 2022, the plaintiffs appealed this Court's order denying their motion for preliminary injunction (ECF No. 52). The plaintiffs respectfully move for an injunction from this Court pending appeal. *See* Fed. R. App. P. 8(a)(1)(C). The plaintiffs respect this Court's ruling of August 8, 2022, and are not attempting to relitigate it. But the rules of appellate procedure require a litigant to first ask the district court for an injunction pending appeal before requesting that relief from the Third Circuit. *See id.*

In deciding whether to issue an injunction pending appeal, a court must consider and weigh the same four factors that govern the preliminary-injunction inquiry. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020); *Conestoga Wood Specialties Corp. v. Secretary of U.S. Dep't of Health & Human Services*, No. 13-1144, 2013 WL 1277419, at *7 (3d Cir. Feb. 8, 2013) (Jordan, J., dissenting) ("While we have not ruled on the matter definitively, the standard for obtaining an injunction pending appeal is essentially the same as that for obtaining a preliminary injunction." (citing authorities)); *Grote v. Sebelius*, 708 F.3d 850, 853 (7th Cir. 2013) ("We evaluate a motion for an injunction pending appeal using the same factors and

'sliding scale' approach that govern an application for a preliminary injunction."). The plaintiffs respectfully submit that these factors counsel in favor of an injunction pending appeal.

## THE COURT SHOULD ISSUE AN INJUNCTION PENDING APPEAL

The test for injunctive relief is well established: An applicant must show "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176–77 (3d Cir. 2017) (quoting *Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). A court should also consider: "(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id*. A court "should balance those four factors so long as the party seeking the injunction meets the threshold on the first two." *Id*.

### I. THE PLAINTIFFS HAVE A REASONABLE PROBABILITY OF EVENTUAL SUCCESS ON THE MERITS

In its order of August 8, 2022, the Court concluded that the plaintiffs had failed to establish a "reasonable probability of eventual success on the merits." Memorandum, ECF No. 50, at 3; *id*. at 7–19. The plaintiffs respect the Court and its decision, but they continue to believe that they have a reasonable probability of eventual success on the merits despite this Court's rejection of that claim.

The Court correctly observed that that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause," and this same showing is needed to establish a violation of Title VI and article I, section 29 of the Pennsylvania Constitution. *See* Memorandum, ECF No. 50, at 8. But the Court held that the plaintiffs' evidence of racially discriminatory intent fell short, because it interpreted the numerical goals in Indicator 4.1 of the Board of Education's Goals &

Guardrails document as referring only to the racial composition of students who are "qualified" to attend the city's criteria-based schools, rather than the students who are admitted or who will ultimately attend those schools. *See id.* at 12–13. The Court explained:

> Indicator 4.1 does not address, at all, increasing the number of Black/African American or Hispanic/Latinx students who are *admitted to* or who *attend* the School District's criteria-based schools, rather Indicator 4.1 addresses increasing the number of Black/African American or Hispanic/Latinx students who are *qualified* to attend such schools.

*Id.* But this does not refute the plaintiffs' claim that the school district changed its admissions policies with the intent of altering the racial composition of its criteria-based schools. First, the school district is admitting students by lottery among those who meet the minimum qualifications—which ensures that the racial makeup of the chosen students will resemble the racial makeup of the "qualified" students. It also means that any "goal" or quota regarding the racial composition of the "qualified" students will by definition serve as a goal for the racial makeup of the overall student body at the city's criteria-based schools.

Second, as the Court acknowledged in its opinion, the school district gets to define and determine the minimum "qualifications" for admissions to the criteria-based schools. *See* Memorandum, ECF No. 50, at 13. And it is undisputed that the school district redefined those minimum qualifications in response to the Goals & Guardrails document. *See* Stipulated Facts, ECF No. 44, at ¶ 23 ("The 2021–22 admissions process required applicants to Palumbo, Carver, Central, and Masterman to complete a 'district administered writing sample,' . . . which was administered and scored by a computer program called MI Write. Students whose computerized essay score equaled or exceeded 22 out of 30 were qualified for admission to Central or Masterman, and only students with essay scores at 17 or above were qualified for admission to Palumbo or Carver.").

The Court faulted the plaintiffs for failing to produce evidence that these new qualification standards "would benefit any one race of students over another." Memorandum, ECF No. 50, at 13. But evidence of that sort is unnecessary to prove racially discriminatory *intent* when the Goals & Guardrails document specifically announces a racial-composition "goal" for the students who will be deemed "qualified" to attend the city's special-admission high schools—and then the school district alters its qualification standards in response to that publicly announced goal. The Board of Education has *admitted* that its "goal" is to increase percentage of black or Hispanic students who fall within the category of those "qualified" to attend its criteria-based schools:

> Among 8th grade students who are qualified to attend Special Admission High schools, the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress toward being proportional to population as a whole) by August 2026.

Stipulated Facts Ex. 5, ECF No. 44-5, at p. 4. And when the school district redefines the meaning of "qualified" in response to this publicly announced "goal," nothing further is needed to show that racial balancing was at least one motivating factor behind the school district's decision to change the "qualification" standards. *See Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("'Discriminatory purpose,' . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."). The discriminatory-purpose inquiry is unconcerned with the ultimate effects of the school district's admissions policies; it turns only on the school district's motivations for adopting the policy that it did. And the Goals & Guardrails document leaves no doubt that the school district was motivated (at least in part) by a desire to change the racial composition of the students deemed

"qualified" to attend the city's criteria-based schools—as well as the racial composition of the students selected to attend. *See Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524, 551 n.42 (3d Cir. 2011) ("The racially discriminatory purpose need not be the sole or primary factor motivating the decision to adopt the challenged action.").

The Court also downplayed the public statements of school-district officials Sabriya Jubilee and Karyn Lynch, who testified in defense of the new admissions policies before the city council. Dr. Jubilee, who serves as Chief of Equity for the School District of Philadelphia, testified as follows:

> On June 15, 2020 in the wake of the murders of Breonna Taylor, Ahmaud Aubery, George Floyd and countless others, as a District we released or statement on anti-racism. In this statement, we committed to becoming an anti-racist equitable organization by uprooting policies, deconstructing processes and eradicating practices that create systems of privilege and power for one group over the other.
>
> The upending of privilege highlighted here is not simply in reference to a configuration of numbers or an assessment of differences in skin color or features, but rather speaks to the destruction of a system and the dismantling institutionalization of norms. It doesn't just ask for us to set aside seats as a way to appease a few, but rather challenges us to explore questions of why, who and for what.
>
> Through the school selection process, we have the opportunity to redesign a process that from inception to current practice has only truly benefited a small group of stakeholders, many of whom do not reflect the majority demographic of our School District or City. But this presentation, I am not speaking solely about visibility, but more about the impact of opportunity, access and power.

Stipulated Facts Ex. 8, ECF No. 44-8, at 84–85. Karyn Lynch, who serves as the Chief of Student Support Services for the School District of Philadelphia, testified that the changes to the school-selection process were made in response to the murder of George Floyd and inspired by the school district's "Goals & Guardrails" document:

> In addition to the removal of the PSSA as a criteria for the school selection process last year—this year, not last year, our District was also impacted by the growing national attention to racism, mainly the murder of George Floyd among others. As a result as an organization, we committed to examining all of our processes, procedures and practices to ensure equity and (inaudible). . . .
>
> For more than a year, the School District obtained feedback about the school selection process and listened to individuals and representatives of groups to inform the improvements to the school selection process. Several public meetings held by the Board of Education as its members considered the Board's goals and guardrails.
>
> One indicator for the guardrails is ending racist practices as I've shared in our policies and procedures.

Stipulated Facts Ex. 8, ECF No. 44-8, at 93–95. Ms. Lynch also admitted that "racial dynamics" (as well as other factors) played a role in the school district's decision to switch from merits-based admissions to the lottery system with zip-code preferences. *See id.* at 121 ("[A] good deal of the discussion has been about access and equity to these schools, so it's not just based on racial dynamics."). And Ms. Lynch warned that these changes were just "the beginning with more to come with regard to access and equity." *Id.* at 107.

The Court, however, held that these statements merely demonstrated that the school district and its officials were *aware* of the racial impact of their new admissions policies; they did not, in the Court's view, evince a racial *motivation* for the change. *See* Memorandum, ECF No. 50, at 15 ("[T]he Court finds that none of the statements made by Dr. Jubilee or Ms. Lynch demonstrate that the changes to the admissions policy were instituted for a racially *discriminatory* purpose." (emphasis in original)); *id.* ("The Third Circuit has made clear that '[t]he consideration or awareness of race while developing or selecting a policy…is not in and of itself a racial classification.' Further, the Third Circuit has specifically provided that '[d]esigning a policy

"with racial factors in mind" does not constitute a racial classification if the policy is facially neutral and is administered in a race-neutral fashion.'" (citations omitted).

The Court is right to observe that mere knowledge or awareness of the racial effects of a chosen policy does not, without more, show racially discriminatory intent. *See, e.g.*, *Lower Merion*, 665 F.3d at 548 ("[T]he mere awareness or consideration of race should not be mistaken for racially discriminatory intent or for proof of an equal protection violation"); *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) ("[A] jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact."). But the statements from Dr. Jubilee and Ms. Lynch go beyond expressing mere knowledge or awareness that the change in admission policies will alter the racial composition of the city's criteria-based schools. Each of their statements made clear that this was the *desired* result of the new admissions policies—and that this was (at least in part) a motivating factor for these changes. Consider once again the statements from Dr. Jubilee:

> [A]s a District . . . we committed to becoming an anti-racist equitable organization by uprooting policies, deconstructing processes and eradicating practices that create systems of privilege and power for one group over the other.

Stipulated Facts Ex. 8, ECF No. 44-8, at p. 84; *id.* at p. 85 (complaining that "current practice has only truly benefited a small group of stakeholders, many of whom do not reflect the majority demographic of our School District or City."). And consider the statements from Ms. Lynch admitting that changed its admissions policies in response to the murder of George Floyd and for the purpose of "ensur[ing] equity":

> [O]ur District was also impacted by the growing national attention to racism, mainly the murder of George Floyd among others. As a result as an organization, we committed to examining all of our processes, procedures and practices to ensure equity . . . .

Stipulated Facts Ex. 8, ECF No. 44-8, at 93–94; *see also id.* at 121 ("[A] good deal of the discussion has been about access and equity to these schools, *so it's not just based on racial dynamics.*" (emphasis added)).

Finally, the Court was too quick to dismiss the zip-code preferences as evidence of racial motivation. *See* Memorandum, ECF No. 50, at 15–17. The Court observed (correctly) that the chosen zip codes were neither the "blackest" nor the "whitest" zip codes, *see id.*, but it overlooked the fact that the Asian-American population in each of the six preferred zip codes is significantly below the 7% level of Asian-Americans in the overall student body of the Philadelphia public schools—and *far* below the percentage of Asian-American students that currently populate Masterman, Central, Carver, and Palumbo. *Compare* Stipulated Facts, ECF No. 44, at ¶ 28 (showing that Asian-Americans make up 36% of the student body at Palumbo, 14% at Carver, 38% at Central, and 26% at Masterman); *with* Stipulated Facts, ECF No. 44-7 (showing that the percentage of Asian-American residents in the six preferred zip codes is 3.5%, 1.1%, 3.5%, 1.6%, 5.7%, and 1.7%). The school district claims that those six zip codes were chosen because they had "the lowest percentage of students attending four criteria-based high schools over the previous four years." Defs.' Br. in Opp. to Mot. for Prelim. Inj., ECF No. 37, at 3–4; *see also* Memorandum, ECF No. 50, at 18 & n.7. But even if this is true, the fact remains that the school district selected these six zip codes after the Board of Education had announced in its Goals & Guardrails document that it would increase the percentage of qualified black and Hispanic students from 33.8% in August 2020 to "at least 52.0%" by August 2026—a goal that can be achieved only by reducing the percentage of Asian-American and white students in the pool of "qualified" applicants. All of this evidence, considered together, shows that the school district was motivated (at least in part) by a desire to alter the racial composition of its criteria-based schools.

The Court also denied relief because it claimed that the plaintiffs failed to show that the change in admissions policies "resulted in a racially discriminatory impact." Memorandum, ECF No. 50, at 19. But a facially neutral law or policy that was enacted for a racially discriminatory purpose will *always* be subject to strict scrutiny—regardless of the actual effects of the law. *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 913 (1995) ("[S]tatutes are subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, *but also when, though race neutral on their face, they are motivated by a racial purpose or object.*" (emphasis added)); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66 (1977) ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, [rational-basis review] is no longer justified."); *see also Boston Parent Coalition for Academic Excellence Corp. v. School Committee of City of Boston*, 996 F.3d 37, 45 (1st Cir. 2021) ("Absent a showing of discriminatory purpose, we review an equal protection challenge to race-neutral selection criteria for a rational basis only."); *Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 276–77 (S.D.N.Y. 2019) ("If a court concludes that the government used a racial classification or was motivated by racial discrimination, then the court must review the government action under strict scrutiny. Absent either conditions, the government action is subject to rational basis review." (citation omitted)). Racially discriminatory purpose alone is sufficient to move a case out of rational-basis review and into strict scrutiny.

In all events, the plaintiffs *did* show a "reasonable probability" that the school district's new admissions policies will have the effect of altering the racial makeup of the city's criteria schools, as they were designed to do—even though the parties do not yet have data showing the racial composition of the incoming students for the 2022–23 school year. A plaintiff does not need proof on a motion for injunction

pending appeal, and it is not only "probable" but nearly certain that the school district's drastic change in admissions policies, and its move away from a merits-based admission process to a lottery with zip code preferences, will achieve the desired outcome of reducing the numbers of "overrepresented" racial groups, such as Asian-Americans and whites at Masterman and Central, and blacks at Carver. The school district did not contend that its new admission policies will leave the racial makeup of the city's criteria schools unchanged, and it presented no reason for imagining that such an outcome could occur.

## II. The Plaintiffs Will Suffer Irreparable Injury Absent An Injunction Pending Appeal

The plaintiffs and their children will suffer grievous and irreparable harm if the school district is not enjoined from implementing these changes before the start of the 2022–23 school year. Sherice Sargent's daughter, who wanted to continue her studies at Carver in the hopes of winning acceptance to Drexel University's computer-science program, has been relegated to an agricultural school where she will learn to become a farmer. *See* Sargent Decl. ¶¶ 14–17. Michelle Sheridan's son had his dreams of attending the Academy of Palumbo dashed and now regards the hard work he put in during his middle-school years as useless, and he is being deprived of the opportunity to take AP classes at Palumbo and compete on the school's football team. *See* Sheridan Decl. ¶ 12. Joshua Meyer's son, who earned straight As at Masterman, is being forced to leave the school where he has attended and wished to continue, a school that consistently ranks as the top high school not only in Philadelphia but in the entire state of Pennsylvania. *See* Meyer Decl. ¶ 5. These students—and many other students of all races and backgrounds—are having their educations and their futures ruined by the school district's misguided and ill-conceived pursuit of racial balancing.

### III. The Public Interest Supports An Injunction Pending Appeal

The public interest also supports an injunction pending appeal. There is no conceivable public interest that can support the school district's decision to abandon merit-based admissions in favor of a system in which students who meet the minimum academic criteria are admitted by lottery, with arbitrary preferences conferred on the residents of six selected zip codes. And the school district has never attempted to justify this change in admissions policies apart from making vapid appeals to "equity"—which is nothing more than an unconstitutional desire to attain racial balancing in the city's elite magnet schools. And if the city's new admissions practices were influenced by unconstitutional racial motivations, then the public interest will by definition require an injunction pending appeal. *See Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 884 (3d Cir. 1997) ("[T]he public interest clearly favors the protection of constitutional rights.").

### IV. The Harms That May Result From An Injunction Pending Appeal Do Not Outweigh The Need For Immediate Relief

Doubtless there will be some harms that befall others if the Court enjoins the school district from implementing its new admissions policies for the 2022–23 school year. School officials will have to reconsider applications under the previous merits-based admission policies, and some students who won admission to magnet schools under the lottery-system-with-zip-code-preferences will be directed to other schools. But none of those considerations can thwart injunctive relief if the Court concludes that the school district is violating the Constitution and federal civil-rights laws—especially when the students who won admission under the new system did so at the expense of other students who will suffer irreparable harm in the absence of a preliminary injunction. If the new admissions regime is not only harmful but unlawful, then it is constitutionally obligated to stop it dead in its tracks. *See* Charles Alan Wright & Arthur R. Miller, et al., 11A Fed. Prac. & Proc. Civ. § 2948.2 (3d ed.) ("[W]hen

plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue.").

## CONCLUSION

The motion for injunction pending appeal should be granted.

                                      Respectfully submitted.

| | |
|---|---|
| Jonathan F. Mitchell<br>Pennsylvania Bar No. 91505<br>Mitchell Law PLLC<br>111 Congress Avenue, Suite 400<br>Austin, Texas 78701<br>(512) 686-3940 (phone)<br>(512) 686-3941 (fax)<br>jonathan@mitchell.law | /s/ Walter S. Zimolong III<br>Walter S. Zimolong III<br>Pennsylvania Bar No. 89151<br>Zimolong, LLC<br>Post Office Box 552<br>Villanova, Pennsylvania 19085-0552<br>(215) 665-0842 (phone)<br>wally@zimolonglaw.com |
| Gene P. Hamilton*<br>Virginia Bar No. 80434<br>Vice-President and General Counsel<br>America First Legal Foundation<br>300 Independence Avenue SE<br>Washington, DC 20003<br>(202) 964-3721<br>gene.hamilton@aflegal.org | |
| Dated: August 17, 2022 | * admitted *pro hac vice*<br><br>*Counsel for Plaintiffs and the Proposed Classes* |

## CERTIFICATE OF CONFERENCE

I certify that I conferred with Bill Kennedy, counsel for the defendants, and he informed us that the defendants oppose this motion.

/s/ Walter S. Zimolong III
WALTER S. ZIMOLONG III
*Counsel for Plaintiffs and
the Proposed Classes*

## CERTIFICATE OF SERVICE

I certify that on August 17, 2022, I served this document through CM/ECF upon:

WILLIAM KENNEDY
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street
Philadelphia, Pennsylvania 19103-7505
(215) 772-7291 (phone)
(215) 731-3689 (fax)
wkennedy@mmwr.com

*Counsel for Defendants*

                                          /s/ Walter S. Zimolong III
                                          WALTER S. ZIMOLONG III
                                          *Counsel for Plaintiffs and*
                                          *the Proposed Classes*