**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**PHILADELPHIA DIVISION**

|  |  |
|---|---|
| **Sherice Sargent**, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>**The School District of Philadelphia**, et al.,<br><br>                    Defendants. | Case No. 2:22-cv-01509-CFK |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS**

**A.      Criteria-Based Schools**

1.      Criteria-based schools are schools within the School District of Philadelphia (the School District) that require an applicant to meet the criteria that has been established for admission into that school.  *See* Deposition of Karyn T. Lynch (30(b)(6) designee) (Lynch Dep.) at 26:7-14 (attached as Ex. 1, ECF No. 91-1).

**Response**: Admitted.

2.      The criteria for admission vary by school.  See Deposition of William R. Hite (Hite Dep.) at 23:18-21 (attached as Ex. 2, ECF No. 91-2).

**Response**: Admitted.

3.      Criteria-based high schools are open to any student regardless of where that student lives.  See Hite Dep. at 23:6-9 (attached as Ex. 2, ECF No. 91-2).

**Response**: Admitted.

4.      Of the criteria-based high schools, Carver Engineering and Science (Carver), Central High School (Central), Julia Reynolds Masterman Laboratory and Demonstration School (Masterman), Parkway Center City Middle College (Parkway Middle), and Academy at Palumbo

(Palumbo) are the most academically rigorous schools.  See Hite Dep. at 25:17-22 (attached as Ex. 2, ECF No. 91-2).

**Response**: Denied.  In response to the question "Would you agree that the criteria-based high schools, the admissions standards to the criteria-based high schools in 2021, Carver, Central, Masterman, and Palumbo were the most rigorous."  Dr. Hite responded "Yes." See *Hite* Dep. at 25:17-22.

5.      Of those five criteria-based schools, Central and Masterman have the highest requirements for admission.  See Lynch Dep. at 111:22-23 (attached as Ex. 1, ECF No. 91-1).

**Response**: Admitted.

**B.    The Racial Demographics of Central, Masterman, Parkway Middle, Carver, and Palumbo**

6.      The School District is always considering the racial disproportionalities of its schools.  See Deposition of Sabriya Jubilee (Jubilee Dep.) at 150:4-13 (attached as Ex. 3, ECF No. 91-3).

**Response**: Denied.  Dr. Jubilee's deposition includes the following exchange:

Q. Is the -- would you agree with me that the percentages of students identifying with a certain race, on that factor, the School District is concerned with that factor regarding the racial makeup of the five schools that appear on Plaintiff's Exhibit 1?

A. So as a -- as a School District, disproportionality is something we're always considering. It's not exclusive to these five schools. So in that question the answer would be no, I don't agree with you.

7.      For the 2021-22 school year, black students made up 52% of the entire student body among all schools within the School District of Philadelphia.  See Defendants' Proposed Statement of Stipulated Facts, ECF No. 86-2, at ¶ 29.

**Response**: Admitted.

8.      For the 2021-22 school year, Hispanic students made up 22% of the entire student body among all schools within the School District of Philadelphia.  See Defendants' Proposed Statement of Stipulated Facts, ECF No. 86-2, at ¶ 29.

**Response**: Admitted.

9.      For the 2021-22 school year, white students made up 13% of the entire student body among all schools within the School District of Philadelphia.  See Defendants' Proposed Statement of Stipulated Facts, ECF No. 86-2, at ¶ 29.

**Response**: Admitted.

10.      For the 2021-22 school year, Asian students made up 7% of the entire student body among all schools within the School District of Philadelphia.  See Defendants' Proposed Statement of Stipulated Facts, ECF No. 86-2, at ¶ 29.

**Response**: Admitted.

11.      The racial demographics of Central, Masterman, Carver, Parkway Middle, and Palumbo depart from the racial demographics of the overall student body of School District.  See Lynch Dep. at 111:13-18 (attached as Ex. 1, ECF No. 91-1).

**Response**: Denied.  By way of further answer, the demographics of each school are
different, and no school has the same demographics as the entire student body.

12.      The racial disproportionality of these criteria-based schools is summarized in the charts below:

|  | Asian | Black/African American | Hispanic/ Latino | Multi-Racial/ Other | White |
|---|---|---|---|---|---|
| **Palumbo (21-22)** | 36% | 34% | 11% | 4% | 15% |
| **Palumbo (22-23)** | 37% | 29% | 13% | 5% | 17% |
| **Carver (21-22)** | 14% | 61% | 11% | 6% | 8% |
| **Carver (22-23)** | 15% | 58% | 11% | 6% | 9% |

|  | Asian | Black/African American | Hispanic/ Latino | Multi-Racial/ Other | White |
|---|---|---|---|---|---|
| **Central (21-22)** | 38% | 18% | 8% | 5% | 31% |
| **Central (22-23)** | 35% | 22% | 10% | 4% | 28% |
| **Masterman (21-22)** | 26% | 16% | 7% | 9% | 41% |
| **Masterman (22-23)** | 25% | 18% | 8% | 9% | 41% |
| **Philadelphia School District (21-22)** | 7% | 52% | 22% | 5% | 13% |
| **Philadelphia School District (22-23)** | 7% | 51% | 23% | 5% | 13% |

*See* Defendants' Proposed Statement of Stipulated Facts, ECF No. 86-2, at ¶ 29.

For Parkway Middle, which was not included in paragraph 29 of the defendants'

proposed statement of stipulated facts, the racial composition for 2021-22 was:



For Parkway Middle, the racial composition for 2022-23 was:



These data were taken from the school district's interactive enrollment data website, which the defendants have stipulated are accurate. *See* Defendants' Proposed Statement of Stipulated Facts, ECF No. 86-2, at ¶ 29 n.2.

> **Response**: Admitted that demographic data regarding the 9th through 12th grade students enrolled at Parkway Middle is accurate, but Defendants deny that racial demographics or any other data regarding Parkway Middle is relevant or material to Defendants' motion for summary judgment. Defendants admit that the table regarding the 9th grade populations of Palumbo, Carver, Central, and Masterman are accurate but deny that the table shows the "racial disproportionality" of the schools.

13. When he was superintendent, Dr. Hite was aware of "systems within the school district that led to racial inequity." Hite Dep. at 42:5-9 (attached as Ex. 2, ECF No. 91-2).

> **Response**:   Admitted.

14.     One system of racial inequity that Dr. Hite identified is "disproportionality."  Hite Dep. at 42:11-13 (attached as Ex. 2, ECF No. 91-2).

> **Response**:  Denied.  Dr. Hite testified in response to a request to identify systems that led to racial inequity that disproportionality provides the School District "with information about where there are certain demographic . . . groups . . . that are being identified in categories . . . at a larger percentage than the whole of the group, if you will."  Hite Dep. at 42:10-43:2. Dr. Hite gave examples "like suspensions or identification for special education or not having access to algebra or instrumental music."  Hite Dep. at 42:10-20.

15.     Dr. Hite testified that "disproportionality refers to the percentage of a subgroup that is then more heavily represented in like—than the percentage of the subgroup."  Hite Dep. at 42:13-16 (attached as Ex. 2, ECF No. 91-2).

> **Response**: Admitted.

16.     According to Dr. Hite, disproportionality occurs when there are percentages of a certain racial group that are not proportional to the percentage that the group makes up as a whole.  *See* Hite Dep. at 43:3-9 (attached as Ex. 2, ECF No. 91-2).

> **Response**: Admitted that Dr. Hite agreed with Plaintiff's counsel's question in the context of the discussion of "racial inequity."  Denied that Dr. Hite testified that this example is the only way in which disproportionality occurs or would be considered by the School District; he testified "And it's not just race. It's also -- it could be gender. It could be demographics. It could be poverty."  Hite Dep. at 43:13-23.

17.     According to Dr. Hite, disproportionality is a system of racial inequity.  *See* Hite Dep. at 43:24-25, 44:1-2 (attached as Ex. 2, ECF No. 91-2).

**Response**:  Denied.  Dr. Hite agreed with Plaintiff's counsel that disproportionality "was an example of what [he] was talking about."  Hite Dep. at 43:24-25, 44:1-2.  Dr. Hite also testified that he saw disproportionality as "a result of policies and practices that don't provide opportunities and access to those opportunities for all students."  Hite Dep. at 91:2-11.

18.     The racial make-up of the criteria-based school was identified by the school district as a "disproportionality."  *See* Hite Dep. at 44:10-15 (attached as Ex. 2, ECF No. 91-2).

**Response**:  Denied.  Dr. Hite testified that he was aware of "disproportionality in the racial makeup of the criteria-based high schools" and that he was "not sure it was identified as racial inequity. It was identified as disproportionality."  Hite Dep. at 44:3-15.

19.     When Dr. Hite was superintendent, the school district made policy changes to address systems of racial inequities.  *See* Hite Dep. at 46:7-10 (attached as Ex. 2, ECF No. 91-2).

**Response**: Admitted.  Dr. Hite pointed to ending the practice of suspending kindergarteners as an example of such a policy change.  *See* Hite Dep. at 45:5-13.

**C.     The Changes To The School Selection Process**

20.     In response to the death of George Floyd and the national attention on racism, the School District committed to examining all of its processes, policies, and practices to "ensure equity."  *See* Lynch Dep. at 129:18-22 (attached as Ex. 1, ECF No. 91-1).

**Response**: Admitted.

21.     One of the practices reviewed to "ensure equity" was the school selection process used for criteria-based schools.  *See* Lynch Dep. at 129:18-25 (attached as Ex. 1, ECF No. 91-1).

**Response**: Admitted.

22.     Following the death of George Floyd, the School District also issued an "Anti-Racism Declaration."  *See* Hite Dep. at 27:10-28:18, 30:12-25 (attached as Ex. 2, ECF No. 91-2). The School District's Anti-Racism Declaration is attached as Ex. 4 (ECF No. 91-4), and is available online at https://www.philasd.org/antiracism [[https://perma.cc/EWW3-5UGC]].

**Response**: Admitted.

23.     The Anti-Racism Declaration was made to assure that the School District was "assessing all policies and practices for inequitable types of outcomes."  *See* Hite Dep. at 28:6-8 (attached as Ex. 2, ECF No. 91-2).

>     **Response**: Admitted that one of the goals of the Anti-Racism Declaration is included in
>     Paragraph 23.  The remaining allegations are denied.  Dr. Hite testified that the "anti-
>     racism declarations was that we were committing to not be an organization that was
>     instituting and practicing on a regular basis practices that would have been inequitable for
>     the young people we served."  Hite Dep. at 28:12-18.

24.     According to the Anti-Racism Declaration, the School District could not fulfil its mission to "ensure we provide conditions needed for all students to excel" because "some of our students are forced to witness and endure acts of hatred because of the color of their skin [and] are dehumanized for where they come from and how they look, and live within conditions that place their bodies under constant attack, rendering them voiceless by the very system that is supposed to protect and empower them."  Anti-Racism Declaration (attached as Ex. 4, ECF No. 91-4).

>     **Response**: Denied.  Plaintiffs attempt to paraphrase a statement in the Anti-Racism
>     Declaration.  The portion of the document cited in Paragraph 24 states "Embedded in this
>     mission, then is an inherent commitment to ensure we provide the necessary conditions

needed for all of our students to excel.  But, how can we truly accomplish this if some of our students are forced to witness and endure acts of hatred because of the color of their skin, are dehumanized for where they come from and how they look, and live within conditions that place their bodies under constant attack, rendering them voiceless by the very system that is supposed to protect and empower them."  Anti-Racism Declaration (attached as Ex. 4, ECF No. 91-4).

25.     In the Anti-Racism Declaration, the School District commits to "uprooting policies, deconstructing processes, and eradicating practices that create systems of privilege and power of one racial group over another."  Anti-Racism Declaration (attached as Ex. 4, ECF No. 91-4).

**Response**: Admitted.

26.     The Anti-Racism Declaration further states that "[n]ow is the time to expand our efforts and take collective action, challenging and changing the ways in which our norms, values, and structures that uphold systems of racism."  Anti-Racism Declaration (attached as Ex. 4, ECF No. 91-4).

**Response**: Denied.  Plaintiffs incorrectly quote the Anti-Racism Declaration—by adding the word "that" before "uphold."  The Anti-Racism Declaration includes the following language: "Now, is the time to expand our efforts and take collective action, challenging and changing the ways in which our norms, values, and structures uphold systems of racism."  Anti-Racism Declaration (attached as Ex. 4, ECF No. 91-4).

27.     The Anti-Racism Declaration concludes that the work to be done pursuant to the Anti-Racism Declaration will be "center[ed] through a lens of racial equity."  Anti-Racism Declaration (attached as Ex. 4, ECF No. 91-4).

**Response**: Denied.  The Anti-Racism Declaration includes the following language: "As we move forward with this charge, we will do so together, with intention and deep purpose, centering our work through the lens of racial equity."  Anti-Racism Declaration (attached as Ex. 4, ECF No. 91-4).

28.     From October 2012 to June 2022, William R. Hite Jr. (Dr. Hite) was the superintendent of the School District of Philadelphia.  *See* Hite Dep. at 14:1-4 (attached as Ex. 2, ECF No. 91-2).

**Response**: Admitted.

29.     Dr. Hite signed the Anti-Racism Declaration.  *See* Hite Dep. at 30:12-23 (attached as Ex. 2, ECF No. 91-2); Anti-Racism Declaration (attached as Ex. 4, ECF No. 91-4).

**Response**: Denied.  The document is not signed.  Although no signature appears on the document, Dr. Hite drafted the Anti-Racism Declaration in collaboration with others, and it was issued as a statement from Dr. Hite.

30.     Consistent with the Anti-Racism Declaration, the School District "would have eradicated any policy that advantaged one demographic group over another demographic group. Or attempted to anyway."  *See* Hite Dep. at 57:18-25, 58:1-3 (attached as Ex. 2, ECF No. 91-2).

**Response**: Admitted.

31.     Dr. Hite believes that whites maintain privilege over blacks in society in general. *See* Hite Dep. at 59:3-8 (attached as Ex. 2, ECF No. 91-2).

**Response**: Denied.  Although Paragraph 31 accurately summarizes Dr. Hite's testimony, Defendants deny that Paragraph 31's summary of testimony about society in general includes facts that are relevant or material to Defendants' Motion for Summary Judgment.

32.    Dr. Hite also believes that white students maintain privilege over black and Latino students within the School District of Philadelphia.  *See* Hite Dep. at 62:19-23, 63:4-8 (attached as Ex. 2, ECF No. 91-2).

> **Response**: Admitted that Dr. Hite testified that, when the Anti-Racism Declaration was published, he believed that white students maintained privilege over Black and Latino students in the School District.  The remaining averments in Paragraph 32 are denied.

33.    Dr. Hite testified that the "norms, values, and structures" referred to in the Anti-Racism declaration that must be changed are systems that create disproportionality.  *See* Hite Dep. at 64:25, 65:1-7 (attached as Ex. 2, ECF No. 91-2).

> **Response**: Denied.  Paragraph 33 inaccurately characterizes Dr. Hite's testimony.  In response to a question asking him what the "norms, values, and structures" referred to in the Anti-Racism Declaration were, Dr. Hite said, "I'm thinking of – so that sentence, to me, gets back to the disproportionality piece and who was being identified, who had access to course -- certain courses, who was being suspended, who was being arrested at schools."  Hite Dep. at 64:25–65:1-7.

34.    In the fall of 2021, the Philadelphia School District announced changes to the process that it would use to admit students into its criteria-based high schools.  *See* Hite Dep. at 20:14-19 (attached as Ex. 2, ECF No. 91-2).

> **Response**: Admitted.

35.    The changes were made "in alignment with our commitment toward **anti-racism** and **equity**, as outlined in the Board of Education's Goals and Guardrails, the school selection process underwent an initial equity review during which feedback was collected from various

stakeholders including parents and families."  2022-23 Philadelphia School District High School

Guide at p. 4, PSD-SARGENT-005161 (attached as Ex. 6, ECF No. 91-6).

> **Response**: Denied.  Paragraph 35 inaccurately characterizes the following statement in
>
> the High School Directory: "This past year, in alignment with our commitment toward
>
> anti-racism and equity, as outlined in the Board of Education's Goals and Guardrails, the
>
> school selection process underwent an initial equity review during which feedback was
>
> collected from various stakeholders including parents and families."  (Ex. 6, ECF No.
>
> 91-6).  Plaintiffs also emphasized words that were not emphasized in the written
>
> document.  On its face, and contrary to Plaintiffs' characterization, the statement in the
>
> High School Directory is that the school selection process underwent an "equity review."
>
> Conducting the "equity review" was "in alignment with [the School District's]
>
> commitment toward anti-racism and equity, as outlined in the . . . Goals and Guardrails."

36.     The School District maintains a "Living Glossary of Equity Related Terms."  *See*

Jubilee Dep. at 40:6-25 (attached as Ex. 3, ECF No. 91-3).

> **Response**: Denied.  Paragraph 36 is an inaccurate characterization of Dr. Jubilee's
>
> testimony.  Dr. Jubilee testified that she and her team created the "Living Glossary" as "a
>
> resource" for School District employees.  *See* Jubilee Dep. at 40:15-42:4.

37.     A copy of the Living Glossary is attached at Exhibit 5 and appears on the School

District's webpage at http://bit.ly/4bL3gXU [[https://perma.cc/Q9E4-883B]].  *See* Jubilee Dep.

at 40:6-20 (attached as Ex. 3, ECF No. 91-3).

> **Response**: Admitted.

38.     When the School District uses terms that appear in the Living Glossary, the meanings of those terms are as they appear in the Living Glossary.  *See* Jubilee Dep. at 42:18-25, 43:1-20 (attached as Ex. 3, ECF No. 91-3).

> **Response**: Denied.  Dr. Jubilee testified that the Living Glossary is "a resource," and that when a term defined in the Living Glossary appears on the School District's website or on School District documents, Dr. Jubilee "can't speak for what people mean . . ."  Jubilee Dep. at 41:24-43:20.

39.     The School District defines "anti-racism" as "the conscious and intentional effort to challenge, disrupt, and dismantle racial prejudice, dominance, discrimination, and privilege both at the individual and institutional level."  Living Glossary (attached as Ex. 5, ECF No. 91-5).

> **Response**: Denied.  The Living Glossary defines "anti-racism" as "the conscious and intentional effort to challenge, disrupt, and dismantle racial prejudice, dominance, discrimination, and privilege both at the individual and institutional level."  (Ex. 5, ECF No. 91-5).  As noted above, not all District employees refer to the Living Glossary definitions for meaning.  *See* Lynch Dep. 143:3-4 (when provided with the Living Glossary Ms. Lynch testified, "I feel somewhat foolish that, you know, I'm looking at terms that I'm not quite familiar with.").

40.     The School District defines "educational equity" as "raising the achievement of all students, while eliminating the racial predictability and disproportionality of which student groups occupy the highest and lowest achievement categories."  Living Glossary (attached as Ex. 5, ECF No. 91-5).

**Response**: Denied.  The Living Glossary defines "educational equity" as "raising the achievement of all students, while eliminating the racial predictability and disproportionality of which student groups occupy the highest and lowest achievement categories."  (Ex. 5, ECF No. 91-5).   As noted above, not all District employees refer to the Living Glossary definitions for meaning.  *See* Lynch Dep. 143:3-4 (when provided with the Living Glossary Ms. Lynch testified, "I feel somewhat foolish that, you know, I'm looking at terms that I'm not quite familiar with.").

41.    While the School District allegedly reviewed the criteria for potential changes annually, in 2021 for the first time, the school selection was given an "equity review."  *See* Hite Dep. at 123:23-25, 124:1-6 (attached as Ex. 2, ECF No. 91-2).

**Response**: Admitted that Dr. Hite responded to the question "You stated that the school selection process is reviewed on an annual basis. When was the first time it was given an equity review?" by stating "After the equity coalition was developed and created [the equity] lens," sometime in 2021.  Hite Dep. at 123:23-25, 124:1-6.

42.    Dr. Hite testified that there is no difference between the viewing something through the lens of "equity" and viewing it through a lens of "racial equity."  *See* Hite Dep. at 67:6-13 (attached as Ex. 2, ECF No. 91-2).

**Response**: Denied.  Dr. Hite was asked "Is there a difference between viewing something through the lens of equity and viewing something through the lens of racial equity?" and responded "I don't believe so, no." Hite Dep. at 67:6-13.

43.    According to Dr. Hite, equity and equality are not synonymous.  "Equality is sameness, everyone receives the same thing.  Equity is providing for what's needed in order to reach equality."  *See* Hite Dep. at 75:1-5 (attached as Ex. 2, ECF No. 91-2).

**Response**: Admitted.

44.     The School District states that "equity at [the School District of Philadelphia]
means to: Cultivate prosperity and liberation for students and staff, stating with historically
marginalized populations, by removing barriers, increasing access and inclusion, building
trusting relationships, and creating a shared culture of social responsibility and origination
accountability."  *See* https://www.philasd.org/dei [[https://perma.cc/LE55-TMWB]].  *See* Jubilee
Dep. at 38:2-39:3 (attached as Ex. 3, ECF No. 91-3) (authenticating this webpage); *id.* at
38:25-39:3 ("Anything that appears on the School District's website, whether it be my page or
the School District's page, is a representation of the School District.").

**Response**: Admitted only that the School District Office of Diversity, Equity and
Inclusion's web page includes the following statement "*Equity at SDP means to: Cultivate
prosperity and liberation for students and staff, starting with historically marginalized
populations, by removing barriers, increasing access and inclusion, building trusting
relationships, and creating a shared culture of social responsibility and organizational
accountability."*  The remaining averments in Paragraph 44 are denied.

45.     The School District does not believe that Jewish people qualify as a "historically
marginalized population."  Jubilee Dep. at 51:12-17 (attached as Ex. 3, ECF No. 91-3).

**Response**: Denied.  The averments in Paragraph 45 (which refer to Dr. Jubilee's personal
    opinion in response to questions "in the context of the United States demographic") are
    not material or relevant to Defendants' Motion for Summary Judgment or any claim or
    defense in this matter.  *See* Jubilee Dep. at 48:15-51:17.[1]

---

[1] Throughout their Statement of Facts, Plaintiffs often conflate a School District official's
personal opinion with an official position adopted by the School District.  In this Response, the
School District has noted the more obvious instances where this occurred.  Suffice it to say,

46.     The School District does not believe that any white people can qualify as a "historically marginalized population," regardless of their ethnic group.  Jubilee Dep. at 51:18-22 (attached as Ex. 3, ECF No. 91-3).

**Response**: Denied.  The averments in Paragraph 45 (which refer to Dr. Jubilee's personal opinion in response to questions "in the context of the United States demographic") are not material or relevant to Defendants' Motion for Summary Judgment or any claim or defense in this matter.  *See* Jubilee Dep. at 48:15-51:17.  Furthermore, on pages 51-52 of the transcript, Plaintiff's counsel confirmed that his question was limited to race, and Dr. Jubilee's response assumed that "White is the racial identifier," and that "race is what you're isolating."  Jubilee Dep. at 51:18-52:1.

47.     The School District changed its school selection process to make it more racially equitable not more equal.  *See* Hite Dep. at 75:1-14 (attached as Ex. 2, ECF No. 91-2).

**Response**: Admitted that, in response to the question "Was the school selection process for the Philadelphia school district's criteria-based schools changed to become more equitable?," Dr. Hite testified "It was changed to provide access to more children who qualify.  So in that sense, yes."  Hite Dep. at 75:1-14.  The remaining averments in Paragraph 47 are denied.  *See, e.g.*, Dr. Jubilee's testimony:

> Q. And was the school selection process that was selected -- selected -- was the school selection process that was going to be instituted and utilized for the '22-23 school year designed to be more equitable or more equal?

---

when an official expresses his or her personal opinion in a non-official capacity in response to a deposition question, he or she is not speaking for the School District.

A. There was a process for both.

Q. Which one won out?

A. They both had merit, implications in both. A lottery was equality, the

Zip code preference was equity.

Jubilee Dep. at 127:1-12.

48.     When the School District applies an "equity lens" to a policy it asks: "How does the proposed policy, program, practice, decision, or action address or advance opportunities for equity across race and other identifiers, as defined by our SDP definition of equity?" *See* https://www.philasd.org/dei/equity-framework [[https://perma.cc/S8MJ-KEMD]].[2] *See* Jubilee Dep. at 38:2-39:3 (attached as Ex. 3, ECF No. 91-3) (authenticating this webpage); *id.* at 38:25-39:3 ("Anything that appears on the School District's website, whether it be my page or the School District's page, is a representation of the School District.").

**Response**: Admitted only that the School District Office of Diversity, Equity and Inclusion's web page includes the following language: "How does the proposed policy, program, practice, decision, or action address or advance opportunities for equity across race and other identifiers, as defined by our SDP definition of equity?" The remaining averments in Paragraph 48 are denied.

49.     The "equity view" or "equity lens" review that the School District applied was a process in which the School District's policies and procedures were reviewed for bias and to determine if "bias or discrimination [was] involved in the development of the process or procedure or policy."  Lynch Dep. at 56:6-19 (attached as Ex. 1, ECF No. 91-1).

---

[2] To find this quote on the webpage, click on the orange box that says "Advancing Equity" or move the cursor on top of that box.

**Response**: Admitted that, in response to the question "What is the equity lens review that you're talking about?" Ms. Lynch replied: "[I]t's a process, as I understand it, of considering the procedures and the processes and the policies that exist with the School District from the lens of ensuring that we are implementing policies and procedures that are free of bias. . . .and that we've considered whether or not there is bias or discrimination involved in the development of the process or the procedure or the policy." Lynch Dep. at 56:6-19.  The remaining averments are denied.

50.     The School District equity lens review was designed to make the school selection process more equitable.  Jubilee Dep. at 147:21-25, 148:1 (attached as Ex. 3, ECF No. 91-3).

**Response**: Admitted that, in response to the question "Were the changes to the school selection process that started for the '22-23 school year designed to end practices that perpetuate systemic racism?" Dr. Jubilee testified "So the changes proposed to the school selection process with the use of the equity lens were intended to make the process more equitable." Jubilee Dep. at 147:21-25, 148:1.

51.     The School District believes that "deep racial and ethnic inequities that exist in Philadelphia's schools today are a direct result of structural racism—the historical and contemporary polices, practices, and norms that create and maintain white supremacy and how it manifests in schools."  School District of Philadelphia, Office of Diversity, Equity, and Inclusion: Racial Equity and the History of Philadelphia p. 3, PSD-SARGENT-013551 (attached as Ex. 7, ECF No. 91-7).

**Response:**  Denied that the statements quoted in Paragraph 51 were written on behalf of the "School District" and denied that they are material or relevant to Defendant's Motion for Summary Judgment.  Admitted that the quoted language appeared in a training

PowerPoint presentation.  By way of further response, the quoted language shows how the Office of Diversity, Equity and Inclusion engages in difficult questions about how power and privilege are structured and asks decision-makers across the District to think self-critically in order to build strong academic outcomes for all students.

52.     The School District believes "all of us are part of a racist system."  School District of Philadelphia, Office of Diversity, Equity, and Inclusion: Racial Equity and the History of Philadelphia p. 7, PSD-SARGENT-013555 (attached as Ex. 7, ECF No. 91-7).

**Response:**  Denied that the statements quoted in Paragraph 52 were written on behalf of the "School District" and denied that they are material or relevant to Defendant's Motion for Summary Judgment.  Admitted that the quoted language appeared in a training PowerPoint presentation.  By way of further response, the quoted language shows how the Office of Diversity, Equity and Inclusion engages in difficult questions about how power and privilege are structured and asks decision-makers across the District to think self-critically in order to build strong academic outcomes for all students.

53.     The School District believes that "white supremacy is the idea (ideology) that white people and the ideas, thoughts, beliefs, and actions of white people are superior to people of color and their ideas."  School District of Philadelphia, Office of Diversity, Equity, and Inclusion: Racial Equity and the History of Philadelphia, PSD-SARGENT-013557 (attached as Ex. 7, ECF No. 91-7).

**Response**: Denied that the statements quoted in Paragraph 53 were written on behalf of the "School District" and denied that they are material or relevant to Defendant's Motion for Summary Judgment.  Admitted that the quoted language appeared in a training PowerPoint presentation.  By way of further response, the quoted language shows how

the Office of Diversity, Equity and Inclusion engages in difficult questions about how power and privilege are structured and asks decision-makers across the District to think self-critically in order to build strong academic outcomes for all students.

54.    The School District claims that white supremacy leads to "oppressive structures in schooling."  School District of Philadelphia, Office of Diversity, Equity, and Inclusion: Racial Equity and the History of Philadelphia, PSD-SARGENT-013557 (attached as Ex. 7, ECF No. 91-7).

**Response:**  Denied that the statements quoted in Paragraph 54 were written on behalf of the "School District" and denied that they are material or relevant to Defendant's Motion for Summary Judgment.  Admitted that the quoted language appeared in a training PowerPoint presentation.  By way of further response, the quoted language shows how the Office of Diversity, Equity and Inclusion engages in difficult questions about how power and privilege are structured and asks decision-makers across the District to think self-critically in order to build strong academic outcomes for all students.

55.    The School District claims that "reverse racism does not exist."  School District of Philadelphia, Office of Diversity, Equity, and Inclusion: Racial Equity and the History of Philadelphia, PSD-SARGENT-013563 (attached as Ex. 7, ECF No. 91-7).

**Response**:  Denied that the statements quoted in Paragraph 55 were written on behalf of the "School District" and denied that they are material or relevant to Defendant's Motion for Summary Judgment.  Admitted that the quoted language appeared in a training PowerPoint presentation.  By way of further response, the quoted language shows how the Office of Diversity, Equity and Inclusion engages in difficult questions about how

power and privilege are structured and asks decision-makers across the District to think
self-critically in order to build strong academic outcomes for all students.

56.     The School District also believes that "Philadelphia is rooted in discrimination"
because it elected Frank Rizzo as Mayor in 1971, and the School District claims that Rizzo
"opposed desegregation of [Philadelphia public] schools."  School District of Philadelphia,
Office of Diversity, Equity, and Inclusion: Racial Equity and the History of Philadelphia,
PSD-SARGENT-013577-013579 (attached as Ex. 7, ECF No. 91-7).

> **Response**:  Denied that the statements quoted in Paragraph 56 were written on behalf of
> the "School District" and denied that they are material or relevant to Defendant's Motion
> for Summary Judgment.  Admitted that the quoted language appeared in a training
> PowerPoint presentation.  By way of further response, the quoted language shows how
> the Office of Diversity, Equity and Inclusion engages in difficult questions about how
> power and privilege are structured and asks decision-makers across the District to think
> self-critically in order to build strong academic outcomes for all students.

57.     The School District claims that that descendants of people involved in the MOVE
bombing of 1985 attend Philadelphia schools today, and asks people to reflect on: "What type of
legacy do you think the bombing of MOVE has had on students in Philadelphia?" School District
of Philadelphia, Office of Diversity, Equity, and Inclusion: Racial Equity and the History of
Philadelphia p. 39, PSD-SARGENT-013585 (attached as Ex. 7, ECF No. 91-7).

> **Response**:  Denied that the statements quoted in Paragraph 57 were written on behalf of
> the "School District" and denied that they are material or relevant to Defendant's Motion
> for Summary Judgment.  Admitted that the quoted language appeared in a training
> PowerPoint presentation.  By way of further response, the quoted language shows how

the Office of Diversity, Equity and Inclusion engages in difficult questions about how

power and privilege are structured and asks decision-makers across the District to think

self-critically in order to build strong academic outcomes for all students.

58.     Sabriya Jubilee is the School District's Chief of Equity and oversees the School

District's Office of Diversity, Equity, and Inclusion (DEI).  *See* Jubilee Dep. at 8:23-25, 9:1

(attached as Ex. 3, ECF No. 91-3).

**Response**: Admitted.

59.     Jubilee has been Chief of the Office of DEI since July 2021.  *See* Jubilee Dep. at

9:6-9 (attached as Ex. 3, ECF No. 91-3).

**Response**: Admitted.

60.     Jubilee is in charge of centering the School District's work through a lens of racial

equity.  *See* Hite Dep. at 68:4-11 (attached as Ex. 2, ECF No. 91-2).

**Response**: Admitted that in response to the question, "would it be a fair statement to say

that Dr. Jubilee was in charge of centering the school district's work through a lens of

racial equity?" Dr. Hite testified, "Yes, she and her team, yes." Hite Dep. at 68:4-11.

61.     Beginning in July 2021, Jubilee applied an equity lens to the processes that were

being proposed for the new school selection process.  *See* Hite Dep. at 71:2-14 (attached as

Ex. 3, ECF No. 91-3).

**Response**: Denied. In response to the question, "Did Dr. Jubilee review the school

selection process for criteria-based high schools, or I should rather say specifically, did

Dr. Jubilee review the proposed changes to the school selection process for criteria-based

high schools through a lens of racial equity?" Dr. Hite testified, "I think she applied the

equity lens to the process that were being proposed for the new school selection process."
Hite Dep. at 71:2-14.

62.     Jubilee testified that part of the equity lens review is an "opportunity to de-
construct, to take apart, to analyze, [and] to assess."  Jubilee Dep. at 59:2-7 (attached as Ex. 3,
ECF No. 91-3).

**Response**: Admitted.

63.     The school selection process was one policy that Jubilee deconstructed and
analyzed.  *See* Jubilee Dep. at 59:8-10 (attached as Ex. 3, ECF No. 91-3).

**Response**: Admitted.

64.     During her racial equity review of the school selection process, Jubilee became
aware of the racial demographics of Carver, Parkway Middle, Masterman, Central, and Palumbo.
*See* Jubilee Dep. at 26:12-31:21 (attached as Ex. 3, ECF No. 913).

> **Response**: Denied.  Paragraph 64 inaccurately characterizes Dr. Jubilee's testimony. Dr.
> Jubilee confirmed that she was first got involved with the school selection process in the
> summer of 2021 and that, as part of that process, she became aware about "general
> demographics at certain schools." Jubilee Dep. at 31:18-21.

65.     Jubilee testified that she was concerned with the racial disproportionalities that
existed at Carver, Parkway, Masterman, Central, and Palumbo.  *See* Jubilee Dep. at 32:22-36:15
(attached as Ex. 3, ECF No. 91-3); *see also id.* at 36:14-15 ("Any time there's disproportionality,
equity is a concern.").

> **Response**: Denied. Paragraph 65 inaccurately characterizes Dr. Jubilee's testimony at
> 32:22-36:15. In response to the question, "regardless of the factors . . . I'm asking you
> from an equity perspective, if you looked at and you see a disproportionate number of

Asians, would that be something that would be concerning to you?" Dr. Jubilee testified,

"Any time there's disproportionality, equity is a concern." Jubilee Dep. at 36:10-15.

66.     Jubilee testified that the racial demographics of these schools was "one set of

data" that was considered in making changes to the school selection process.  *See* Jubilee Dep. at

33:1-10 (attached as Ex. 3, ECF No. 91-3).

> **Response**: Denied. In response the question, "[W]hen you learned about, just in general,
>
> what the demographics of the schools of Academy at Palumbo, Carver, Central,
>
> Masterman, and Parkway were, were you -- were you satisfied with the demographics?"
>
> Dr. Jubilee testified, "[S]atisfaction isn't a word that I would use to describe that. The
>
> data that was provided as a part of our -- the team's process of looking at the school
>
> selection process was one set of data when we were thinking about a number of criteria
>
> changes." Jubilee Dep. at 32:22 - 33:10.

67.     Jubilee believes that certain racial groups have power over others.  *See* Jubilee

Dep. at 60:22-25 (attached as Ex. 3, ECF No. 91-3).

> **Response**: Denied.  The averment in Paragraph 67 are neither material nor relevant to
>
> Defendants' Motion for Summary Judgment.  Paragraph 67 also mischaracterizes Dr.
>
> Jubilee's testimony.  In response to the question "Do certain racial groups have power
>
> over each other?" Dr. Jubilee responded "So if you take it in the historical context of the
>
> United States, then yes."

68.     Specifically, Jubilee believes whites have power over groups that identify as

non-white.  *See* Jubilee Dep. at 62:5-13 (attached as Ex. 3, ECF No. 91-3).

> **Response**: Denied that the statements in Paragraph 68 are material or relevant to
>
> Defendants' Motion for Summary Judgment. Paragraph 68 also mischaracterizes Dr.

Jubilee's testimony: "In the context of the United States, those who identify racially as White have historically had power over groups that identify racially as nonWhite." Jubilee Dep. at 62:5-13.

69.     Jubilee also believes that Christian have privileges over non-Christians, with the exception of Jews.  *See* Jubilee Dep. at 89:18-25, 90:3-18 (attached as Ex. 3, ECF No. 91-3).

**Response**: Denied.  The statements in Paragraph 69, which are a mischaracterization of Dr. Jubilee's testimony, are neither material nor relevant to Defendants' Motion for Summary Judgment.

70.     Jubilee believes that Jews are not a "historically marginalized group."  *See* Jubilee Dep. at 90:14-18 (attached as Ex. 3, ECF No. 91-3).

**Response**: Denied.  The statements in Paragraph 70, which are a mischaracterization of Dr. Jubilee's testimony, are neither material nor relevant to Defendants' Motion for Summary Judgment.

71.     Jubilee testified that the school-selection process that existed before the changes reflected a system in which whites had power over non-whites and in which blacks lacked privilege and power relative to other groups.  *See* Jubilee Dep. at 64:5-20, 68:4-9 (attached as Ex. 3, ECF No. 91-3).

**Response:** Denied. Dr. Jubilee testified that there was "some evidence that suggested" Black applicants to criteria-based school lacked privilege and power relative to other groups prior to the '22-23 admissions process.  *See* Jubilee Dep. at 64:5-20, 68:4-9.

72.     Jubilee believes that "[i]dentifying as white racially in the context of the United States puts one in a position of privilege and power off of that racial identification."  Jubilee Dep. at 74:6-11 (attached as Ex. 3, ECF No. 91-3).

**Response**: Denied.  The statements in Paragraph 72 are neither material nor relevant to Defendants' Motion for Summary Judgment.  Furthermore, Paragraph 72 mischaracterizes Dr. Jubilee's testimony: "So I don't -- I don't think that the privilege and power is in comparison to the school selection process. Identifying as White racially in the context of the United States puts one in position to have privilege and power off of that racial identification."  Jubilee Dep. at 74:6-11.

73.     Jubilee further believes that this privilege and power could lead to the ability to attend certain schools.  *See* Jubilee Dep. at 74:13-18 (attached as Ex. 3, ECF No. 91-3).

**Response:** Denied that the statements in Paragraph 73, which mischaracterize Dr. Jubilee's testimony, are material or relevant to Defendants' Motion for Summary Judgment.

74.     Jubilee believes that this privilege and power could extend to educational opportunities within the School District of Philadelphia.  *See* Jubilee Dep. at 75:2-6 (attached as Ex. 3, ECF No. 91-3).

**Response:** Denied. In response to the question, "And the privilege that White students and applicants have would -- for educational opportunities would extend to schools within the School District of Philadelphia, right?" Dr. Jubilee testified, "It could." Jubilee Dep. at 75:2-6.

75.     Jubilee believes that if a system of meritocracy is used to exclude certain group, then it is an "institutionalization of norms that need to be dismantled from a [racial] equity perspective."  Jubilee Dep. at 106:2-5 (attached as Ex. 3, ECF No. 91-3).

**Response**: Denied that the statements in Paragraph 75 are material or relevant to Defendants' Motion for Summary Judgment.  Dr. Jubilee testified that, if "meritocracy"

is "used to uphold any form of exclusion for student groups, it is an institutionalization of norms that needs to be dismantled from an equity perspective" and that the same answer would apply "for any group that you name where they're being excluded."  Jubilee Dep. at 105:21-106:23.

76.     The School District defines "colorblind" and "colorblindness" as a "racial ideology that posits the best way to end discrimination is by treating individuals as equally as possible without regarding to race, culture, or ethnicity."  Living Glossary (attached as Ex. 5, ECF No. 91-5).

**Response**: Denied that the statements in Paragraph 76 are material or relevant to Defendants' Motion for Summary Judgment.  It is further denied that the School District defines "colorblind" and "colorblindness."  The Living Glossary defines "Colorblind-ness" as "the racial ideology that posits the best way to end discrimination is by treating individuals as equally as possible without regarding to race, culture, or ethnicity."

77.     As director of DEI, Jubilee does not use colorblindness.  *See* Jubilee Dep. at 109:22-25 (attached as Ex. 3, ECF No. 91-3).

**Response**: Denied that the statements in Paragraph 77 are material or relevant to Defendants' Motion for Summary Judgment.  By way of further response, in response to the question, "Is the current school -- is the current school selection process colorblind as you define it in the living glossary?" Dr. Jubilee testified, "So just to help you contextualize this a little bit more, colorblindness is a critique. There -- the -- the goal in anything that we do around equity is not to be colorblind in the sense that you disregard a human's race, culture or ethnicity."  Jubilee Dep. at 128:2-7.

78.     Jubilee believes that "[b]eing colorblind is not a good thing."  Jubilee Dep. at

128:29 (attached as Ex. 3, ECF No. 91-3).

**Response**: Admitted that Dr. Jubilee agreed with Plaintiffs' counsel that being

"colorblind" is not a good thing.  Denied that the statements in Paragraph 78 are material

or relevant to Defendants' Motion for Summary Judgment.

79.     Jubilee does not use colorblindness because it is "an erasure of racial identity."

Jubilee Dep. at 110:1-4 (attached as Ex. 3, ECF No. 91-3).

**Response**: Denied that the statements in Paragraph 79 are material or relevant to

Defendants' Motion for Summary Judgment.  Dr, Jubilee's testimony was:

> A. I -- I as the chief of equity don't use colorblindness, so I'm not sure that
>
> I can answer that question.
>
> Q. When you say you don't use colorblindness, what do you mean by that?
>
> A. So colorblindness, as I understand it, is an erasure of racial identity,
>
> which is less about what's on the paper and more about an ideology. So in
>
> that context it doesn't show up in the work that I do in the School District
>
> of Philadelphia.

Jubilee Dep. at 109:23–110:7.

80.     Jubilee believes that if colorblindness is "utilized as a way to increase privilege

for a racial group which has historically always had privilege because their race," then it is a

"institutionalized norm" that needs to be "deconstructed."  Jubilee Dep. at 112:1-7 (attached as

Ex. 3, ECF No. 91-3).

**Response**: Denied.  Dr Jubilee testified, "[I]f the removal of race is utilized as a way to

increase privilege for a racial group which has historically always had privilege because

of their race, then from an equity perspective that would be an institutionalized norm that might want to be considered." Jubilee Dep. at 112:1-7.  It is further denied that the statements in Paragraph 80 are material or relevant to Defendants' Motion for Summary Judgment.

81.     The changes that the School District made to the school selection process for criteria-based schools were not colorblind.  *See* Jubilee Dep. at 128:14-17 (attached as Ex. 3, ECF No. 91-3).

**Response**: Denied.  In response to the question, "Is the school selection process that was utilized for the '22-23 school year colorblind as you define 'colorblind' in your living glossary?" Dr. Jubilee testified, "No."  It is further denied that the statements in Paragraph 81 are material or relevant to Defendants' Motion for Summary Judgment.

82.     The changes that the School District made to the school selection process for criteria-based schools were not colorblind because Jubilee believes that "equity is not to be colorblind in the sense that you disregard a human's race, culture or ethnicity."  Jubilee Dep. at 128:4-6 (attached as Ex. 3, ECF No. 91-3).

**Response:** Denied. In response to the question, "Is the current school -- is the current school selection process colorblind as you define it in the living glossary?" Dr. Jubilee testified, "So just to help you contextualize this a little bit more, colorblindness is a critique. There -- the -- the goal in anything that we do around equity is not to be colorblind in the sense that you disregard a human's race, culture or ethnicity."  Jubilee Dep. at 128:2-7.  It is further denied that the statements in Paragraph 82 are material or relevant to Defendants' Motion for Summary Judgment.

83.     Jubilee believes that the former school selection process was an example of "white supremacy culture."  Jubilee Dep. at 129:16-21 (attached as Ex. 3, ECF No. 91-3).

**Response:**  Denied.  The statements in Paragraph 83 are not material or relevant to Defendants' Motion for Summary Judgment.  In response to Plaintiffs' counsel's questions, Dr. Jubilee testified that the former school selection process itself was not reflective of white supremacy culture but that the results of the process may have been. Jubilee Dep. at 129:3-21.

84.     Jubilee believes that "[h]istorically those identified racially as White have had an opportunity and benefited from systems of power that non-Whites have not traditionally historically had the same benefits from."  Jubilee Dep. at 126:20-25 (attached as Ex. 3, ECF No. 91-3).

**Response**:  Denied that the statements in Paragraph 84 are material or relevant to Defendants' Motion for Summary Judgment.

85.     Jubilee testified that "our goal as a school system is to be equitable across— in the entire system regardless of the identity.  Race is a factor, but it is not an isolated factor in any of the decision that we make toward equity."  Jubilee Dep. at 164:9-16 (emphasis added) (attached as Ex. 3, ECF No. 91-3).

**Response:**  Admitted.

86.     In December 2021, Dr. Hite asked Jubilee to appear before Committee on Education of the Philadelphia City Council to be present and answer the Committee's questions. Hite Dep. at 70:14-20 (attached as Ex. 2, ECF No. 91-2).

**Response:**  Admitted.

-30-

87.     The hearing was centered around the changes that were made to the selection process for Philadelphia's criteria-based schools.  Hite Dep. at 69:21-25, 70:1 (attached as Ex. 2, ECF No. 91-2).

**Response:**  Admitted.

88.     Dr. Hite was aware of Jubilee's equity lens review of the school selection process when he asked Jubilee to testify.  Jubilee Dep. at 45:24-46:5 (attached as Ex. 3, ECF No. 91-3).

**Response:**  Admitted.

89.     Jubilee told the city council that "in the [Anti-Racism Declaration, the School District] committed to becoming an anti-racist organization by uprooting policies, deconstructing processes, and eradicating practices that create systems of privilege and power for one group over the other."  Council of the City of Philadelphia, Committee on Education, December 15, 2021, at 84:14-24 (attached as Ex. 8, ECF No. 91-8).

**Response:**  Admitted.

90.     Jubilee testified that the school selection process could have been one of the policies, processes, or practices she was referring to in her statement.  Jubilee Dep. at 61:1-7 (attached as Ex. 3, ECF No. 91-3).

> **Response:**  Admitted that, in response to the question "Was the school selection process that existed prior to the 2022-23 school year one of the policies, processes or practices that you're referring to in your testimony at line 18 through 24?" Dr. Jubilee testified, "It could have been." Jubilee Dep. at 61:1-7.

## D.     The Zip-Code Preference

91.     One of the changes that the School District made to the school-selection process was to implement a lottery to assign students to criteria-based schools.  *See* Lynch Dep. at 39:6-14, 42:6-9 (attached as Ex. 1, ECF No. 91-1).

**Response:**  Admitted that the School District implemented a lottery for admission to Criteria-Based schools.  The remaining averments are denied. Lynch testified, "[W]e expanded the lottery from those schools that we were already admin -- administering a lottery for to criteria-based schools." Lynch Dep. at 39:6-14. In response to the question, "And then the lottery was used to assign the student to a criteria-based school based upon their rankings; would that be a fair statement?" Lynch testified, "No."

92.      Under the previous school-selection process, admissions decisions were made at the individual school level.  *See* Lynch Dep. at 43:23-25, 44:1-7 (attached as Ex. 1, ECF No. 91-1).

**Response:**  Admitted.  By way of further response, one reason for the change to a lottery system was to ensure that only qualified students were admitted to schools that required applicants to have certain qualifications.  *See* Lynch Dep. at 42:11–43:8 ("So one of the determinations that Pew raised in their findings was that we had -- within the School District of Philadelphia, entering schools that required a student to meet criteria, we had students that were entering schools that did not meet the criteria for the school that they were entering.  Pew also said that there were students that met the criteria for these schools that very likely would not be considered because of the schools that they came from or because of whatever other reasons.").

93.      The lottery, however, included a zip-code preference.  *See* Lynch Dep. at 44:8-20 (attached as Ex. 1, ECF No. 91-1).

**Response:**  Admitted that zip code preference applied at Carver, Central, Palumbo, and Masterman.  The remaining averments are denied.

94.     With the zip-code preference, if an applicant lived in one of five preferred zip codes, that applicant would be offered admission before any students were assigned admission based on the lottery.  *See* Lynch Dep. at 47:18-24 (attached as Ex. 1, ECF No. 91-1).

**Response:**  Denied. Lynch testified, "if you lived in a Zip code and you submitted an application . . . and as an applicant you met the criteria for the school and it was one of those four schools, you went into the lottery and then the lottery, the system itself, prioritized those applicants and moved them to the top of the list."  Lynch Dep. at 47:18-24.  Students from six zip codes received preference in the lottery.

95.     Therefore, students living in a zip code that was one of the preferred zip-codes had an advantage over students living in non-preferred zip code.  *See* Lynch Dep. at 85:1-5 (attached as Ex. 1, ECF No. 91-1).

**Response:**  Admitted that, in response to the question, "Would you agree with me that a student living in a Zip code preference has an advantage over a student that does not live within the preferred Zip code?" Lynch testified, "Yes."  By way of further response, Lynch also explained that an applicant to one of the four schools had to meet the qualifications for the particular criteria-based school in order to get the preference for living in one of the zip codes.  *See* Lynch Dep. at 47:18-24 ("if you lived in a Zip code and you submitted an application . . . and as an applicant you met the criteria for the school and it was one of those four schools, you went into the lottery and then the lottery, the system itself, prioritized those applicants and moved them to the top of the list.").

96.     The zip-code preference did not apply to all criteria-based schools.  *See* Hite Dep. at 24:10-15 (attached as Ex. 2, ECF No. 91-2), Lynch Dep. at 48:9-12 (attached as Ex. 1, ECF No. 91-1).

**Response:** Admitted.

97.     The zip-code preference applied to Masterman, Central, Carver, and Palumbo. *See* Hite Dep. at 24:20-25 (attached as Ex. 2, ECF No. 91-2).

**Response:** Admitted.

98.     The racial demographics of the five zip codes was a consideration in their selection. *See* Jubilee Dep. at 152:25-153:19 (attached as Ex. 3, ECF No. 91-3).

**Response:** Denied. Paragraph 98 mischaracterizes Dr. Jubilee's testimony at 152:25-153:19. Although Dr. Jubilee testified that "Race is always a part of the conversation" (Jubilee Dep. at 153: 13), School District administrators have confirmed that racial demographics were not considered in the selection of the six zip codes. See, e.g., Wolford Decl. at ¶ 14 (attached as Ex. 1, ECF No. 95-1) ("To determine where the zip code priority should apply, [we] examined which zip codes had the lowest representation of 9th grade students at Palumbo, Carver, Central and Masterman. I was personally involved in identifying those zip codes, and I did not consider their location within the City of Philadelphia, the racial demographics of the zip codes or of eligible students in the zip codes, or any factor other than the number of students enrolled at these four schools in prior years.").

99.     The zip-code preference was included to make the selection process more equitable. *See* Jubilee Dep. at 127:7-10 (attached as Ex. 3, ECF No. 91-3).

**Response**: Admitted that zip code preference was an example of equity in the process. By way of further response, Dr. Jubilee's testimony was that both equality and equity had implications in the school selection process and that, for example, the "lottery was equality, the Zip code preference was equity." Jubilee Dep. at 127:1-10.

100.    The zip-code preference was added based on the equity lens review which revealed the old selection system was "biased."  *See* Lynch Dep. at 44:21-56:19 (attached as Ex. 1, ECF No. 91-1).

**Response**:  Denied.  This statement mischaracterizes Ms. Lynch's testimony.  For example, she testified, in the transcript page range cited in Paragraph 100, that a study by the Pew Foundation many years earlier had identified bias in the selection process:

- "One of the findings from Pew study was that a good number of students were selected from certain parts of the City when in other areas of the City there were students that had equal qualifications that were not considered."  Lynch Dep. at 44:23-45:2.

- "The Zip code priority was an attempt to identify students who met criteria who applied, because of course they had to apply, and give to those students a priority to attend four schools.  In four schools they had -- they received a priority."  Lynch Dep. at 45:12-16.

- "The bias, from my opinion, was that we had a process where, depending on the school, there could be different criteria, there could be a different selection process, there could be different and additional factors taken into consideration.  For example, legacy, did the parent attend the school. Other factors were taken into consideration and not just the objective review of a child's academic credentials.  And what Pew said to us was, you have students that meet criteria all across your -- all across your City and in numerous schools they meet the criteria, they had the academic credentials, but they're not given access."  Lynch Dep. at 50:6-18.

### E.    Changes in the Racial Demographics

101.    The School District maintains the racial and ethnic demographics of each year's applicants to criteria-based high schools, which is available at http://bit.ly/3LjWJIP [[https://perma.cc/66AE-GN52]].  *See* Jubilee Dep. at 38:25-39:3 (attached as Ex. 3, ECF No. 91-3) ("Anything that appears on the School District's website, whether it be my page or the School District's page, is a representation of the School District.").

**Response**:  Admitted.

102.    The School District maintains data regarding the admissions offers for each criteria-based high school based on the applicant's race and ethnicity.  *See* http://bit.ly/3LjWJIP [[https://perma.cc/66AE-GN52]].

**Response**:  Admitted.

103.    The School District maintains data regarding the acceptances for each criteria-based school based on the applicant's race and ethnicity.  *See* http://bit.ly/3LjWJIP [[https://perma.cc/66AE-GN52]].

**Response**:  Admitted.

104.    The racial demographics for accepted applicants to criteria-based high schools for the 2021-2022 school year, the year immediately prior to the changes in the school selection process, are attached at Ex. 9 (ECF No. 91-1).  *See* Declaration of Walter S. Zimolong 1 6 (attached as Ex. 14, ECF No. 91-14) (authenticating these data).

**Response**:  Denied as stated.  The chart on Plaintiffs' Exhibit 9 (which appears at ECF No. 91-9, not ECF No. 91-1) lists racial and ethnicity information only for applicants from School District schools or programs.  It does not include applicants from Charter, Alternative Education, parochial, or private schools outside the District.  That additional

data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, Plaintiffs' Exhibit 9 is incomplete on its own terms.

105.    The racial demographics for accepted applicants to criteria-based high schools for the 2022-2023 school year, the year immediately after to the changes in the school selection process, are attached at Ex. 10 (ECF No. 91-10).  *See* Declaration of Walter S. Zimolong 1 7 (attached as Ex. 14, ECF No. 91-14) (authenticating these data).

> **Response**:  Denied as stated.  The chart on Plaintiffs' Exhibit 10 lists racial and ethnicity information only for applicants from District schools or programs.  It does not include applicants from Charter, Alternative Education, parochial, or private schools outside the District.  That additional data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, Plaintiffs' Exhibit 10 is incomplete on its own terms.

106.    The table below compares the number of admissions offers for each racial and ethnic category made by Palumbo, Carver, Central, and Masterman for the 2021-2022 and 2022-2023 school years:

**Admissions Offers**

| School Year | School | Asian | Black | Hispanic | Multi-Racial | White |
|---|---|---|---|---|---|---|
| 21-22 | Palumbo | 233 | 81 | 72 | 41 | 183 |
| 22-23 | Palumbo | 166 | 149 | 54 | 25 | 51 |
| 21-22 | Central | 239 | 98 | 45 | 46 | 254 |
| 22-23 | Central | 216 | 146 | 85 | 39 | 167 |
| 21-22 | Masterman | 37 | 24 | 12 | 12 | 48 |
| 22-23 | Masterman | 56 | 20 | 13 | 11 | 43 |
| 21-22 | Carver | 164 | 127 | 40 | 34 | 145 |
| 22-23 | Carver | 145 | 160 | 70 | 32 | 108 |

> **Response**:  Denied as stated. The table in Paragraph 106 includes racial and ethnicity information only for applicants from District schools or programs.  It does not include

applicants from Charter, Alternative Education, or private schools outside the District. That additional data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, the table is incomplete and incorrect on its own terms.

107.    The table below shows the change in the number of admissions offers made by Palumbo, Carver, Central, and Masterman for each racial and ethnic category between the 2021-2022 and 2022-2023 school years:

| School | Asian | Black | Hispanic | Multi-Racial | White |
|--------|-------|-------|----------|--------------|-------|
| Palumbo | -67 | +68 | -18 | -16 | -132 |
| Central | -23 | +48 | +40 | -7 | -87 |
| Masterman | +19 | -4 | +1 | -1 | -5 |
| Carver | -19 | +33 | +30 | -2 | -37 |

**Response**:  Denied as stated.  The table in Paragraph 107 includes racial and ethnicity information only for applicants from District schools or programs.  It does not include applicants from Charter, Alternative Education, or private schools outside the District. That additional data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, the table is incomplete and incorrect on its own terms.  Defendants also deny that the averments in Paragraph 107 or material or relevant to Defendants' Motion for Summary Judgment.  For example, they ignore significant variables that impact the numbers in Plaintiffs' table.  See, e.g., Wolford Decl. at ¶ 31 (pointing out that Plaintiffs' table and analysis do not consider the number of offers made by each school, "any fluctuation in the number of applicants and the demographics of applicants from year to year," and other variables.).

108.     The table below shows the percentage change in the number of admissions offers made by Palumbo, Carver, Central, and Masterman for each racial and ethnic category between the 2021-2022 and 2022-2023 school years:

| School | Asian | Black | Hispanic | Multi-Racial | White |
|---|---|---|---|---|---|
| Palumbo | -28.8% | +84.0% | -25.0% | -39.0% | -72.1% |
| Central | -9.6% | +49.0% | +88.9% | -15.2% | -34.3% |
| Masterman | +51.4% | -16.7% | +8.3% | -8.3% | -10.4% |
| Carver | -11.6% | +26.0% | +75% | -5.9% | -25.5% |

**Response**:  Denied as stated.  The table in Paragraph 108 includes racial and ethnicity information only for applicants from District schools or programs.  It does not include applicants from Charter, Alternative Education, or private schools outside the District.  That additional data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, the table is incomplete and incorrect on its own terms.  Defendants also deny that the averments in Paragraph 108 or material or relevant to Defendants' Motion for Summary Judgment.  For example, they ignore significant variables that impact the numbers in Plaintiffs' table.  See, e.g., Wolford Decl. at ¶ 31 (pointing out that Plaintiffs' table and analysis do not consider the number of offers made by each school, "any fluctuation in the number of applicants and the demographics of applicants from year to year," and other variables.).

109.     According to the School District's data, after the changes to the school selection process were made, the number of admissions offers made to Asian students at Palumbo **decreased** by 28.8%.

**Response**:  Denied as stated.  The statement in Paragraph 109 is based on data that includes racial and ethnicity information only for applicants from District schools or programs.  It does not include applicants from Charter, Alternative Education, or private

schools outside the District.  That additional data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, the statement is incorrect on its own terms.  Defendants also deny that the averments in Paragraph 109 or material or relevant to Defendants' Motion for Summary Judgment.  *See, e.g.,* Wolford Decl. at ¶ 31 (pointing out that Plaintiffs' table and analysis do not consider the number of offers made by each school, "any fluctuation in the number of applicants and the demographics of applicants from year to year," and other variables.); Wolford Decl. at ¶ 37-40, Table E.

110.    According to the School District's data, after the changes to the school selection process were made, the number of admissions offers made to white students at Palumbo **decreased** by 72.1%.

**Response**:  Denied as stated.  The statement in Paragraph 110 is based on data that includes racial and ethnicity information only for applicants from District schools or programs.  It does not include applicants from Charter, Alternative Education, or private schools outside the District.  That additional data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, the statement is incorrect on its own terms.  Defendants also deny that the averments in Paragraph 110 or material or relevant to Defendants' Motion for Summary Judgment.  *See, e.g.,* Wolford Decl. at ¶ 31 (pointing out that Plaintiffs' table and analysis do not consider the number of offers made by each school, "any fluctuation in the number of applicants and the demographics of applicants from year to year," and other variables.); Wolford Decl. at ¶ 37-40, Table E.

111.    Conversely, according to the School District's data, after the changes to the school selection process were made, the number of admissions offers made to black students at Palumbo **increased** by 84.0%.

> **Response**:  Denied as stated.  The statement in Paragraph 111 is based on data that includes racial and ethnicity information only for applicants from District schools or programs.  It does not include applicants from Charter, Alternative Education, or private schools outside the District.  That additional data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, the statement is incorrect on its own terms.  Defendants also deny that the averments in Paragraph 111 or material or relevant to Defendants' Motion for Summary Judgment.  *See, e.g.,* Wolford Decl. at ¶ 31 (pointing out that Plaintiffs' table and analysis do not consider the number of offers made by each school, "any fluctuation in the number of applicants and the demographics of applicants from year to year," and other variables.); Wolford Decl. at ¶ 37-40, Table E.

112.    According to the School District's data, after the changes to the school selection process were made, the number of admissions offers made to Asian students at Central **decreased** by 9.6%.

> **Response**:  Denied as stated.  The statement in Paragraph 112 is based on data that includes racial and ethnicity information only for applicants from District schools or programs.  It does not include applicants from Charter, Alternative Education, or private schools outside the District.  That additional data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, the statement is incorrect on its own terms.  Defendants also deny that the averments in Paragraph 112 or

material or relevant to Defendants' Motion for Summary Judgment.  *See, e.g.,* Wolford

Decl. at ¶ 31 (pointing out that Plaintiffs' table and analysis do not consider the number

of offers made by each school, "any fluctuation in the number of applicants and the

demographics of applicants from year to year," and other variables.); Wolford Decl. at ¶

37-40, Table E.

113.    According to the School District's data, after the changes to the school selection

process were made, the number of admissions offers made to white students at Central

**decreased** by 34.3%.

> **Response**:  Denied as stated.  The statement in Paragraph 113 is based on data that
>
> includes racial and ethnicity information only for applicants from District schools or
>
> programs.  It does not include applicants from Charter, Alternative Education, or private
>
> schools outside the District.  That additional data appears on the website Plaintiffs cite in
>
> Paragraph 101, but Plaintiffs did not include it.  Because of this omission, the statement is
>
> incorrect on its own terms.  Defendants also deny that the averments in Paragraph 113 or
>
> material or relevant to Defendants' Motion for Summary Judgment.  *See, e.g.,* Wolford
>
> Decl. at ¶ 31 (pointing out that Plaintiffs' table and analysis do not consider the number
>
> of offers made by each school, "any fluctuation in the number of applicants and the
>
> demographics of applicants from year to year," and other variables.); Wolford Decl. at ¶
>
> 37-40, Table E.

114.    Conversely, according to the School District's data, after the changes to the

school selection process were made, the number of admissions offers made to black students at

Central **increased** by 49.0% and offers made to Hispanic students **increased** by 88.9%.

**Response**:  Denied as stated.  The statement in Paragraph 114 is based on data that includes racial and ethnicity information only for applicants from District schools or programs.  It does not include applicants from Charter, Alternative Education, or private schools outside the District.  That additional data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, the statement is incorrect on its own terms.  Defendants also deny that the averments in Paragraph 114 or material or relevant to Defendants' Motion for Summary Judgment.  *See, e.g.,* Wolford Decl. at ¶ 31 (pointing out that Plaintiffs' table and analysis do not consider the number of offers made by each school, "any fluctuation in the number of applicants and the demographics of applicants from year to year," and other variables.); Wolford Decl. at ¶ 37-40, Table E.

115.    According to the School District's data, after the changes to the school selection process were made, the number of admissions offers made to Asian students at Carver **decreased** by 11.6%.

**Response**:  Denied as stated.  The statement in Paragraph 115 is based on data that includes racial and ethnicity information only for applicants from District schools or programs.  It does not include applicants from Charter, Alternative Education, or private schools outside the District.  That additional data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, the statement is incorrect on its own terms.  Defendants also deny that the averments in Paragraph 115 or material or relevant to Defendants' Motion for Summary Judgment.  *See, e.g.,* Wolford Decl. at ¶ 31 (pointing out that Plaintiffs' table and analysis do not consider the number of offers made by each school, "any fluctuation in the number of applicants and the

demographics of applicants from year to year," and other variables.); Wolford Decl. at ¶ 37-40, Table E.

116.    Conversely, according to the School District's data, after the changes to the school selection process were made, the number of admissions offers made to black students at Carver **increased** by 26.0% and the number of admissions offers made to Hispanic **increased** by 75.0%.

> **Response**:  Denied as stated.  The statement in Paragraph 116 is based on data that includes racial and ethnicity information only for applicants from District schools or programs.  It does not include applicants from Charter, Alternative Education, or private schools outside the District.  That additional data appears on the website Plaintiffs cite in Paragraph 101, but Plaintiffs did not include it.  Because of this omission, the statement is incorrect on its own terms.  Defendants also deny that the averments in Paragraph 116 or material or relevant to Defendants' Motion for Summary Judgment.  *See, e.g.,* Wolford Decl. at ¶ 31 (pointing out that Plaintiffs' table and analysis do not consider the number of offers made by each school, "any fluctuation in the number of applicants and the demographics of applicants from year to year," and other variables.); Wolford Decl. at ¶ 37-40, Table E.

**F.    Other Relevant Facts**

117.    The School District is concerned about the disproportionately low black enrollment numbers at Central High School.  *See* Lynch Dep. at 111:9-24 (attached as Ex. 1, ECF No. 91-1).

> **Response**:  Denied, including that the averment in Paragraph 117 reflects a concern expressed by "the School District."  Ms. Lynch testified as follows:

Q:      you did say . . . the 18 percent enrollment figure for Black and African American

students at Central was concerning to you?

A. Personally.

Q. Yes.

A. Yes.

Lynch Dep. at 116:21-117:3.

118.    The School District is "very concerned about the lack of achievement among for

Black and Brown students in the School District of Philadelphia."  Lynch Dep. at 95:23-25

(attached as Ex. 1, ECF No. 91-1).

**Response**:  Admitted that the partial statement in Paragraph 118 was made by Ms.

Lynch.  The remaining averments are denied.  Ms. Lynch testified: "I think the School

District is concerned about the academic achievement of students within the School

District of Philadelphia. I think that the School District is very concerned about the lack

of achievement among Black and Brown students in the School District of Philadelphia. I

think the School District is very concerned about access for qualified students to schools

within the School District of Philadelphia when criteria is required."  95:20-96-4.

119.    The School District is "concerned about the lack of achievement or that— for

Black and Brown students, particularly boys, that their academic achievement has not been the

same, and so we look for measures, ways, practices, we look to other jurisdictions to see what

they are doing that are going to lead to success or more success for students that are Black and

Brown within the School District of Philadelphia."  Lynch Dep. at 97:7-14 (attached as Ex. 1,

ECF No. 91-1).

**Response**:  Admitted.

120.     Karyn Lynch, the School District's 30(b)(6) designee, testified that the lack of
achievement for "Black and Brown" boys was a result of racism.  Lynch Dep. at 97:19-98:19
(attached as Ex. 1, ECF No. 91-1).

> **Response**:  Denied.  Ms. Lynch testified as a fact witness and 30(b)(6) designee.  In the
> section of the deposition referred to in Paragraph 120, Ms. Lynch confirmed that
> Plaintiff's counsel was seeking her "personal opinion," and, therefore, Ms. Lynch's
> testimony was not in her role as the 30(b)(6) designee.

121.     Karyn Lynch, the School District's 30(b)(6) designee, testified: "I think that it is
important for all children to have the same opportunities. And if racism is preventing those
opportunities, I think that those practices should be changed."  Lynch Dep. at 98:16-19 (attached
as Ex. 1, ECF No. 91-1).

> **Response**:  Denied.  Ms. Lynch testified as a fact witness and 30(b)(6) designee.  In the
> section of the deposition referred to in Paragraph 121, Ms. Lynch was asked for her
> "opinion," and, therefore, Ms. Lynch's testimony was not in her role as the 30(b)(6)
> designee.

122.     Sabriya Jubilee testified: "If the goal of the admission decision is to be more
racially equitable, then two students who have the same academic achievement, one being White
and one being Black, if Blacks students are not being represented at the same rate, then there
could be plausibility for race to be considered, a student's race to be considered, if the goal is to
be racially equitable."  Jubilee Dep. at 161:11-18 (attached as Ex. 3, ECF No. 91-3).

> **Response**:  Admitted that the quoted language appears in Dr. Jubilee's deposition
> transcript.  Defendants deny that the averments, which are based on Plaintiffs' counsel's

hypothetical question (and not the actual school selection process) are relevant or

material to Defendants' Motion for Summary Judgment.

123.    Sabriya Jubilee further testified: "If the goal is to increase the presence of

qualified Black students because they're not represented at the same rate as their Asian

counterparts, then in an example like that the Black student's race would be considered."  Jubilee

Dep. at 162:23-163:2 (attached as Ex. 3, ECF No. 91-3).

> **Response**:  Admitted that the quoted language appears in Dr. Jubilee's deposition
>
> transcript.  Defendants deny that the averments, which are based on Plaintiffs' counsel's
>
> hypothetical question (and not the actual school selection process) are relevant or
>
> material to Defendants' Motion for Summary Judgment.

124.    Sabriya Jubilee testified that if her review of the school-selection process through

an "equity lens" revealed privilege, then the process was to be changed.  *See* Jubilee Dep. at

90:20-91:2 (attached as Ex. 3, ECF No. 91-3).

> **Response**:  Admitted.

125.    Sabriya Jubilee testified that when she reviewed the school-selection process

through an "equity lens," it revealed privileges.  *See* Jubilee Dep. at 91:3-6 (attached as Ex. 3,

ECF No. 91-3).

> **Response**:  Admitted.

126.    The School District maintains a DEI webpage at www.philasd.org/dei.  *See*

Jubilee Dep. at 38:10-19 (attached as Ex. 3, ECF No. 91-3).

> **Response**:  Admitted.

127.    The information that is contained on this webpage is an official representation of

the School District.  *See* Jubilee Dep. at 38:20-25, 39:1-3 (attached as Ex. 3, ECF No. 91-3).

**Response**:  Admitted that Dr. Jubilee testified that "Anything that appears on the School District's website, whether it be my page or the School District's page, is a representation of the School District."  The remaining averments in Paragraph 127 are denied.

128.    On its webpage, the School District maintains a "Living Glossary of Equity Related Terms."  *See* Jubilee Dep. at 40:6-20 (attached as Ex. 3, ECF No. 91-3).

**Response**:  Admitted that the DEI webpage includes a "Living Glossary of Equity Related Terms."  The remaining averments in Paragraph 127 are denied.

129.    Sabriya Jubilee and her team created the Living Glossary.  *See* Jubilee Dep. at 40:15-23 (attached as Ex. 3, ECF No. 91-3).

**Response**:  Admitted.

130.    When Sabriya Jubilee is speaking in her official capacity, the definitions of the terms that she uses are those found in the Living Glossary.  *See* Jubilee Dep. at 43:7-10 (attached as Ex. 3, ECF No. 91-3).

**Response**:  Admitted.

131.    The School District's Anti Racism Declaration was written by a collection of school district officials including Sabriya Jubilee (the head of the school district's DEI office), and Dr. Hite's chief of staff, Alicia Prince.  *See* Hite Dep. at 29:1-7 (attached as Ex. 2, ECF No. 91-2).

**Response**:  Denied.  Dr. Hite testified, "And it was a collection of individuals that included the then head of our diversity, equity, and inclusion office, Sabriya Jubilee. My chief of staff at the time, Alicia Prince. I'm trying to remember the others. And my deputy superintendent, Naomi Wyatt." Hite Dep. at 29:1-7.  He also testified in response to the following question:

> Q. You didn't -- so if I understand correctly, you did not author the
>
> declaration individually, you did so in collaboration with Sabriya Jubilee,
>
> Alicia Prince, and Naomi Wyatt?
>
> A. Yes.

Hite Dep. at 29:12-17.

132.    When the School District published the Anti Racism Declaration, it claimed that it was aware of "school district policies, processes, and practices that created a system of privilege and power for one racial group over another."  *See* Hite Dep. at 48:1-6 (attached as Ex. 2, ECF No. 91-2).

> **Response**:  Denied.  Dr. Hite responded to the question as follows:
>
> > Q. … At the time this declaration was published, were you aware of
> >
> > Philadelphia school district policies, processes, and practices that created a
> >
> > system of privilege and power for one racial group over another?
> >
> > A. Yes.
> >
> > Hite Dep. at 48:1-6.

**G.    Goals and Guardrails**

133.    An authentic copy of the School District's "Goals and Guardrails" document is attached as Ex. 11 (ECF No. 91-11).  *See* Stipulated Facts, ECF No. 44, at ¶ 21; Board of Education Goals & Guardrails, ECF No. 44-5.

> **Response**:  Admitted.

134.    The "indicators" listed under each guardrail were designed to judge progress toward the "goal."  *See* Hite Dep. at 85:16-21 (attached as Ex. 2, ECF No. 91-2).

> **Response**:  Denied.  Dr. Hite agreed that "the indicators were chosen so that you could --
> the school district could judge its progress towards the guardrail."  Hite Dep. at 85:2-21.

135.    Indicator 4.1 for Guardrail 4 says: "Among 8th grade students who are qualified to attend Special Admission High schools, the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress towards being proportional to population as a whole) by August 2026."  Board of Education Goals & Guardrails p. 4 (attached as Ex. 11, ECF No. 91-11); *see also* Board of Education Goals & Guardrails p. 4, ECF No. 44-5.

**Response**:  Admitted.

136.    If data were to show an increase in the number of white students qualified to attend criteria-based schools, Hite would not consider that progress toward Guardrail 4 because Guardrail 4 "talks specifically about Black, African American, and Hispanic, Latinx."  Hite Dep. at 88:4-18 (attached as Ex. 2, ECF No. 91-2).

**Response**:  Denied.  The averments are not relevant or material to Defendants' Motion for Summary Judgment.  The averments refer to a hypothetical scenario.  Furthermore, the averments do not accurately reflect the question Plaintiffs' counsel asked Dr. Hite, and the question misstated the wording in Indicator 4.1.  As reflected in the transcript, the question and answer were:

Q. If data showed that more white students among the eighth grade students who were qualified -- among the eighth grade students who were qualified to attend special admission schools, if the data showed that a greater number of white students were qualified, would you have considered that progress towards goal four?

. . .

THE WITNESS: I would not have because it [Indicator 4.1] talks

specifically about Black, African American, and Hispanic, Latinx.

Hite Dep. at 88:4-18.

137.    If data were to show an increase in the number of Asian students qualified to

attend criteria-based schools, Hite would not consider that progress toward Guardrail 4.  Hite

Dep. at 88:20-25 (attached as Ex. 2, ECF No. 91-2).

> **Response**:  Admitted that Dr. Hite so testified, but the averments are not relevant or
>
> material to Defendants' Motion for Summary Judgment.  The averments refer to a
>
> hypothetical scenario.

138.    In August 2020, the percentage of black and Hispanic students qualified to attend

criteria-based high schools in Philadelphia was disproportionally low compared to their

representation in the student body as a whole.  *See* Hite Dep. at 90:12-21 (attached as Ex. 2, ECF

No. 91-2).

> **Response**:  Denied.  The averments in Paragraph 138 are not material or relevant to
>
> Defendants' Motion for Summary Judgment.  Although Dr. Hite agreed that the
>
> percentage "of Black, African American, Hispanic, and Latino students who are qualified
>
> to attend special admission high schools is disproportional to the percentage of Black,
>
> African American, Hispanic, or Latinx students that are in the student body of the
>
> Philadelphia school district as a whole," those percentages cannot be "disproportional,"
>
> because they were measuring different data.

139.    Indicator 4.2 for Guardrail 4 concerns the percentages of suspensions given to

black students.  *See* Board of Education Goals & Guardrails p. 4 (attached as Ex. 11, ECF No.

91-11); *see also* Board of Education Goals & Guardrails p. 4, ECF No. 44-5.

**Response**: Admitted that the Goals & Guardrails include the information in Paragraph 139. Defendants deny that the averments in Paragraph 139 are material or relevant to Defendants' Motion for Summary Judgment.

140. Indicator 4.2 for Guardrail 4 says: "The percentage of suspensions received by Black/African American students will decrease from 72.6% in August 2020 to no more than 48.3% (proportional to population as a whole) by August 2026." *See* Board of Education Goals & Guardrails p. 4 (attached as Ex. 11, ECF No. 91-11); *see also* Board of Education Goals & Guardrails p. 4, ECF No. 44-5.

**Response**: Admitted that the Goals & Guardrails include the information in Paragraph 140. Defendants deny that the averments in Paragraph 140 are material or relevant to Defendants' Motion for Summary Judgment.

141. In August 2020, 72.6% of all suspensions in the School District were given to black students. *See* Hite Dep. at 92:23-93:4 (attached as Ex. 2, ECF No. 91-2).

**Response**: Admitted that the Goals & Guardrails include the information in Paragraph 141. Defendants deny that the averments in Paragraph 141 are material or relevant to Defendants' Motion for Summary Judgment.

142. Dr. Hite testified that the percentage of suspensions issued to black students is disproportionally high relative to the black student population as a whole. *See* Hite Dep. at 93:7-12 (attached as Ex. 2, ECF No. 91-2).

**Response**: Defendants deny that the averments in Paragraph 139 are material or relevant to Defendants' Motion for Summary Judgment. Dr. Hite's testimony related to the percentage of suspensions in August 2020. His testimony was:

Q. Of all the suspensions – in other words, according to indicator 4.2, of

all the suspensions leveled by the School District of Philadelphia, as of

August 2020, 72.6 percent of those suspensions were for Black and

African American students?

A. Yes.

. . .

Q. Which is disproportionately high relative to the percentage of Black

and African American students in the school district as a whole, correct?

A. Yes.

Hite Dep. at 92:23–93:12.

143.    Dr. Hite testified that this racial disproportionality in the issuance of school

suspensions was the result of systemic racism.  *See* Hite Dep. at 93:8-15 (attached as Ex. 2, ECF

No. 91-2).

**Response**:  Admitted that Dr. Hite so testified.  Defendants deny that the averments in

Paragraph 143 are material or relevant to Defendants' Motion for Summary Judgment.

144.    The script for a Goals and Guardrails presentation on January 14, 2021, was

produced by the defendants and marked as PSD-SARGENT-000075-000084.  It is attached as

Ex. 12 (ECF No. 91-12).

**Response**:  Admitted.

145.    A document describing Goals and Guardrails was produced by the defendants and

marked as PSD-SARGENT-000055-000074.  It is attached as Ex. 13 (ECF No. 91-13).

**Response**:  Admitted.

**H.      Disproportionately low numbers of blacks and Hispanics at Masterman and Central**

146.    Hite testified that the data showing a disproportionally low number of Hispanic and Latino students at the city's criteria-based high schools are problematic.  *See* Hite Dep. at 114:18-115:2 (attached as Ex. 2, ECF No. 91-2).

**Response**:  It is admitted that, in response to a question about data that appeared in the *Philadelphia Inquirer* that Plaintiffs' counsel showed Dr, Hite at his deposition, Dr, Hite testified as follows:

> Q.  … Before I do that, the more general question, are any of the figures that you see on the chart that appears before you problematic in your opinion?
>
> MR. KENNEDY: Objection. Go ahead. You can answer.
>
> THE WITNESS: I think the disproportionately low representation of Hispanic, Latino in all categories is problematic for me.

Hite Dep. at 114:18–115:2.

147.    Hite testified that the disproportionally low number of black students at Central is problematic.  *See* Hite Dep. at 115:4-7 (attached as Ex. 2, ECF No. 91-2).

**Response**:  It is admitted that, in response to a question about data that appeared in the *Philadelphia Inquirer* that Plaintiffs' counsel showed Dr, Hite at his deposition, Dr, Hite testified as follows:

> BY MR. ZIMOLONG:
>
> Q. Is the disproportionately low percentage of Black/African American students at Central problematic?
>
> A. Sure. Yes.

Hite Dep. at 115:3-7.

148.    Hite testified that the disproportionally low number of students at Masterman is problematic.  *See* Hite Dep. at 115:8-11 (attached as Ex. 2, ECF No. 91-2).

**Response**:  It is admitted that, in response to a question about data that appeared in the *Philadelphia Inquirer* that Plaintiffs' counsel showed Dr, Hite at his deposition, Dr, Hite testified as follows:

Q. Is the disproportionately low percentage of Black/African American students at Masterman problematic to you?

A. Yes.

Hite Dep. at 115:8-11.

149.    Hite, however, testified that the disproportionally high number of blacks students at Carver and Parkway Middle is not problematic.  *See* Hite Dep. at 115:12-20 (attached as Ex. 2, ECF No. 91-2).

**Response**:  Admitted that Dr. Hite so testified.  Defendants deny that the averments in Paragraph 149 are material or relevant to Defendants' Motion for Summary Judgment, including the averment regarding Parkway Middle.  By way of further answer, Dr. Hite testified that "none of the 17 disproportionately high numbers are a problem 18 to me at all. 19 What's a problem for me are the 20 disproportionately low numbers of whatever the 21 subgroups are."  Hite dep. at 116:12-21.

Dated: July 26, 2024

Respectfully submitted,

By: /s/ *William K. Kennedy*
William K. Kennedy (I.D. No. 86571)
Montgomery McCracken Walker & Rhoads
LLP
1735 Market Street, 21st Floor
Philadelphia, Pennsylvania 19103
wkennedy@mmwr.com

Renee N. Smith (I.D. No. 65866)
Jackson Lewis P.C.
1601 Cherry Street, Suite 1350
Philadelphia, PA 19102
renee.smith@jacksonlewis.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of July 2024, I caused a true and correct copy of the forgoing Defendants' Response to Plaintiffs' Statement of Facts to be served electronically on all counsel of record via the Court's ECF filing system.

Date:  <u>July 26, 2024</u>                              <u>/s/ *William K. Kennedy*          </u>
                                                        William K. Kennedy