**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SHERICE SARGENT, et al.,** | : | |
| *Plaintiffs*, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **No. 22-1509** |
| | : | |
| **THE SCHOOL DISTRICT OF** | : | |
| **PHILADELPHIA, et al.,** | : | |
| *Defendants*. | : | |

<u>**MEMORANDUM**</u>

**Kenney, J.**                                                                                            **October 9, 2024**

In 2021, the School District of Philadelphia (the "<u>School District</u>") revised its admissions process for enrollment in its "criteria-based" high schools for the 2022-2023 school year (the "<u>2022 Admission Process</u>").  Criteria-based high schools are admission-only public schools that offer a rigorous, enriched curriculum that may focus on a specific area of study, such as mathematics, science, humanities, or fine and performing arts.  To gain admission, students must submit an application and meet certain qualifications, including grade cut-offs and attendance requirements.  Plaintiffs' challenge focuses on the changes to the admissions process for four criteria-based high schools:  Academy at Palumbo ("<u>Palumbo</u>"), George Washington Carver High School of Engineering and Science ("<u>Carver</u>"), Central High School ("<u>Central</u>"), and Julia R. Masterman High School ("<u>Masterman</u>").

With the changes, Defendants sought to remedy a number of issues with the prior admissions process for the 2021-2022 school year (the "<u>2021 Admissions Process</u>").  During the 2021 Admissions Process, each criteria-based school employed its own student admissions team, tasked with individually reviewing applications and admitting students.  As a result, *unqualified* students were gaining admission to certain criteria-based schools at the expense of other *qualified*

students who resided in six Philadelphia zip codes.  To remedy this issue, in the 2022 Admissions Process, the individual admissions teams were replaced by a computerized lottery which only admitted qualified students.  The School District also implemented a "zip code preference" in the lottery.  Pursuant to the zip code preference, any qualified student of any race that applied for admission to Palumbo, Carver, Central, or Masterman and lived in one of the selected six Philadelphia zip codes would automatically be admitted.  In addition to implementing these changes to address issues from the 2021 Admissions Process, Defendants raised the standards for admission to Palumbo, Central, Carver, and Masterman.[1]

Plaintiffs are parents of students who participated in the 2022 Admissions Process and did not receive admission into their preferred criteria-based school.  The gravamen of Plaintiffs' complaint is that the School District—along with the other named defendants in this case, all of whom are either on the Board of Education for the School District or are employed by the School District—specifically revised the admissions process to give preference to students on the basis of their race or on the basis of their residence in zip codes that were selected because of their racial composition.  *See* ECF No. 31 ¶¶ 6–17, 102.

Plaintiffs initially sought to enjoin Defendants from implementing the changes to the admissions process for the criteria-based schools through a Motion for a Preliminary Injunction.  *See* ECF No. 32 at 1.  Plaintiffs' motion primarily hinged on their interpretation of a single sentence from a School District Board of Education document:

---

[1] For example, in the 2021 Admissions Process, applicants to Palumbo, Carver, Central, and Masterman needed to have A's and B's, but could have "one C in a major subject" on their report card to be qualified for admission.  ECF No. 86-2 ¶ 20; ECF No. 93 ¶ 20.  In the 2022 Admissions Process, applicants to those four schools needed to have all A's and B's; a single C would have disqualified an applicant from the lottery for admission.  ECF No. 86-2 ¶ 20; ECF No. 93 ¶ 20.

> Among 8th grade students who are qualified to attend [the criteria-based high schools], the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress towards being proportional to population as a whole) by August 2026.

ECF No. 44-5 at 4.  According to Plaintiffs, this sentence—an "Indicator" of student achievement in a policy document entitled "Goals & Guardrails"—was "as close to a smoking gun as can be imagined."  ECF No. 41 at 1; *see also* ECF No. 50 at 2.

On August 8, 2022, following an in-person hearing, the Court denied Plaintiffs' Motion for a Preliminary Injunction.  ECF Nos. 50, 51.  The Court found that Plaintiffs had failed to show a reasonable probability of eventual success on the merits, as Plaintiffs' claims that Defendants enacted changes to the admissions process "for the illegal and unconstitutional purpose of achieving racial balancing" at the criteria-based schools were unfounded and, at least as of that time, "unsupported by the record."  ECF No. 50 at 2.  With respect to the Indicator, the Court found that Plaintiffs' characterization was "contrary to its plain language" and read out of context. *Id.* at 12.  More specifically, by its plain language, the Indicator did not address increasing the number of Black or Hispanic students who would be *admitted* to or *attend* criteria-based schools; instead, it provided that the number of Black or Hispanic students who would be *qualified* to attend criteria-based schools would increase.  *Id.* at 12–13.  When read in context, it became clear that the Indicator was used to measure and understand Black and Hispanic student achievement—not set racial quotas for admittance to the criteria-based schools.  *Id.*  Ultimately, however, the Court declined to "rule out the possibility that further discovery [would] change" its conclusion.  *Id.* at 20.

Presently before the Court is Defendants' Motion for Summary Judgment (ECF No. 86 (the "Motion")).  In their Motion, Defendants argue that even after discovery, there remains no evidence of a racially discriminatory purpose motivating the changes to the admissions process,

and there is no evidence that the changes resulted in a racially discriminatory impact. Therefore, according to Defendants, the Court must apply rational basis review, not strict scrutiny, and find the changes to the admissions process to be constitutional. In response, Plaintiffs argue that the evidence in the record creates a genuine dispute of material fact on whether the changes to the admissions process had a racially disparate impact, and whether the change was motivated by a racially discriminatory purpose. Notably, Plaintiffs do not appear to rely upon the Indicator at all. Instead, Plaintiffs point to a limited set of data in an effort to show a genuine dispute on the impact prong, and various snippets of testimony and documentary evidence to attempt to show a genuine dispute on the intent prong.

Upon review, the Court finds that the record compels the same result that the Court reached back at the preliminary injunction stage. Discovery has changed nothing. Before discovery, there was no evidence that the changes to the admissions process resulted in any racially discriminatory impact, or were enacted for a racially discriminatory purpose. Following discovery, the record has only confirmed that the changes to the admissions process were race-blind—both in their motivation, and in their application. Therefore, despite Plaintiffs' apparent pivot away from the Indicator, there is no genuine dispute on either the discriminatory impact or purpose prong. Accordingly, the changes are subject only to rational basis review, and, under that test, the changes in the admissions process pass constitutional muster. The Court will grant Defendants' Motion.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Factual Background

The School District maintains a system of public high schools, including "criteria-based" high schools. ECF No. 86-2 ¶¶ 1, 13; ECF No. 93 ¶¶ 1, 13. Criteria-based high schools do not have an "attendance boundary," meaning children from across the city are able to attend. ECF No. 86-2 ¶¶ 16, 18; ECF No. 93 ¶¶ 16, 18. According to the School District, criteria-based high schools

are schools "which offer a rigorous, enriched curriculum that may concentrate on a particular discipline or area of study, such as mathematics, natural sciences, engineering, humanities[,] social sciences, or fine and performing arts." ECF No. 86-2 ¶ 16; ECF No. 93 ¶ 16. Students must apply for admission to criteria-based high schools. ECF No. 86-2 ¶ 16; ECF No. 93 ¶ 16. Additionally, students must meet certain established criteria, such as grades or attendance, in order to gain admission. ECF No. 86-2 ¶¶ 18, 20; ECF No. 93 ¶¶ 18, 20. Admission in these schools is subject to space availability. ECF No. 86-2 ¶ 18; ECF No. 93 ¶ 18.

In 2017, the Pew Charitable Trusts conducted an independent study regarding the School District's school admission process, including the process for admission into criteria-based schools (the "Pew Study"). ECF No. 86-1 ¶ 9; ECF No. 86-3 (Lynch Dep.) at 35:19–37:17. The Pew Study identified the following issues with the admissions process: (1) the criteria-based schools were admitting some students who *did not* meet the admissions criteria, like legacy students whose parents were alumni of a particular school, but not admitting other students who *did* meet the criteria, ECF No. 86-1 ¶ 9(a); (2) qualified students in certain schools in certain parts of Philadelphia were less likely to apply to criteria-based schools, *id.* ¶ 9(b); (3) if qualified students from those parts of Philadelphia did apply, they were less likely to be considered, *id.* ¶ 9(c); and (4) if those students were given offers, they were less likely to accept them when compared with their peers in other neighborhoods, *id.* ¶ 9(d).

During the 2020-2021 school year, the School District's Board of Education approved a policy document entitled "Board of Education Goals & Guardrails." ECF No. 86-2 ¶ 11; ECF No. 93 ¶ 11. The Goals & Guardrails document includes a general vision statement—which, among other things, is "to ensure that all students are given an education that allows them to thrive, succeed and lead in a global society"—and lays out a series of "Goals" and "Guardrails" consistent

with that vision.  ECF No. 44-5 at 1–4; *see also* ECF No. 50 at 12.  Among other things, the Goals

& Guardrails document identifies the following as "Guardrail 4":  "Our students' potential will

not be limited by practices that perpetuate systemic racism and hinder student achievement."  ECF

No. 44-5 at 4.  As one of two indicators under that Guardrail, "Indicator 4.1" reads:

> Among 8th grade students who are qualified to attend [the criteria-based high
> schools], the percentage who are Black/African American or Hispanic/Latinx will
> grow from 33.8% in August 2020 to at least 52.0% (making progress towards being
> proportional to population as a whole) by August 2026.

*Id.*

Following the death of George Floyd,[2] the School District shared an "Anti-Racism

Declaration" with the families who attended schools in the District.  ECF No. 91-4.  Dr. Sabriya

Jubilee (the School District's Chief of Equity, Office of Diversity, Equity, and Inclusion) and Dr.

William Hite, Jr. (former Superintendent of the School District) both helped author the

Declaration.  ECF No. 91-2 (Hite Dep.) at 29:12–21; ECF No. 99 ¶ 29.  In the Declaration, the

School District emphasized its commitment to anti-racist practices and highlighted the importance

of racial equity.  *See* ECF No. 91-4.  For example, the Declaration states that some of the School

District's students "are forced to witness and endure acts of hatred because of the color of their

skin"; that the School District is committed to "eradicating practices that create systems of

privilege and power of one racial group over another"; and that the School District was "committed

to calling out racism when [it] see[s] it, investigating racism when [it] hear[s] it, and taking

aggressive actions to eradicate its existence from [its] school system."  *Id.*  Nothing in the

---

[2] The Anti-Racism Declaration itself indicates that it was "[l]ast modified" on March 31, 2022.
ECF No. 91-4.  However, deposition testimony indicates that the declaration was initially released
following the death of George Floyd.  *See* ECF No. 86-7 (Jubilee Dep.) at 52:3–56:17; ECF No.
86-8 (Hite Dep.) at 27:10–28:18; *see also* ECF No. 91 ¶ 22; ECF No. 99 ¶ 22.

Declaration mentions changes to the 2022 Admissions Process. *See id.*; *see also* ECF No. 86-7 (Jubilee Dep.) at 56:11–17 (testifying that the Declaration is "agnostic to the school selection process").

In July of 2021, Dr. Jubilee, along with her office, conducted an "equity lens" review of the school admissions process. ECF No. 91 ¶¶ 48–49, 61–63; ECF No. 91-3 (Jubilee Dep.) at 12:25–13:15; ECF No. 99 ¶¶ 62, 63. The "equity lens" review is "a tool" that Dr. Jubilee's office uses to help assess "to what degree a particular policy or action will [raise] equitable issues or concerns." ECF No. 91-3 (Jubilee Dep.) at 13:13–20. All of the School District's policies are reviewed by Dr. Jubilee's office through an "equity lens," including the school admissions process for criteria-based schools. *Id.* at 13:2–15, 45:7–10, 57:9–19, 59:2–12; *see also* ECF No. 99 ¶ 50.

Later in 2021, the School District reviewed and revised the school selection process for qualified students applying to criteria-based schools, including for Palumbo, Carver, Central, and Masterman, for the 2022–23 school year. ECF No. 86-2 ¶ 22; ECF No. 93 ¶ 22; ECF No. 99 ¶ 34. Prior to the changes, the School District employed a de-centralized system that allowed each school to review applications through an "admission review team," which would individually review applications and admit students. ECF No. 86-2 ¶ 17; ECF No. 93 ¶ 17; ECF No. 99 ¶ 92; ECF No. 86-9 (Lynch Dep.) at 43:23–25, 44:1–7. Through this process—as identified by the Pew Study—in certain instances, *ineligible* students applied to a criteria-based school and received admission at the expense of other *eligible* students who applied and did not receive admission. ECF No. 86-1 ¶ 15; ECF No. 86-9 (Lynch Dep.) at 43:23–44:7, 50:2–25 (explaining that ineligible students sometimes gained admission due to "[o]ther factors," such as "legacy, did the parent attend the school"; admission was not solely based on "the objective review of a child's academic credentials").

To address this issue, among the others identified by the Pew Study, the School District implemented a number of changes to the school admissions process. *See* ECF No. 86-2 ¶¶ 22–25; ECF No. 93 ¶¶ 22–25; ECF No. 86-1 ¶ 9; ECF No. 86-9 (Lynch Dep.) at 35:19–36:14 (testifying that with the changes, the School District hoped to move towards "the elimination of subjectivity and increasing objectivity" in the school selection process). First, the School District began using a computerized lottery in place of the individualized review process. ECF No. 86-1 ¶ 10. Through the lottery, only qualified students could gain admission to the criteria-based schools; unqualified students were not considered. *See id.* ¶ 16.

Second, the School District implemented a "zip code preference." ECF No. 86-2 ¶¶ 22–25; ECF No. 93 ¶¶ 22–25. Pursuant to the zip code preference, qualified students who resided in six specified zip codes—19121, 19132, 19133, 19134, 19135, or 19140—received a preference in the lottery for admission to Palumbo, Carver, Central, or Masterman. ECF No. 86-2 ¶ 25; ECF No. 93 ¶ 25. More specifically, if a student was qualified to attend one of those schools—that is, the student met all the requirements, including for grades and attendance—applied for admission and resided in one of those six specified zip codes, the student would automatically receive an offer of admission to that school. ECF No. 86-2 ¶ 25; ECF No. 93 ¶ 25. Only *qualified* students who resided in the six zip codes identified received a preference. ECF No. 86-2 ¶ 25; ECF No. 93 ¶ 25. Other, unqualified students who resided in the six zip codes were ineligible to attend any criteria-based school for which they did not meet the requirements. *See* ECF No. 86-1 ¶ 16.

Based on 2020 census data, the racial makeup of these six preferred zip codes is as follows:

|  | Black | Hispanic | White | Asian |
|---|---|---|---|---|
| **19121** | 72.2% | 6.5% | 15.4% | 3.5% |
| **19132** | 91.9% | 3.2% | 2.5% | 1.15% |
| **19133** | 36.7% | 57.7% | 3.6% | 3.5% |
| **19134** | 13.4% | 51.3% | 30.3% | 1.6% |
| **19135** | 20.9% | 24.2% | 44.7% | 5.7% |
| **19140** | 50.1% | 42.2% | 4.3% | 1.7% |

ECF No. 94 at 3–4 (citing ECF No. 32-16 (Mitchell Decl.) ¶ 4).  This data represents the racial

makeup of *all persons* living in these six zip codes—not 8th-grade eligible schoolchildren who

could participate in the 2022 Admissions Process.  ECF No. 32-16 ¶ 4 (citing census data tables);

*see also* ECF No. 95 at 5–6.

Additionally, the School District raised the standards for admission to the criteria-based

schools, as set forth in the chart below:

| School (Admission Year) | Grades | Attendance | Additional Requirements |
|---|---|---|---|
| Palumbo (2022) | A's and B's | 95% | District administered writing sample |
| Palumbo (2021) | A's and B's with the possible exception of one C in major subject on report cards | Exemplary attendance and punctuality | Two letters of recommendation, at least one from current school staff<br><br>Writing sample |
| Carver (2022) | A's and B's | 95% | District administered writing sample |
| Carver (2021) | A's and B's with the possible exception of one C in major subject on report cards | 95% | Writing sample required |
| Central (2022) | A's and B's | 95% | District administered writing sample |
| Central (2021) | A's and B's with the possible exception of one C in major subject on report cards | Excellent attendance and punctuality | Writing sample required |
| Masterman (2022) | A's and B's | 95% | District administered writing sample |

|  |  |  | Successful completion of Algebra I in 8th grade |
|---|---|---|---|
| Masterman (2021) | A's and B's with the possible exception of one C in major subject on report cards | Excellent attendance and punctuality (no more than 5 absences, no more than 5 instances of lateness) on report cards | Successful completion of Algebra I and French I or Spanish I in 8th grade; Priority for admission given to Masterman's current 8th grade students. |

ECF No. 86-2 ¶ 20; ECF No. 93 ¶ 20.

Plaintiffs deposed Dr. Hite, Dr. Jubilee, Ms. Karen Lynch (School District Chief of Student Support Services).  *See* ECF No. 86-7 (Jubilee Dep.); ECF No. 86-8 (Hite Dep.); ECF No. 86-9 (Lynch Dep.).  Dr. Hite approved the changes that were implemented in the 2022 Admissions Process.  ECF No. 86-1 ¶ 2; ECF No. 92 ¶ 2.  Dr. Jubilee also reviewed the changes to the 2022 Admissions Process as part of her role as the School District's Chief of Equity at the Office of Diversity, Equity, and Inclusion.  ECF No. 86-7 (Jubilee Dep.) at 31:22–32:21; *see also* ECF No. 91 ¶¶ 48–49, 61–63; ECF No. 91-3 (Jubilee Dep.) at 12:25–13:15; ECF No. 99 ¶¶ 62, 63.  Ms. Lynch oversaw the high school admissions process and was responsible for reviewing and making changes to the process in any given year.  ECF No. 86-1 ¶¶ 1–2; ECF No. 92 ¶¶ 1–2.  She reported directly to Dr. Hite.  ECF No. 86-1 ¶ 2; ECF No. 92 ¶ 2.

All three deponents—Dr. Jubilee, Dr. Hite, and Ms. Lynch—uniformly testified that in making the changes to the admissions process, Defendants did not consider race.  Specifically, Dr. Hite testified that the changes to the admissions process were not intended to affect the racial demographics of any of the criteria-based schools.  *See* ECF No. 86-1 ¶ 22(a); ECF No. 86-8 (Hite Dep.) at 135:21–136:10.  Dr. Jubilee and Ms. Lynch both testified that the School District did not consider the racial composition of the six zip codes that were given preference.  *See* ECF No. 86-

7 (Jubilee Dep.) at 181:20–23 (she was "not aware of race being a reason" to select those zip codes), 188:3–7 (testifying that the six zip codes selected to be given preference were not selected due to their racial makeup); ECF No. 86-9 (Lynch Dep.) at 98:24–99:2 (stating that the racial demographics of the six zip codes given preference were not reviewed prior to implementing the zip code preference). Instead, the School District specifically chose the six zip codes to be given "preference" because they had the lowest percentage of students enrolled at Masterman, Central, Carver, and Palumbo between 2017 and 2021. ECF No. 86-1 ¶ 18; ECF No. 95-1 (Wolford Decl.) ¶ 14.

All students who did not reside in one of these zip codes and met the qualifications for a criteria-based school were still entered into the computerized lottery for admission to each criteria-based school they applied to. ECF No. 86-2 ¶ 24; ECF No. 93 ¶ 24. Race was not considered in any aspect of the lottery; all students, regardless of race, could apply for admission so long as they were qualified. ECF No. 86-1 ¶¶ 19–22.

The below tables depict the change in the number of admissions offers made to applicants from schools within the School District by Palumbo, Carver, Central, and Masterman for each racial category between the 2021–2022 and 2022–2023 school years:

**Table 1 (by raw numbers)**

| School Year | School | Asian | Black | Hispanic | Multi-Racial | White |
|---|---|---|---|---|---|---|
| 21–22 | Palumbo | 233 | 81 | 72 | 41 | 183 |
| 22–23 | Palumbo | 166 | 149 | 54 | 25 | 51 |
| 21–22 | Central | 239 | 98 | 45 | 46 | 254 |
| 22–23 | Central | 216 | 146 | 85 | 39 | 167 |
| 21–22 | Masterman | 37 | 24 | 12 | 12 | 48 |
| 22–23 | Masterman | 56 | 20 | 13 | 11 | 43 |
| 21–22 | Carver | 164 | 127 | 40 | 34 | 145 |
| 22–23 | Carver | 145 | 160 | 70 | 32 | 108 |

**Table 2 (by raw numbers)**

| School | Asian | Black | Hispanic | Multi-Racial | White |
|--------|-------|-------|----------|--------------|-------|
| Palumbo | –67 | +68 | –18 | –16 | –132 |
| Central | –23 | +48 | +40 | –7 | –87 |
| Masterman | +19 | –4 | +1 | –1 | –5 |
| Carver | –19 | +33 | +30 | –2 | –37 |

**Table 3 (by percentage)**

| School | Asian | Black | Hispanic | Multi-Racial | White |
|--------|-------|-------|----------|--------------|-------|
| Palumbo | –28.8% | +84.0% | –25.0% | –39.0% | –72.1% |
| Central | –9.6% | +49.0% | +88.9% | –15.2% | –34.3% |
| Masterman | +51.4% | –16.7% | +8.3% | –8.3% | –10.4% |
| Carver | –11.6% | +26.0% | +75% | –5.9% | –25.5% |

ECF No. 91 ¶¶ 106, 107, 108; ECF No. 99 ¶¶ 106, 107, 108; *see also* ECF No. 94 at 15–18.

On December 15, 2021, the City Council of Philadelphia, Committee on Education held a hearing on the School District's plans to change the admissions process for its criteria-based schools. *See* ECF No. 91-8; ECF No. 44-8. Dr. Jubilee and Ms. Lynch both testified at the hearing. ECF No. 44-8. Ms. Lynch testified that the School District responded to the death of George Floyd by examining all of its processes and policies, including the 2021 Admissions Process, to "ensure equity." ECF No. 44-8 at 94; *see also* ECF No. 91-1 (Lynch Dep.) at 129:18–22. Dr. Jubilee testified that, "[t]hrough the school selection process, [the School District had] the opportunity to redesign a process that from inception to current practice has only truly benefited a small group of stakeholders, many of whom do not reflect the majority demographic of our School District or City." ECF No. 91-8 at 4.

Plaintiffs are parents of children who participated in the 2022 Admissions Process but did not receive admission into their preferred criteria-based school. ECF No. 86-2 ¶¶ 31–46; ECF No. 93 ¶¶ 31–46; *see also* ECF No. 31 ¶¶ 1–4, 52–78. However, each student received admission into at least one criteria-based school. *See* ECF No. 86-2 ¶¶ 31–47; ECF No. 93 ¶¶ 31–47. Plaintiff

Sargent's child was waitlisted at Carver but was admitted to three criteria-based high schools through the 2022 Admissions Process.  ECF No. 86-2 ¶¶ 31–37; ECF No. 93 ¶¶ 31–37.  Plaintiff Sheridan's child was waitlisted at Palumbo but was admitted to another criteria-based high school. ECF No. 86-2 ¶¶ 38–43; ECF No. 93 ¶¶ 38–43.  Plaintiff Meyer's child was waitlisted at Masterman but was admitted to Palumbo and Carver.  ECF No. 86-2 ¶¶ 44–47; ECF No. 93 ¶¶ 44–47.

**B.    Procedural Background**

On June 3, 2022, Plaintiffs filed a Motion for a Preliminary Injunction seeking to enjoin Defendants from implementing the changes to the 2022 Admissions Process for the School District's criteria-based schools.[3]  ECF No. 32 at 1.  To show that the changes to the admissions process were motivated by a racially discriminatory purpose, Plaintiffs largely focused upon the below language from the "Goals & Guardrails" document:

> Among 8th grade students who are qualified to attend [criteria-based high] schools, the percentage who are Black/African American or Hispanic/Latinx will grow from 33.8% in August 2020 to at least 52.0% (making progress towards being proportional to population as a whole) by August 2026.

ECF No. 44-5.  Plaintiffs argued that through this language, the School District announced a "quota" of "at least 52.0%" for Black and Hispanic students at the School District's criteria-based schools.  ECF No. 32 at 15.  This, according to Plaintiffs, was "as close to a smoking gun as can be imagined."  ECF No. 41 at 1.

On August 8, 2022, following an in-person hearing held on July 27, 2022, this Court denied Plaintiffs' Motion for Preliminary Injunction.  ECF Nos. 50, 51.  As detailed in its Memorandum,

---

[3] All of the relevant procedural background preceding Plaintiffs' Motion for Preliminary Injunction is detailed in this Court's August 8, 2022 Memorandum (ECF No. 50).

the Court's reasoning largely rested upon its finding that Plaintiffs had failed to show a reasonable probability that the changes to the admissions policy were motivated by a racially discriminatory purpose.  ECF No. 50 at 10–17.  In particular, the Court rejected Plaintiffs' interpretation of the above-quoted language from the Goals and Guardrails document, concluding that "Plaintiffs' so-called smoking gun is, at this stage, merely smoke, as the plain language of the policy statement does not provide what Plaintiffs claim that it does, and Plaintiffs' interpretation of its meaning is, as of yet, unsupported by the record."  *Id.* at 1.  As the Court explained, the plain language of the language from the Goals and Guardrails document did not "address, at all, increasing the number of Black/African American or Hispanic/Latinx students who are *admitted to* or who *attend* the School District's criteria-based schools. . . ."  *Id.* at 12 (emphasis in original).  Instead, that language merely "addresse[d] increasing the number of Black/African American or Hispanic/Latinx students who are *qualified* to attend such schools."  *Id.* at 13 (emphasis in original).  Therefore, the Court concluded that there was not a reasonable probability that such changes would be subject to strict scrutiny, and Plaintiffs could not show that the changes would fail rational basis review.  *Id.* at 10, 17–18.

Three days later, Plaintiffs appealed the Court's Order denying their Motion for Preliminary Injunction to the Third Circuit, ECF No. 52, and then promptly sought to enjoin this case from proceeding any further until the Third Circuit decided Plaintiffs' appeal, ECF No. 53.  On August 17, 2022, the Court denied Plaintiffs' request, see ECF No. 55, and the case proceeded through fact discovery.

On October 13, 2022, Plaintiffs sought to certify a class.  ECF No. 57.  Although the Court denied Plaintiffs' Motion for Class Certification, it did so without prejudice to re-file following the Third Circuit's decision on their appeal.  ECF No. 58.  On May 12, 2023, the Third Circuit

14

granted Plaintiffs' request to voluntarily dismiss their appeal.  ECF No. 59.  On July 12, 2023, Plaintiffs filed a letter indicating that they will not be seeking class certification.  ECF No. 66.

Fact discovery closed on May 16, 2024, ECF No. 80, and the parties did not retain expert witnesses, see ECF No. 86 at 13, 25; ECF No. 94 at 18–19.  On June 6, 2024, Defendants filed their Motion for Summary Judgment (ECF No. 86), along with their Statement of Facts (ECF No. 86-1) and their Proposed Statement of Stipulated Facts (ECF No. 86-2).  On July 12, 2024, Plaintiffs filed their Opposition (ECF No. 94), their Statement of Facts (ECF No. 91), their Response to Defendants' Statement of Facts (ECF No. 92), and their Response to Defendants' Proposed Statement of Stipulated Facts (ECF No. 93).  Defendants filed their Reply on July 16, 2024 (ECF No. 95), as well as a Response to Plaintiffs' Statement of Facts on July 26, 2024 (ECF No. 99).  On August 2, 2024, counsel for the parties presented oral argument on Defendants' Motion for Summary Judgment.  ECF No. 100.  Accordingly, Defendants' Motion is now ripe for disposition.

## II.   <u>LEGAL STANDARD</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Therefore, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"[4] *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti*

---

[4] On reply, Defendants attach the Declaration of Dr. Tonya Wolford, School District Chief of Evaluation, Research, and Accountability.  ECF No. 95-1.  Although Plaintiffs had an opportunity to address this additional declaration—through, for example, sur-reply, a motion to strike, or during in-person oral argument which took place after the Motion was fully briefed—Plaintiffs did

*v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted).  Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1).  The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production, *Anderson*, 477 U.S. at 252, and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *see Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), or arguments made in briefs, as those "are not evidence," *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

When determining the existence of a genuine issue of material fact, a court must "examine the evidence of record in the light most favorable to the party opposing summary judgment[] and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  The court need only decide whether "a fair-minded jury could return a verdict for the

---

not do so.  Therefore, the Court will consider Dr. Wolford's declaration in its reasoning above (ECF No. 95-1).

plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

## III.   **DISCUSSION**

Plaintiffs assert three counts of racial discrimination against Defendants:  (1) Violation of Title VI; (2) Violation of the Equal Protection Clause; and (3) Violation of §§ 26, 29 of Article I of the Pennsylvania Constitution.[5]  The survival of all three turn upon the same analysis and standards used to evaluate federal Equal Protection claims.  *See Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (indicating that the prohibitions of the Equal Protection Clause and Title VI are co-extensive); *Commonwealth v. Albert*, 758 A.2d 1149, 1151 (Pa. 2000) (finding that Article I, § 26 of the Pennsylvania Constitution is analyzed under the same standards that the Supreme Court uses in reviewing federal equal protection claims); *see also Regents of Univ. of California v. Bakke*, 438 U.S. 265, 287 (1978) (opinion of Powell, J.) ("Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause."); *Doe ex rel. Doe v. Lower Merion School Dist.*, 665 F.3d 524, 557 (3d Cir. 2011) ("*Lower Merion*") (explaining same).

---

[5] Consistent with its analysis in its August 8, 2022 Memorandum, the Court will construe the protections provided by, and constitutional analysis applicable to, claims arising under Sections 26 and 29 of the Pennsylvania Constitution to be co-extensive.  *See* ECF No. 50 at 8 n.5 ("The Court notes that Section 29 of the Pennsylvania Constitution (added May 18, 2021) has not yet been subject to any reported judicial construction, and that the Court finds no basis to find that Section 29—which expressly bars the denial or abridging of "[t]he equality of rights under the law" on the basis of "race or ethnicity"—would be construed differently than the more generally worded Section 26, which does not mention race or ethnicity.  Accordingly, the Court finds it appropriate, here, to also analyze Section 29 under the federal equal protection standards." (citations omitted)).

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. When considering claims of racial discrimination, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Lower Merion*, 665 F.3d at 543 (citation omitted) (alteration in original). If a government action is motivated by a racially discriminatory intent or purpose, strict scrutiny applies. *See id.* at 543–56. Absent a racially discriminatory intent or purpose, the challenged government action "is subject only to rational basis review." *Id.* at 551 (citing *United States v. Frazier*, 981 F.2d 92, 95 (3d Cir. 1992)).

Here, no fair-minded jury could find that the changes to the admissions process were implemented with racially discriminatory intent or purpose. Therefore, strict scrutiny does not apply; rational basis review does. Under rational basis review, the changes to the admissions process must be upheld because they are rationally related to a legitimate government interest: to increase access to criteria-based schools for qualified students across the City of Philadelphia. Accordingly, Defendants are entitled to summary judgment on all of Plaintiffs' claims.

A.  **Strict scrutiny does not apply because the changes to the admissions process were not made with racially discriminatory intent, or for a racially discriminatory purpose.**

The Supreme Court has recognized three circumstances that show racially discriminatory intent. First, intentional racial discrimination can be shown when "a law or policy explicitly classifies citizens on the basis of race." *Id.* at 543 (citing *Hunt v. Cromartie*, 526 U.S. 541 (1999)). Second, intentional racial discrimination can also be shown when a "facially neutral law or policy is applied differently on the basis of race." *Id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)). Lastly, "a facially neutral law or policy that is applied evenhandedly" can still demonstrate intentional racial discrimination if it (1) has "a racially discriminatory impact" and (2) is

"motivated by discriminatory intent."  *Id.* (citing *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)).

Similarly, a government action has a "racially discriminatory purpose" if (1) it is an explicit racial classification imposed by the government, *id.* (citing *Grutter*, 539 U.S. at 327); (2) it is applied differently on the basis of race, *id.* (citing *Yick Wo*, 118 U.S. 356); or (3) "a plaintiff establishes a discriminatory purpose based on race," whether "explicit or inferable," *id.* (citing *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3d Cir. 2002)).

Here, Plaintiffs claim that in enacting the changes to the admissions process, Defendants acted with racially discriminatory intent or purpose.  ECF No. 31 at 2–3 (claiming that the School District "overhauled the admissions process to [criteria-based schools] in a conscious and intentional effort to rebalance the racial makeup of the student body").  However, Plaintiffs do not argue that the 2022 Admissions Process explicitly classified applicants on the basis of race, or that it was facially neutral but applied differently on the basis of race.  Instead, Plaintiffs contend that although the changes were implemented in a facially race-neutral manner, Defendants harbored a racially discriminatory intent or purpose—and that this invidious motivation is apparent from (1) data evidencing racially discriminatory impact, or the change in the racial composition of the four criteria-based schools at issue, and (2) circumstantial evidence showing a racially discriminatory purpose.  ECF No. 31 at 2–3; ECF No. 94 at 4, 17–22.

As further detailed below, there is no genuine dispute on either the "impact" or "purpose" prongs.  *See Lower Merion*, 665 F.3d at 546 ("To establish government action within the third alternative, a plaintiff is 'required to prove that the actions of . . . officials (1) had a discriminatory effect [or impact] and (2) were motivated by a discriminatory purpose.'" (citation omitted)).  Therefore, strict scrutiny does not apply.

1.      There is no genuine dispute on the "impact" prong because Plaintiffs' "before-and-after" approach cannot demonstrate discriminatory impact.[6]

"To establish discriminatory impact in a racial discrimination case, [Plaintiffs] must show that similarly situated individuals of a different race were treated differently." *Lower Merion*, 665 F.3d at 550.  In other words, a plaintiff must prove that the challenged state action results in a "racially disproportionate impact": that it "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 265–66.

Here, to show discriminatory impact, Plaintiffs rely on "the change in the number of admissions offers made by Palumbo, Carver, Central, and Masterman for each racial and ethnic category between the 2021–2022 and 2022–2023 school years," as depicted in three tables reproduced below from Plaintiffs' briefing:

---

[6] In addition to the arguments detailed above, Defendants also insinuate that Plaintiffs cannot show discriminatory impact without an expert—and because Plaintiffs failed to engage an expert, there is no genuine dispute on this prong.  *See* ECF No. 86 at 26 (citing *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 46 (1st Cir. 2021) ("Second, even as to its preferred comparators, plaintiff offers no evidence establishing that the numerical decrease in the overrepresentation of Whites and Asians under the Plan is statistically significant. A party claiming a disparate impact generally does not even get to first base without such evidence.")); ECF No. 95 at 5 ("[F]or Plaintiffs to even have a chance at showing discriminatory impact on the data they present, they would have had to engage an expert or conduct an analysis that shows statistical significance.").

While the Court agrees that Plaintiffs' failure to engage an expert certainly makes it more difficult to show a genuine dispute of material fact on this prong, the Court disagrees with Defendants that expert testimony is necessary.  There is no precedent to support a finding that, without expert testimony, the Court is foreclosed from finding a genuine dispute of material fact on the discriminatory impact prong—and the Court will not go so far as to hold that today.  *Cf. Bos. Parent Coal.*, 996 F.3d at 46 (noting that the court "need not decide" whether the plaintiff's failure to provide expert testimony "doom[s] plaintiff's appeal on the merits," although it "certainly cut[s] against finding that the degree of disproportionate effect contributes to plaintiff's likelihood of success on the merits"); *see also id.* at 57 (stating that the court "do[es] not rest [its] decision on the lack of expert evidence").

**Table 1 (by raw numbers)**

| School Year | School | Asian | Black | Hispanic | Multi-Racial | White |
|---|---|---|---|---|---|---|
| 21–22 | Palumbo | 233 | 81 | 72 | 41 | 183 |
| 22–23 | Palumbo | 166 | 149 | 54 | 25 | 51 |
| 21–22 | Central | 239 | 98 | 45 | 46 | 254 |
| 22–23 | Central | 216 | 146 | 85 | 39 | 167 |
| 21–22 | Masterman | 37 | 24 | 12 | 12 | 48 |
| 22–23 | Masterman | 56 | 20 | 13 | 11 | 43 |
| 21–22 | Carver | 164 | 127 | 40 | 34 | 145 |
| 22–23 | Carver | 145 | 160 | 70 | 32 | 108 |

**Table 2 (by raw numbers)**

| School | Asian | Black | Hispanic | Multi-Racial | White |
|---|---|---|---|---|---|
| Palumbo | −67 | +68 | −18 | −16 | −132 |
| Central | −23 | +48 | +40 | −7 | −87 |
| Masterman | +19 | −4 | +1 | −1 | −5 |
| Carver | −19 | +33 | +30 | −2 | −37 |

**Table 3 (by percentage)**

| School | Asian | Black | Hispanic | Multi-Racial | White |
|---|---|---|---|---|---|
| Palumbo | −28.8% | +84.0% | −25.0% | −39.0% | −72.1% |
| Central | −9.6% | +49.0% | +88.9% | −15.2% | −34.3% |
| Masterman | +51.4% | −16.7% | +8.3% | −8.3% | −10.4% |
| Carver | −11.6% | +26.0% | +75% | −5.9% | −25.5% |

ECF No. 91 ¶¶ 107, 108; ECF No. 99 ¶¶ 106, 107, 108;[7] ECF No. 94 at 15–19.  According to

Plaintiffs, this data shows that "the change to a lottery-with-zip-code preference[] led to a dramatic

---

[7] As Defendants note in their Response to Plaintiffs' Statement of Facts, these tables only depict admissions offers made to applicants who were applying from a school within the School District. ECF No. 99 ¶¶ 106, 107, 108.  They do not include applicants from private schools, or other schools outside of the School District.  ECF No. 99 ¶¶ 106, 107, 108.  This omission provides yet another reason why Plaintiffs have not established a genuine dispute of material fact on the discriminatory effect prong:  their data is incomplete.  Without a set of accurate data reflecting *all* admissions offers made to *all* eligible applicants, including applicants from outside of the School District, Plaintiffs cannot demonstrate a genuine dispute of material fact on the question of whether the changes to the admissions plan disproportionately impacted one racial group over another.

increase in [B]lack admissions at Palumbo, Central, and Carver (+84%, +49%, +26%) at the expense of whites (–72%, –34%, –26%) and Asians (–29%, –10%, –12%)[, and] led to a massive boost in Hispanic admissions at Central and Carver (+89%, +75%)." ECF No. 94 at 17–18. Therefore, Plaintiffs argue that this data creates a genuine dispute of material fact on the impact prong.

While the Court understands the persuasive appeal that this data might have on a superficial level, upon closer review, the Court finds that none of this data raises a genuine dispute of material fact on the impact prong. In so finding—and given that the parties do not point the Court to any factually analogous Third Circuit authority—the Court relies primarily on the analysis of the Fourth and First Circuits in two recent decisions with analogous facts, as summarized below.

In a recent Fourth Circuit case, *Coalition for TJ v. Fairfax County School Board*, Plaintiff—an advocacy organization of Fairfax County public school parents—challenged an admissions policy adopted by Virginia's Fairfax County School Board for use at a highly selective magnet school, Thomas Jefferson High School for Science & Technology ("TJ"), as intentionally racially discriminatory against Asian American students. *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, No. 1:21CV296, 2022 WL 579809, at *1 (E.D. Va. Feb. 25, 2022), *rev'd and remanded*, 68 F.4th 864 (4th Cir. 2023), *cert. denied*, 218 L. Ed. 2d 71 (Feb. 20, 2024). In finding that the admissions policy had a racially discriminatory impact on the admitted schoolchildren, the district court primarily relied upon data showing that "the number and proportion of Asian-American students offered admission to TJ fell following the challenged changes." *Coal. for TJ*, 68 F.4th at 880 (citing *Coal. for TJ*, 2022 WL 579809, at *6).

The Fourth Circuit found that the district court "went fatally awry" in relying solely upon "a simple [] comparison" of the number of Asian American students admitted before and after the

implementation of the challenged admissions policy.  *Id.*  In particular, the Fourth Circuit critiqued a core premise underlying the district court's analysis:  that the results of the former policy must be viewed as a "status quo" that cannot be changed.  *Id.* at 880–81.  In the words of the Fourth Circuit, "it would make little sense [] to use a prior government policy as the 'proper baseline' for scrutinizing a replacement version of the same.  That approach would simply turn 'the previous status quo into an immutable quota,' thereby opening a new policy that might impact a public institution's racial demographics – even if by wholly neutral means – to a constitutional attack." *Id.*  Put differently, the Fourth Circuit found that there was no reason to assume that the results of the prior government policy were the gold standard—and no reason to find that simply because the status quo changed with the implementation of the new policy, the new policy was racially discriminatory.  *See id.*

Instead, as the Fourth Circuit explained, the "proper metric" requires a comparison of the racial group's "success rate"—that is, "an evaluation of a given racial or ethnic group's share of the number of applications to TJ versus that group's share of the offers extended"—both before and after the admissions policy change.  *Id.*  In other words, the Fourth Circuit found that Plaintiff was "obliged to show that, under the challenged admissions policy, Asian American students face proportionally more difficulty in securing admission to TJ than do students from other racial or ethnic groups."[8]  *Id.*  Ultimately, the Fourth Circuit reversed the judgment of the district court,

_____

[8] For example, if White students had a 50% success rate under the former policy but a 10% success rate under the challenged policy, whereas Black students had a 20% success rate under the former policy but a 50% success rate under the challenged policy, the new policy may be understood to have a racially disproportionate impact on White students.

which had granted summary judgment to Plaintiff, and remanded for entry of summary judgment in favor of Defendants, the School Board.[9]

The First Circuit employed similar reasoning in *Boston Parent Coalition for Academic Excellence Corporation v. School Committee for City of Boston*, 89 F.4th 46 (1st Cir. 2023).  There, a nonprofit organization acting on behalf of parents and students challenged a temporary admissions plan for three selective Boston public schools on equal protection grounds as racially discriminatory.  *Id.* at 51, 53.  To prove that the challenged admissions plan had a racially disparate impact on its members, the plaintiff argued that "White and Asian students made up a smaller percentage of the students invited to join the Exam Schools under the [challenged admissions plan]

---

[9] It is worth noting that the Court's analysis departs from the district court's analysis in *Coalition for TJ* in one critical aspect.  There, the district court based its determination that the challenged admissions policy had a disparate impact on Asian Americans by focusing solely on "a simple before-and-after comparison" of one racial group:  Asian-American students.  *See Coal. for TJ*, 2022 WL 579809 at *6; *Coal. for TJ*, 68 F.4th at 880.  As the Fourth Circuit found, such an analysis "will not answer the question of whether a challenged policy 'bears more heavily *on one race than another*,'" which is the keystone inquiry behind finding racially disproportionate, or discriminatory, impact.  *Coal. for TJ*, 68 F.4th at 880 (citing *Arlington Heights*, 429 U.S. at 266) (emphasis in original).

By contrast, here, Plaintiffs do not solely focus one racial group; rather, as stated above, they argue that the challenged policy caused a "dramatic increase" in Black and Hispanic student admissions at the expense of White and Asian students.  ECF No. 94 at 17–18.  The Court, therefore, focuses its analysis on whether Plaintiffs' data in fact raises a genuine dispute over whether the challenged admissions policy disproportionately impacts White and Asian students when compared with Black and Hispanic students.  The Court parses out that analysis above, but leaves this footnote to explain that the Fourth Circuit's point—that a "before-and-after" comparison would effectively require the Court to treat any departure from prior admissions outcomes as constitutionally condemnable, therefore transforming the prior outcome into an "immutable quota," *Coalition for TJ*, 68 F.4th at 880–81—applies equally to Plaintiffs' analysis.  As described above, by relying upon Plaintiffs' before-and-after comparison, the Court would effectively need to hold that any change to the outputs, or the results, of the challenged admissions policy was constitutionally impermissible.  This, however, does not make sense:  not only is there no reason to assume that the results of the former admissions policy must remain the same year-over-year, but Plaintiffs also cannot disregard the possible changes to the number of *applicants* by focusing solely on the changes to the number of *admissions*.

than in the years before the [challenged admissions plan] was implemented." *Id.* at 57.  Put simply, the plaintiff—much like the plaintiff in *Coalition for TJ* and Plaintiffs here—argued that because the raw percentage of admitted White and Asian students decreased after the implementation of the challenged plan, the challenged plan caused the disparate impact.

In analyzing this argument, the First Circuit identified the same problematic premise of Plaintiffs' argument that the Fourth Circuit identified in *Coalition for TJ*:  that by comparing the number of admitted White and Asian students before the admissions plan with the number of those admitted students after the admissions plan, Plaintiffs were treating the previous status quo to be "an immutable quota," such that any challenged admissions plan could not change the number of White and Asian students, even if it was race neutral.  *See id.* at 58 (citing *Coal. for TJ*, 68 F.4th at 881).

Applying the reasoning of the Fourth and First Circuits in the cases above, as well as the rules set forth by the Third Circuit in *Lower Merion* and the Supreme Court in *Arlington Heights*, this Court finds that Plaintiffs' simplistic "before-and-after" approach fails to raise a genuine dispute of material fact on the discriminatory effect prong.  As an initial matter, because Plaintiffs rely upon a comparison between the number of offers rendered per racial group following the 2021 Admissions Process to the number of offers rendered per racial group following the 2022 Admissions Process, adopting Plaintiffs' logic would require the Court to find that the results of the 2021 Admissions Process must serve as "an immutable quota."  *See Coal. for TJ*, 68 F.4th at 881.  There is no reason to assume or find that the results of the 2021 Admissions Process—*i.e.*, the number of admissions offers extended per racial group—must remain impervious to change.

Additionally, Plaintiffs' data relies solely on a comparison between the *results* of the 2021 Admissions Process and the 2022 Admissions Process—that is, the number of students who

received admission in each racial group.  But Plaintiffs do nothing to take into consideration the *inputs* of the 2021 Admissions Process and the 2022 Admissions Process—that is, the number of children who applied.  By focusing only on the *outputs* (the number of admissions offers rendered) without considering the *inputs* (the number of students who applied), Plaintiffs miss a critical part of the requisite analysis and simply cannot answer the relevant inquiry:  whether the challenged admissions policy resulted in admitting a disproportionate number of students in any racial group out of those who applied.  Indeed, without understanding the inputs, there is no way to understand whether one racial group was admitted at a higher rate than another racial group.  *See Arlington Heights*, 429 U.S. at 265–66 (holding that to show racially disproportionate impact, a plaintiff must prove that the challenged state action "bears more heavily on one race than another").  That is the relevant inquiry here, but is one that Plaintiffs cannot answer with the data they rely upon.

To further illustrate the point by way of example, Plaintiffs' approach could result in a situation where even though 183 eligible White students were admitted to Palumbo in the 2021–2022 school year but only 51 were admitted in the 2022–2023 school year, 100% of the White eligible students *who applied* were admitted to Palumbo in each school year.  In other words, with only the data relied upon by Plaintiffs to review, it is fully possible that 183 eligible White students applied to Palumbo in the 2021–2022 school year and all 183 were admitted—and in the next school year, 51 eligible White students applied and all 51 were admitted.[10]  And while 81 eligible

---

[10] There are a number of variables that affect the number of students who apply, as well as the demographics of the applicant pool, from year to year.  ECF No. 95-1 ¶ 31(b).  For example, student and parent choice play a major role in where students apply.  *Id.* ¶ 34.  Additionally, there are variations in the number of students who meet the requirements to apply in the first place.  *Id.* ¶ 31(b).  From the 2021 Admissions Process, there was a dramatic increase in the numbers of students who applied to these schools and were qualified, and there were, in some cases, dramatic changes in the demographics of the applicant pools at these four schools.  *Id.*

Black students were admitted to Palumbo in the 2021–2022 school year, but 149 were admitted in the 2022–2023 school year, it is fully possible that many more—say, double—applied.  This would mean that the success rate of eligible White students was 100% (*i.e.*, 100% of eligible White students who applied were admitted), but the success rate of eligible Black students was 50% (*i.e.*, only 50% of eligible Black students were admitted).   Plaintiffs' argument is that the 2022 Admissions Process gave "preferential treatment" to Black and Hispanic students—that is, that Black and Hispanic students were admitted at a higher rate than other students, *see* ECF No. 31 at 1–2—but the data that Plaintiffs rely upon wholly fails to demonstrate that.[11]

Put another way, and most simply, Plaintiffs' claims all stem from their allegations that Defendants gave "preferential treatment" to "Black and Latino students" in order to "rebalance the racial makeup of the student body" of Palumbo, Carver, Central, and Masterman.  *Id.* at 3.  That requires an analysis of the admissions rate (or, as the Fourth Circuit calls it, the "success rate," *see*

---

[11] In her declaration, Dr. Wolford conducts the "correct" analysis as described by the Fourth Circuit in *Coalition for TJ*:  a comparison between the success rates of each racial group.  *See* 68 F.4th at 881–82; ECF No. 95-1.  That analysis reveals that the success rates for each racial group are nearly equal; that is, when the percentage of eligible applicants per racial group is compared with the percentage of eligible applicants who are offered admission, the percentages across each racial group appear nearly identical.  *See* ECF No. 95-1 ¶ 37 (concluding that "[t]here is very little difference between the racial breakdown of students who are eligible for admission and offered admission"), tbl.E.  For example, in the 2022 Admissions Process, in Central, 22% of the eligible applicants were Black students—and 22% of the applicants who were offered admission were Black students.  *See id.* at tbl.E.  Similarly, 26% of the eligible students were White students, and 26% of the applicants who were offered admission were White students.  *See id.* at tbl.E.

It is worth noting that the Court need not rely on the analysis in Dr. Wolford's declaration to grant summary judgment to Defendants.  Without it, there is no evidence affirmatively showing discriminatory impact, and that is all that is needed on the summary judgment standard.  With it, the evidence simply bolsters the Court's conclusion by showing that, affirmatively, the 2022 Admissions Process did not have a discriminatory impact.

*Coal. for TJ*, 68 F.4th at 881) of eligible Black and Latino students with the admissions rate of other racial groups, like eligible White students.  Plaintiffs provide no such analysis.

Third, even putting aside the data that Plaintiffs rely upon, there is also no other evidence that the changes to the admissions plan caused "similarly situated individuals of a different race [to be] treated differently."  *Lower Merion*, 665 F.3d at 550.  All qualified students that reside within the six zip codes were treated the same regardless of race:  they all were automatically admitted to any criteria-based school that they applied to.  ECF No. 86-2 ¶ 25; ECF No. 93 ¶ 25. All qualified students who reside outside of the six zip codes were also treated equally:  they all had an equal opportunity, through the computerized lottery, to receive admission to each criteria-based school where they applied.  ECF No. 86-2 ¶ 24; *see Lower Merion*, 665 F.3d at 550 (finding that appellants failed to meet their burden to show discriminatory impact where all of the students within the "Affected Area" are assigned to attend one school and all students in North Ardmore are assigned to a different school, regardless of race).  Plaintiffs do not contend otherwise.  ECF No. 93 ¶ 24.  The only differentiating factor was on the basis of geography, not race—and the Court cannot find a genuine dispute of material fact on the question of *racially* discriminatory impact based on that.  *See Lower Merion*, 665 F.3d at 551 (finding no discriminatory impact where "there is no possibility that any of the Students Doe will be denied a school assignment because of his or her race" because the school redistricting plan at issue "imposes no racial barrier and assigns students on an equal basis—geography").

### 2.    There is no genuine dispute of material fact on the discriminatory "purpose" prong.

To establish a genuine dispute of material fact on the discriminatory "purpose" prong, Plaintiffs must adduce evidence showing that "the decisionmaker [] selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' the action's

beneficial or adverse effects 'upon an identifiable group.'" *See Lower Merion*, 665 F.3d at 551

(citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)); *see also Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005) ("[Plaintiffs] can also demonstrate intent by proving that

the state took a particular course of action 'because of' its desire to benefit a particular racial

group." (citations omitted)).   "Racially discriminatory purpose means that the decisionmaker

adopted the challenged action at least partially because the action would benefit or burden an

identifiable group." *Lower Merion*, 665 F.3d at 552.   "[T]he mere awareness or consideration of

race should not be mistaken for racially discriminatory intent or for proof of an equal protection

violation." *See id.* at 548 (citation omitted).

 "In *Arlington Heights*, the Supreme Court outlined how courts should determine whether

a discriminatory purpose was a motivating factor." *Id.* at 552 (citing 429 U.S. at 266–68). "The

determination requires a 'sensitive inquiry' into the available 'circumstantial and direct evidence

of intent,' including: (1) whether the official action has a racially disproportionate impact; (2) the

historical background of the decision; and (3) the legislative or administrative history of the

decision." *Id.* (citing 429 U.S. at 266–68).

 Here, Plaintiffs argue that the following pieces of evidence demonstrate a genuine dispute

of material fact on the discriminatory purpose prong:  (1) deposition testimony from Dr. Hite, Ms.

Lynch, and Dr. Jubilee, (2) an "Anti-Racism Declaration" issued by the School District following

the death of George Floyd, and (3) testimony given by Ms. Lynch and Dr. Jubilee at a hearing held

by the City Council of Philadelphia, Committee on Education on December 15, 2021.  ECF No.

94 at 7–15, 19–22 (citing ECF No. 91-2 (Hite Dep.); ECF No. 91-1 (Lynch Dep.); ECF No. 91-3

(Jubilee Dep.); ECF No. 91-4 (Anti-Racism Declaration); ECF No. 32-6 (Lynch and Jubilee

testimony at Dec. 15, 2021 hearing)).[12]   After reviewing each of these pieces of evidence, as addressed seriatim below, the Court finds that the evidence uniformly demonstrates that the changes to the admissions process were not motivated by a racially discriminatory purpose.

First, none of the deposition testimony that Plaintiffs cite reveals a racially discriminatory purpose.  For example, Plaintiffs rely on Dr. Hite's testimony that the School District "would have eradicated any policy that advantaged [or attempted to advantage] one demographic group over another demographic group."  *See* ECF No. 94 at 19 (citing ECF No. 91-2 (Hite Dep.) at 57:18–25, 58:1–3).  This testimony does not evince racially discriminatory intent—it demonstrates the opposite.  Dr. Hite appears to be expressing his preference for race-neutral policies, and distaste for policies that are not.  Indeed, Dr. Hite's testimony should assuage Plaintiffs' concerns; it indicates that the School District would *not* have adopted a policy that advantaged Black and Hispanic students over White students, as Plaintiffs fear.  In any case, even if Dr. Hite's testimony

---

[12] Although Plaintiffs include the racial composition of the six zip codes that receive preference in the "Factual Background" section of their brief, they do not appear to argue that this racial composition is evidence of a racially discriminatory purpose.  *See* ECF No. 94 at 7–15, 19–22.  To the extent that they do, the Court finds that this evidence likewise does not establish a genuine dispute of material fact on the purpose prong.  As an initial matter, this evidence is based upon the 2020 census data, and is not specific to schoolchildren, let alone eligible applicants who could apply to the criteria-based schools at issue.  ECF No. 32-16 ¶ 4 (citing census data tables); *see also* ECF No. 95 at 5–6.  Instead, it depicts the racial composition of all who live in those zip codes.  ECF No. 32-16 ¶ 4 (citing census data tables); *see also* ECF No. 95 at 5–6.  In any case, the deposition testimony before the Court uniformly reflects that Defendants did not review, and were not aware of, the racial composition of the six zip codes.  *See* ECF No. 86-7 (Jubilee Dep.) at 181:23 (she was "not aware of race being a reason" to select those zip codes), 188:3–7 (testifying that the reason the five zip codes were selected to be given preference was not due to the racial makeup of those zip codes); ECF No. 86-9 (Lynch Dep.) at 98:24–99 (stating that the racial demographics of the zip codes given preference were not reviewed prior to implementing the zip code preference).  Therefore, even if Plaintiffs were to rely on this evidence, it does not provide evidence of a racially discriminatory purpose.

does evince a racially discriminatory motive, nothing Plaintiffs cite connects this testimony to the changes in the admissions process that are at issue in this case.

Plaintiffs also rely upon Ms. Lynch's testimony that Defendants added in the zip-code preference following an "equity lens" review—a process in which the School District's policies and procedures were reviewed for bias, including the admissions process.  *Id.* at 20 (citing ECF No. 91-1 (Lynch Dep.) at 95:23–25).  In other words, Plaintiffs appear to argue that Ms. Lynch's testimony indicates that the zip-code preference must have been racially motivated given that it was implemented after the School District conducted its "equity lens" review.  *See id.* at 5.

Even construing all inferences in Plaintiffs' favor, no reasonable jury would find that simply because the School District conducted an "equity lens" review and implemented a zip code preference thereafter, the zip code preference must have been implemented *because* it would benefit any specific racial group.  In fact, the record compels the opposite conclusion:  that the zip code preference was not implemented to change the racial demographics of the criteria-based schools.  *See, e.g.*, ECF No. 86-7 (Jubilee Dep.) at 188:3–7; ECF No. 86-8 (Hite Dep.) at 136:23–137:1; ECF No. 86-9 (Lynch Dep.) at 181:20–181:23.  Indeed, Defendants did not even know the racial demographics of the zip codes given preference.  *See* ECF No. 86-9 (Lynch Dep.) at 98:24–99:2 ("Q:  Before determining which [z]ip codes would be given preference within the school lottery, were the racial demographics of those [z]ip codes reviewed?  A:  Not to my knowledge, no, and not by me."), 181:13–23 (testifying that zip codes were identified by "the participation rate of qualified students across [z]ip codes and then [by] look[ing] at those that had the least amount of qualified students participating in the school selection process . . . ."); ECF No. 95-1 (Wolford Decl.) ¶ 14 (stating that Dr. Wolford was "personally involved in identifying [the] zip codes [to be given preference], and [she] did not consider . . . the racial demographics of the zip codes or of

eligible students in the zip codes, or any factor other than the number of students enrolled at these four schools in prior years").

Additionally, Plaintiffs rely on select testimony from Dr. Jubilee, the School District's Chief of Equity and the head of the School District's Office of Diversity, Equity, and Inclusion, but none of this testimony evinces a racially discriminatory motive. *See, e.g.*, ECF No. 94 at 10. For instance, Plaintiffs cite Dr. Jubilee's testimony indicating that she was "aware of the racial disproportionalities at Carver, Parkway, Masterman, Central, and Palumbo." *Id.* at 20–21 (citing ECF No. 91-3 (Jubilee Dep.) at 32:22–36:15). But as with the cited testimony from Dr. Hite and Ms. Lynch, none of Dr. Jubilee's testimony links Defendants' awareness of the racial demographics of the criteria-based high schools to the changes made to the admissions process to those schools, including the zip code preference. Put differently, there is no evidence that the changes to the admissions process were adopted *because of* an intent to change the racial demographics of criteria-based schools. *See Coal. for TJ*, 68 F.4th at 883 (finding no evidence of racially discriminatory intent given that "the record is devoid of any statements by Board members, meeting minutes, or other documentation showing that the policy was adopted 'because of' a specific intent to reduce the number of Asian American students at TJ or to otherwise bring hardship to bear on those students." (citing *Feeney*, 442 U.S. at 279)).

In sum, the deposition testimony cited by Plaintiffs is devoid of any evidence of a racially discriminatory purpose. If anything, the record appears to present a resounding chorus of testimony that the changes to the admissions process, including the zip code preference, were not intended to change the racial demographics of any criteria-based school. *See, e.g.*, ECF No. 86-8 (Hite Dep.) 135:21–136:1 ("Q: . . . were the changes to the admissions process intended to increase or decrease the number of students of any race in any of the criteria-based schools?  A:  No.");

ECF No. 86-7 (Jubilee Dep.) at 181:20–23 (testifying that she was "not aware of race being a reason" to select the zip codes given preference).  Indeed, the record makes clear that the zip codes selected to receive preference were not on the basis of race—instead, they were selected because they had the lowest percentage of students enrolled at Masterman, Central, Carver, and Palumbo between 2017 and 2021.  ECF No. 86-9 (Lynch Dep.) at 98:24–99:2; ECF No. 95-1 (Wolford Decl.) ¶ 14.

Second, nothing in the Anti-Racism Declaration—even when read in the light most favorable to Plaintiffs, and even when resolving all reasonable inferences in Plaintiffs' favor—could allow a fair-minded jury to find that Defendants implemented the changes to the 2022 Admissions Process for a racially discriminatory purpose.  True, the Declaration mentions racism, highlights the importance of racial equity, and emphasizes the School District's commitment to anti-racist practices.  *See* ECF No. 91-4.  For example, the Declaration states that some of the School District's students "are forced to witness and endure acts of hatred because of the color of their skin"; that the School District is committed to "eradicating practices that create systems of privilege and power of one racial group over another"; and that the School District was "assessing all policies and practices for inequitable types of outcomes."  *Id.*  But even assuming that these statements evince a racially discriminatory purpose, nothing in the Declaration, nor any of the deposition testimony cited by Plaintiffs about the Declaration, ties the changes to the 2022 Admissions Process to race.  Indeed, the Declaration itself does not even mention the 2022 Admissions Process.  *See id.*

Third, the testimony that Ms. Lynch and Dr. Jubilee gave at the Committee on Education hearing on December 15, 2021, does not evince any racially discriminatory motive.  Plaintiffs specifically point to (1) Ms. Lynch's testimony that the School District responded to the death of

George Floyd by examining all of its processes and policies, including the 2021 Admissions Process, to "ensure equity," ECF No. 94 at 19–20 (citing ECF No. 32-6 at 93); and (2) Dr. Jubilee's testimony that "[t]hrough the school selection process, [the School District has] the opportunity to redesign a process that from inception to current practice has only truly benefited a small group of stakeholders, many of whom do not reflect the majority demographic of our School District or City," *id.* at 22 (citing ECF No. 32-6 at 84–85). But none of this testimony indicates that Defendants acted with a racially discriminatory motive; instead, it reveals a desire to correct racial biases that manifested in the previous school selection process. As the Court remarked in its memorandum opinion denying Plaintiffs' Motion for a Preliminary Injunction:

> Consideration of whether prior practices allowed for racial bias to exist in the admissions process and a desire to safeguard against the potential for race-based-discrimination by moving to an objective system for selecting which students are admitted to the schools they are qualified to attend does not constitute a racially *discriminatory* motive. It constitutes the opposite.

ECF No. 50 at 15 (emphasis in original) (citation omitted).

As a final note, despite Plaintiffs' reliance upon the language of "Indicator 4.1" in the "Goals and Guardrails" document to show evidence of a discriminatory purpose at the preliminary injunction stage, it does not appear that Plaintiffs rely upon that language here. *See* ECF No. 94 at 4–15, 19–22. To the extent that they do, the Court relies upon the same reasoning that it did in its Memorandum denying Plaintiffs' Motion for a Preliminary Injunction and finds that the language in this document does not evince a racially discriminatory purpose. *See* ECF No. 50 at 12–14. More specifically, the Court finds that the language of Indicator 4.1 does not suggest any intention to impose racial quotas in the admissions process. Rather, both the plain language of Indicator 4.1 and the surrounding content suggest that Indicator 4.1 merely sets a goal for the number of Black and Hispanic students who will meet the qualifications—such as the grade cut-offs—to attend criteria-based high schools by 2026. It does not suggest that those students

necessarily will attend, or impose a quota on the number of Black and Hispanic qualified students that must attend.  Put simply, all Indicator 4.1 reflects is a legitimate policy goal of improving academic outcomes for Black and Hispanic students.  And that is not a racially discriminatory motive.

**B.**   **The changes to the admissions process pass rational basis review.[13]**

"Under rational basis review, the challenged classification must be upheld if it is 'rationally related to a legitimate state interest.'"  *Lower Merion*, 665 F.3d at 556 (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam)).  The challenged conduct "is rationally related to a legitimate interest 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  *Id.* (citation omitted).  Rational basis review is a "highly deferential" standard.  *Id.*

Applying this "highly deferential" standard here, the Court finds that the changes to the admissions plan pass rational basis review.  The City of Philadelphia's interest—to ensure that all qualified students, regardless of what neighborhood they live in, have access to Philadelphia's criteria-based schools—is legitimate.   Indeed, Defendants indicate that the changes to the admissions process were made to address the following four issues with the prior admissions process, as identified by the Pew Study:

> (1) Prior to the 2022 Admissions Process, the criteria-based schools were admitting some students who *did not* meet the admissions criteria, like legacy students whose parents were

---

[13] Plaintiffs do not appear to dispute that, were the Court to apply rational basis review, summary judgment would be granted.  *See* ECF No. 94 (Pls. Opp.) at 17 n.7 (acknowledging that Plaintiffs "must show that there is a "genuine dispute" on both the purpose and effect prongs to survive the defendants' summary-judgment motion").  Regardless, to complete the necessary constitutional analysis, the Court will provide a brief analysis as to why the 2022 Admissions Process passes rational basis review.

alumni of a particular school, but not admitting other students who *did* meet the criteria, see ECF No. 86-1 ¶ 9(a);

(2) Prior to the 2022 Admissions Process, qualified students in certain schools in certain parts of Philadelphia were less likely to apply to apply to criteria-based schools, see *id.* ¶ 9(b);

(3) Prior to the 2022 Admissions Process, if qualified students from those parts of Philadelphia did apply, they were less likely to be considered, see *id.* ¶ 9(c); and

(4) Prior to the 2022 Admissions Process, if those students were given offers, they were less likely to accept them when compared with their peers in other neighborhoods, see *id.* ¶ 9(d).

By addressing these four issues, Defendants hoped to "increase access [to criteria-based schools] so that all qualified students were considered for admission and to disrupt feeder patterns that left qualified students from some zip codes without access to schools to which they were qualified." ECF No. 86 at 26; *see also* ECF No. 86-1 ¶¶ 10–17; ECF No. 95-1 (Wolford Decl.) ¶¶ 35–36 (indicating that by implementing the changes to the admissions process, the School District hoped to "remove the concern . . . of the inequitable practice of admitting students who were not eligible, and just as important, failing to admit students who were eligible"). That is a legitimate goal.

Additionally, the changes that Defendants implemented are rationally related to the City's legitimate interest of ensuring that all qualified students have access to criteria-based schools. Previously, the admissions process afforded individual school admissions teams the discretion to handpick students. *See* ECF No. 86-1 ¶ 17. Under that system, unqualified students gained admission at the expense of qualified students. By replacing those student admissions teams with a computerized lottery that only selects qualified students for admission, the School District eliminated the possibility that unqualified students could gain admission at all. Through this change, the School District addressed the first and third issues identified by the Pew Study. *See* ECF No. 86-3 (Lynch Dep.) at 84:15–18 (explaining that the School District implemented the

changes in the school selection process in order to move towards "the elimination of subjectivity and increasing objectivity").

Additionally, by implementing the zip code preference, the School District addressed the second and fourth issues identified by the Pew Study. The zip code preference ensures that all qualified students from the six underrepresented zip codes who applied to criteria-based schools would automatically receive admission, thereby incentivizing students from those neighborhoods to apply. And it is not a far logical leap to assume that if more students from those neighborhoods applied and received admission, more students were likely to accept—for perhaps many reasons,[14] but at the very least, for the simple reason that more students from those neighborhoods were admitted in the first place.

In short, increasing access for all qualified children to some of the City's best schools— regardless of where they live—is a legitimate state interest, and the changes to the admissions plan are rationally related to that interest.[15] Therefore, the changes to the admissions process have a rational basis and do not violate the Equal Protection Clause.

---

[14] School District witnesses noted that factors outside of the School District's control influence student enrollment decisions—such as, for example, student and parent choice. *See* ECF No. 86-1 ¶ 23. It is conceivable that if more students from a neighborhood are admitted to a school, more students will attend, simply because there are other students from the same community who are going to that school. *See FCC v. Beach Commc'ns Inc.*, 508 U.S. 307, 313 (1993) (explaining that a classification subject to rational basis review "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" (citations omitted)).

[15] It is worth noting that the 2022 Admissions Process appeared to actually achieve this goal: as Dr. Wolford indicates in her declaration, following the 2022 Admissions Process, the difference between the percentage of eligible applicants and the percentage of eligible applicants who were offered enrollment narrowed. ECF No. 95-1 ¶ 40 ("The data in Table E shows that there is no support for the argument that zip code preference or that the lottery led to increased changes between the percentage of eligible applicants and the percentage of eligible applicants who were

IV.     <u>**CONCLUSION**</u>

For the reasons stated above, the Court grants Defendants' Motion for Summary Judgment

(ECF No. 86).  An appropriate Order will follow.


                                        **BY THE COURT:**

                                        **/s/ Chad F. Kenney**
                                        _____
                                        **CHAD F. KENNEY, JUDGE**

--------

offered enrollment. Instead, the data supports the opposite conclusion – that variations narrowed
once the lottery and zip code preference were introduced.").